# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| REDBOX AUTOMATED RETAIL, LLC ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> UNIVERSAL STUDIOS HOME ) <br> ENTERTAINMENT, LLC; UNIVERSAL ) <br> CITY STUDIOS, LLLP; UNIVERSAL CITY ) <br> STUDIOS PRODUCTIONS, LLLP, and ) <br> FOCUS FEATURES, LLC ) <br> ) <br> Defendants. ) | Civil Action No. _____ <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Redbox Automated Retail, LLC ("Redbox" or "Plaintiff"), by and through its attorneys, alleges the following:

## OVERVIEW

1. Redbox rents and sells digital video disks ("DVDs") to consumers through innovative, consumer-friendly means: automated, self-service kiosks located in various retail outlets. Consumer demand for Redbox has exploded since the company's inception in 2002, primarily due to Redbox's efficient means of providing consumers with low-cost, easily accessible new motion picture releases on the day those DVDs become available to the general public.

2. Under the guise of a "Revenue Sharing Agreement" (attached as Ex. A), Defendants seek to eliminate the low-cost rental alternative for consumers. Specifically, Defendants want to: prohibit Redbox from renting or selling Universal DVDs until after 45 days from when they otherwise become available to the public; limit the number of copies of Universal DVDs that Redbox kiosks can stock; and require that Redbox ultimately destroy all of

its copies of Universal DVDs so that previously-viewed DVDs cannot be sold at a low price to consumers. To drive home its "take it or leave it" proposition, Defendants will terminate Redbox's two distributors (VPD and Ingram) if they continue supplying Redbox with Universal DVDs or providing other services to Redbox – unless Redbox forsakes its customers and participates in Defendants' attempts to decrease the supply of copyrighted DVDs, reduce consumer choice in the marketplace, and increase prices that consumers pay during tough economic times.

3. Defendants' actions violate antitrust laws and constitute copyright misuse. Further, their conduct will tortiously interfere with the existing supply contracts that Redbox has with VPD and Ingram.

4. Redbox thus seeks the following relief against and from the Defendants: (1) injunctive relief; (2) declaratory relief (3) money damages; (4) attorneys' fees and costs; and (5) such further relief as this Court deems just and appropriate. In particular, Redbox seeks a declaration that the Defendants' conduct renders "Universal Studios" copyrights unenforceable on motion pictures distributed during the time frame that the Defendants continue to engage in their inequitable and illegal conduct.

**PARTIES, OTHER ENTITIES, JURISDICTION AND VENUE**

5. Plaintiff Redbox is a Delaware limited liability company with its principal place of business in Oakbrook Terrace, Illinois.

6. Defendant Universal Studios Home Entertainment, LLC ("USHE") is a Delaware limited liability company with its principal place of business in Universal City, California. USHE markets and sells DVDs that are copies (as that term is defined in Section 101 of the Copyright Act) of motion pictures and other audiovisual works, such as television programs. USHE is indirectly owned by NBC Universal, Inc.

7. Defendant Universal City Studios Productions LLLP ("Universal City Studios Productions") is a limited liability limited partnership organized under the laws of the State of Delaware with its principal place of business located in Universal City, California. Universal City Studios Productions is one of the world's leading creators and distributors of motion pictures. Universal City Studios Productions, directly or through its affiliates, is engaged in the business of developing, producing, and distributing to others the right to distribute and exhibit copyrighted motion pictures in the United States and throughout the world. Universal City Studios Productions is wholly and indirectly owned by NBC Universal, Inc. Universal City Studios Productions also does business as "Universal Studios."

8. Defendant Universal City Studios LLLP ("Universal City Studios") is a limited liability limited partnership organized under the laws of the State of Delaware with its principal place of business located in Universal City, California. Universal City Studios, directly or through its affiliates, is engaged in the business of developing, producing, and distributing to others the right to distribute and exhibit copyrighted motion pictures in the United States and throughout the world. Universal City Studios is wholly and indirectly owned by NBC Universal, Inc. Universal City Studios also does business as, and owns the federally registered service mark "Universal Studios."

9. Defendant Focus Features, LLC ("Focus Features") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located in Universal City, California. Focus Features, directly or through its affiliates, is engaged in the business of developing, producing, and distributing to others the right to distribute and exhibit copyrighted motion pictures in the United States and throughout the world. Focus Features is indirectly owned by NBC Universal, Inc.

10. USHE is an affiliate of Universal City Studios Productions. Through USHE, Universal City Studios Productions distributes its motion pictures and/or television programs on DVD for the home viewing market.

11. USHE is an affiliate of Universal City Studios. Through USHE, Universal City Studios distributes its motion pictures and/or television programs on DVD for the home viewing market.

12. USHE is an affiliate of Focus Features. Through USHE, Focus Features distributes its motion pictures and/or television programs on DVD for the home viewing market.

13. Universal City Studios Productions, Universal City Studios and Focus Features are collectively referred to in this Complaint as "Universal Studios." The DVDs distributed by USHE for Universal Studios are referred to as the "Universal DVDs."

14. On information and belief, Ingram Entertainment, Inc. ("Ingram") is a Tennessee corporation with its principal place of business in La Vergne, Tennessee. Ingram is a wholesale distributor of DVDs.

15. On information and belief, Video Product Distributors ("VPD") is a California corporation with its principal place of business in Folsom, California. VPD is a wholesale distributor of DVDs.

16. This Court has subject matter jurisdiction over Counts I, II and III of this action pursuant to 28 U.S.C. § 1331, 17 U.S.C. §§ 101, *et seq*. (Copyright Act) and 15 U.S.C. §§ 1, *et seq*. (Sherman Antitrust Act), and 28 U.S.C. §§ 1337, 1338. This Court has supplemental subject matter jurisdiction over Count IV pursuant to 28 § U.S.C. 1367.

17. Pursuant to 28 U.S.C. §§ 2201-02, this Court may declare the rights and other legal relations of the parties because there exists an actual controversy.

18.     This Court has personal jurisdiction over USHE, Universal City Studios Production, Universal City Studios and Focus Features because each of them does business and resides in the State of Delaware.

19.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because each Defendant is organized under the laws of the State of Delaware and thus resides in this State.

## FACTUAL ALLEGATIONS

### A.     Background:  Redbox's Consumer-Friendly Business Model and Relationships With USHE, VPD and Ingram

20.      Since the introduction of DVDs into the marketplace, DVD has become the dominant medium for the distribution of movies for home viewing.

21.     Redbox was founded in July 2002, when the company deployed DVD rental kiosks in a "test market" in Washington, D.C.  After initial success in that market, Redbox chose Las Vegas, Nevada, as a second "test market" in 2003.  These test markets established that consumers would enthusiastically turn to this convenient, low-cost source for new release DVD rentals and sales, and the company expanded.

22.     Redbox is an innovator.  It has developed a highly-convenient, yet low-cost option for consumers wishing to obtain DVDs.  Redbox provides to consumers DVDs through a network of over 10,000 self-service kiosks at locations nationwide.  Each kiosk features an interactive touch screen and sign, a robotic disk array system and a web-linked electronic communications system that allows customers to rent and/or buy DVDs.  Kiosks typically hold up to 700 DVDs comprising 70-200 individual titles.  The kiosks are updated weekly with a supply of new release DVDs.  A single kiosk may hold up to as many as forty-five (45) copies of a popular release.  Consumers use credit cards to rent or purchase DVDs, and can also search for and reserve DVDs online through Redbox's website.  Consumers enjoy the ability to rent DVDs

at one location and return them at any other Redbox location, thanks to Redbox's patented rent and return system. For instance, a family can rent the latest Disney movie at a McDonald's restaurant on Friday night, and return it to their neighborhood Albertson's supermarket when shopping the next day. In 2007, readers of "SelfServiceWorld" magazine ranked Redbox as the No. 1 self-service application, besting other kiosks deployed by NCR, IBM, Kodak and Starbucks, among others.

23. Consumers love Redbox. Consumer demand for Redbox rentals and sales has grown substantially in the last four years. Redbox had 125 kiosks in 2004, had nearly 6500 by the end of 2007 and expects to exceed 12,000 kiosks by the end of 2008. Consumer demand has enabled Redbox to surpass Blockbuster, Inc. in the number of DVD rental locations in the United States. To date, consumers have rented more than 200 million DVDs from Redbox. Consumers average approximately 50 DVD rentals per day per kiosk. Indeed, consumer demand has supported Redbox's expansion such that Redbox has installed a new kiosk, on average, every 90 minutes somewhere in the United States this year to date. As part of this expansion, Redbox has hired over 600 new employees this year.

24. Consumers currently find Redbox kiosks located in retail outlets such as McDonald's restaurants, Walmart stores, grocery stores such as Albertson's, Stop & Shop, Harris Teeter, Meijer's and others, and drug stores such as Walgreen's, throughout the continental United States and Puerto Rico. Redbox typically has contracts (*i.e.*, "downstream contracts") with these retail outlets. Much of Redbox's success depends on maintaining a business model that satisfies the expectations of the retail outlets and consumers.

25. Consumers can rent DVDs from Redbox kiosks for $1 per night – a lower cost than alternative brick-and-mortar outlets or alternative sources for DVD rental. In comparison,

some 175 million DVDs were rented in the United States last month, at an average cost of approximately $3.25.

26. Consumers can also purchase previously-viewed DVDs from Redbox, beginning 12 days after their release, for only $7. In comparison, 50 million newly-released DVD movies were sold last month at an average price of approximately $18.50 from other sources.

27. Consumer preference for Redbox rentals can largely be attributed to its ability to conveniently provide consumers with low-cost rentals on the same day that a DVD is released by a studio and made available for home viewing. This date is known as the "street date." Over 60% of the rental demand for a particular title offered by Redbox occurs within 45 days of the street date.

28. Consumers further value Redbox's ability to stock multiple copies (as stated above, as many as 45 copies per kiosk in some instances) of popular, high-demand new releases.

29. Redbox can meet consumer demand for multiple copies of DVDs for rental on a title's street date because of its longstanding contractual and business relationships with its distributors, VPD and Ingram. Redbox purchases all or nearly all of its supply of Universal DVDs from VPD and Ingram. Redbox has enjoyed long term, mutually beneficial business relationships with VPD and Ingram. On information and belief, absent interference from USHE, those relationships would continue into the foreseeable future.

30. Redbox has a supply contract with Ingram (the "Ingram Supply Contract" (attached as Ex. B, redacted so as to protect sensitive commercial information)) that gives Redbox the right to purchase Universal DVDs from Ingram, and similarly obligates Ingram to sell to Redbox, upon Redbox's request, Universal DVDs marketed by USHE.

31.     Specifically, the Ingram Supply Contract requires Ingram to "order DVD software from the studios." The term "studios" has, throughout the relationship between Redbox and Ingram, always included Universal. Indeed, Ingram holds itself out as having the ability to provide retailers like Redbox access to all of the titles released by the major Hollywood studios, which includes Universal Studios.

32.     The Ingram Supply Contract also contains a "DVD Buy Back" clause that permits Redbox to sell and obligates Ingram to "repurchase from Redbox ('Buy Back') new release DVD product" pursuant to a timeframe tied to the title's street date. Under this arrangement, Ingram purchases back significant amounts of previously-viewed DVDs from Redbox, and in turn sells them to other buyers in the distribution stream.

33.     Redbox has a similar business relationship with VPD, although the agreement is not reflected in a single integrated document. However, the VPD contract has always permitted Redbox to buy Universal DVDs from VPD and receive these Universal DVDs in advance of their street date. VPD holds itself out as having the ability to provide retailers like Redbox access to all of the titles released by the major Hollywood studios, which includes Universal Studios. As with Ingram, Redbox is able to sell back significant amounts of previously-viewed DVDs to VPD, who in turn sells them to other buyers in the distribution stream.

34.     Approximately 15% of the DVDs that Redbox purchases from VPD and Ingram are DVDs marketed and sold by USHE.

35.     USHE does not sell DVDs directly to kiosk outlets like Redbox. Rather, USHE sells DVDs to distributors like VPD and Ingram who in turn re-sell to kiosk outlets like Redbox.

36.     On information and belief, VPD and Ingram have contracts with USHE. In these contracts, USHE has demanded and obtained the right to terminate those contracts at will if VPD and Ingram do not distribute Universal DVDs in accordance with USHE's wishes.

### B.     August 26, 2008 Meeting Between Redbox and USHE

37.     On Tuesday, August 26, 2008, USHE representatives visited Redbox's headquarters in Oakbrook Terrace, Illinois. Specifically, USHE Vice Presidents Jamie Guzzaldo and Dick Longwell, as well as a USHE in-house lawyer and an account representative, attended the meeting on behalf of USHE.

38.     Redbox personnel at this meeting included Chief Operating Officer Mitch Lowe, Vice President of Purchasing Scott Goldberg, and Senior Buyer Eric Litynski.

39.     During the meeting USHE presented the Revenue Sharing Agreement to Redbox and stated that Redbox had until the close of business the following day (*i.e.*, August 27, 2008) by which to sign the Revenue Sharing Agreement. Redbox had no prior notice as to the nature of this proposal, which would materially and adversely alter the conditions under which consumers are able to rent and buy DVDs from kiosk outlets.

40.     During the meeting USHE said that if Redbox refused to sign the Revenue Sharing Agreement and the distributors continued to supply Universal DVDs to Redbox, USHE would stop selling any Universal DVDs to VPD and Ingram.

41.     VPD and Ingram also perform other services for Redbox, including barcode labeling, packaging DVDs into Redbox jewel cases, sorting, shipping and storage of the original DVD cases and artwork prior to street date, as well as DVD repair. USHE has threatened to cut off sales to VPD and Ingram if they continue to provide these services without a signed Revenue Sharing Agreement from Redbox.

42.     USHE has been and is aware of Redbox's longstanding business and contractual relationships with Ingram and VPD.

43.     Unless Redbox signs the Revenue Sharing Agreement, USHE will compel Ingram and VPD to stop shipping Universal DVDs to Redbox effective December 1, 2008.  As a result, Redbox will not have access through its normal distribution channels to Universal DVDs, including those listed in Exhibit C, during the 2008-09 Holiday Season and beyond.  These DVDs include popular recent theatrical releases such as "*Mama Mia!*," "*Wanted*" and "*Burn After Reading*."

44.     If Redbox signs the Revenue Sharing Agreement, USHE will continue to sell Universal DVDs to VPD and Ingram.  However, if Redbox will not sign the Revenue Sharing Agreement, and not agree to thereby restrict consumer access to new-release Universal DVDs, USHE will not allow VPD and Ingram to resell any of those DVDs to Redbox.

C.     **The Terms of the Revenue Sharing Agreement Are Unlawful And Would Substantially Harm Consumers, As Well As Redbox**

45.     The Revenue Sharing Agreement is a naked restriction on output that directly reduces the supply of goods to consumers, and will increase the prices consumers must pay.

a.     The Revenue Sharing Agreement artificially constrains output by prohibiting Redbox from renting to consumers any DVD until "forty-five (45) days following [the] DVD sell-through street date established by USHE with respect to a Title;"

b.     The Revenue Sharing Agreement also limits the number of DVDs of a single copyrighted work that any particular kiosk may carry based upon a formula that correlates to the gross box office revenue of the movie.  Although Redbox would offer as many as forty-five copies of a popular DVD in one kiosk to meet consumer demand, the

- 10 -

maximum number of copies per kiosk authorized under the Revenue Sharing Agreement is eight.

    c.    The Revenue Sharing Agreement also seeks to require Redbox to "destroy 100% of the units removed from an active rental machine" and certify that it has done so. This directly reduces the supply of previously-rented disks available in the market place, artificially restricting supply and increasing prices.

46.    The provisions of the Revenue Sharing Agreement will substantially limit consumer access to copyrighted works and simultaneously damage Redbox's ability to meet consumer demand.

47.    Not only is Redbox's distribution system more efficient than other existing methods of providing DVDs to consumers ($1 per night vs. $3.25 for the average rental; $7 sale price for a 12-day old DVD vs. $18.50 for a new one), but it is also less expensive than other methods that USHE seeks to develop including internet download services (the typical price of a new full-length purchased on iTunes, for example is $14.99 and the so-called "rental" price for time-limited access to the downloaded copy is $3.99, USHE's affiliates have said) and Video-on-Demand (the average price of watching a video-on-demand movie is $4.00).

48.    The Revenue Sharing Agreement will have the effect of restricting output, eliminating competition in the rental and sales markets and raising prices to consumers.

49.    USHE's affiliates, the co-defendants Universal City Studios Productions and Universal City Studios, have said in other litigation: "Studios have worked hard to create distribution channels that: (a) provide consumers with choices about how they wish to access entertainment programming at different price points for different time periods and different purposes; and (b) allow us, as content owners, to earn revenues *depending* on how consumers

choose to access that programming." Defendants' true purpose in seeking to impose the Revenue Sharing Agreement is to eliminate choice; to eliminate the low-cost, highly convenient and fast-growing Redbox distribution model, which threatens to undercut the artificial structure that Defendants seeks to establish.

50. Copyright law serves the purpose of enriching the general public by providing access to creative works, and thus it is peculiarly important that the boundaries of copyright law be demarcated clearly. In particular, Congress expressly provided in the copyright statute that a copyright owner's exclusive right to distribute copies of a copyrighted work to the public is limited by the "first sale" doctrine. 17 U.S.C. § 109(a) provides that "[T]he owner of a particular copy . . . lawfully made under [Title 17 of the United States Code] . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . ."

51. As indicated in paragraph 44 above, if Redbox signs the Revenue Sharing Agreement, USHE will continue to sell Universal DVDs to VPD and Ingram. However, unless Redbox agrees to sign the Revenue Sharing Agreement, and to thereby restrict consumer access to new-release Universal DVDs, USHE will not allow VPD and Ingram to resell any of those DVDs to Redbox. But for USHE's scheme, under the first sale doctrine, VPD and Ingram ordinarily would have the right to sell or otherwise dispose of the DVDs that they purchase as they please. USHE's attempts to thwart the first sale doctrine of Section 109(a) of the Copyright Act violate the public policy embodied in the grant of copyright, and constitute copyright misuse.

52. Redbox seeks a declaration that by orchestrating a boycott of consumer outlets that refuse to sign the Revenue Sharing Agreement, USHE has engaged in copyright misuse, and as a result, USHE is not entitled to enforce the copyrights that would otherwise apply to the DVDs that USHE markets.

53.     As stated in paragraph 40 above, USHE has informed Redbox that USHE would stop selling Universal DVDs to Redbox's two main distributors, Ingram and VPD, if Redbox did not sign the Revenue Sharing Agreement.  Ingram and VPD have indicated that while they disapprove of USHE's attempt to restrict the availability of DVDs to consumers by forcing Redbox to agree to the terms of the Revenue Sharing Agreement, they would have no choice but to comply with the demand of a major studio.

54.     Redbox plans to purchase substantial and increasing quantities of Universal DVDs from VPD and Ingram now and into the foreseeable future.  VPD and Ingram will be in breach of their contracts with Redbox if they are unable to and/or do not ship Universal DVDs to Redbox on or after December 1, 2008.

55.     If VPD and/or Ingram no longer supply Redbox with Universal DVDs on or after December 1, 2008, Redbox will not be able to obtain sufficient quantities of Universal DVDs by their street date to adequately meet consumer demand.

56.     Further, consumers would be forced to pay higher prices for DVD rentals and sales through other, less efficient distribution channels.  Such results would directly harm both Redbox and consumers.

## COUNT I
## DECLARATORY RELIEF:  COPYRIGHT MISUSE

57.     Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 56, above, as if fully set forth herein.

58.     The public policy behind copyright law includes the enhancement of retail competition and the maximization of dissemination of copyrighted works.  Anti-competitive agreements that conflict with this public policy subvert the goals of copyright law and constitute

"copyright misuse." The existence of such anti-competitive agreements precludes the enforcement of the copyright during the period of copyright misuse.

59. USHE has threatened to no longer supply Defendants' copyrighted DVDs to Redbox's distributors, VPD and Ingram, unless Redbox signs the Revenue Sharing Agreement.

60. The Revenue Sharing Agreement would, *inter alia*, restrict the output of each copyrighted DVD, eliminate competition for sales of recently released DVDs, and require Redbox and its distributors to participate in a restraint of trade with USHE, all of which would stifle invention, creative expression and dissemination of copyrighted works. USHE's actions and the Revenue Sharing Agreement violate the public policy underlying copyright law and therefore constitute copyright misuse.

61. Redbox is entitled to a declaration that the restrictions in the Revenue Sharing Agreement constitute copyright misuse, and USHE should be precluded from enforcing Defendants' DVD copyrights.

62. Further, Redbox is entitled to a declaration that so long as USHE continues to engage in its inequitable conduct, Redbox may lawfully reproduce and sell copies of copyrighted Universal DVDs, including but not limited to those listed on Exhibit C, without incurring any liability pursuant to copyright law.

## COUNT II
## SHERMAN ANTITRUST ACT: QUICK LOOK DOCTRINE

63. Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 62, above, as if fully set forth herein.

64. Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) states that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

65. The restrictions demanded by USHE in the Revenue Sharing Agreement constitute a naked restraint on output that will decrease the supply of copyrighted DVDs, reduce consumer choice in the marketplace and increase prices that consumers will have to pay to rent DVDs.

66. The Revenue Sharing Agreement restricts Redbox's output of Universal DVDs and limits consumer supply of DVDs for rental and sale. Specifically, as described in paragraph 45 above, the Revenue Sharing Agreement seeks to limit the number of copies of Universal DVDs that individual kiosks could contain; prohibits Redbox from renting new releases until 45 days after their street date; and requires the ultimate destruction, rather than resale, of all previously-viewed Universal DVDs.

67. The restrictions required by the Revenue Sharing Agreement cannot possibly result in a net pro-competitive effect that would enhance competition with DVDs sold by others. The restrictions in the Revenue Sharing Agreement constitute business activities that are so plainly anti-competitive that even a "cursory exam" demonstrates that they constitute unlawful restrictions on output.

68. As such, USHE's unlawful agreement with its distributors not to sell DVDs to Redbox unless Redbox enters into the Revenue Sharing Agreement constitutes an illegal restraint of trade in violation of Section 1 of the Sherman Act.

**COUNT III**

**SHERMAN ANTITRUST ACT:**
**RULE OF REASON**

69. Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 68, above, as if fully set forth herein.

70. Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) states that, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

71. Each copyrighted work recorded on DVD constitutes an individual product market. Each copyrighted work is unique, and each such unique work has been granted a limited governmental monopoly. The geographic market for each such copyrighted work is nationwide.

72. A copyright holder enjoys a "distribution right" and may initially sell, or not sell, copies of a copyrighted work to others on such terms as he or she sees fit. However, the copyright holder's distribution right is limited to the first sale of the copyrighted item. Under the "first sale" doctrine, codified at 17 U.S.C. § 109(a) "the distribution right may be exercised solely with respect to the initial disposition of copies of a work, not to prevent or restrict the resale or other further transfer of possession of such copies."

73. USHE's right to control distribution of copyrighted DVDs ends once a DVD has been sold. The distribution right may not lawfully be exercised after the initial sale, "to prevent or restrict the resale or further transfer of possession of such copies."

74. USHE's threats of termination of sales of all product to Ingram or VPD if they re-sell or "transfer possession of copies," *i.e.*, DVDs, to Redbox exceeds the scope of the government-granted distribution right, and therefore violates the antitrust laws as an illegal restraint of trade.

75. As such, by combining with its distributors to boycott Redbox if Redbox refuses to sign the Revenue Sharing Agreement, USHE has violated Section 1 of the Sherman Act and unlawfully entered into an agreement to restrain commerce within the United States.

**COUNT IV**

**INTENTIONAL INTERFERENCE WITH
CONTRACTUAL/BUSINESS RELATIONSHIPS**

76. Redbox hereby incorporates the allegations set forth in paragraphs 1 through 75, above, as if fully set forth herein.

77. Redbox has a valid and existing contract with Ingram to purchase, among other things, Universal DVDs.

78. Redbox has a valid and existing contract with VPD to purchase, among other things, Universal DVDs.

79. USHE is aware of the existence of Redbox's supply contracts with its distributors. This is evidenced by USHE's threat to stop selling to VPD and Ingram if they continue to sell Universal DVDs or otherwise provide services to Redbox.

80. USHE's threat to no longer supply Universal DVDs to VPD and Ingram constitutes an intentional inducement to those distributors to breach their supply agreements with Redbox. This inducement is not protected by any recognized judicial, statutory, constitutional or other privilege and therefore is not justified.

81. USHE's threatened action to no longer supply Universal DVDs to VPD and Ingram will make it unfeasible for those distributors to satisfy their contractual obligations to Redbox.

82. USHE's threatened action to no longer supply Universal DVDs to VPD and Ingram will result in substantial damages to Redbox. Damages will accrue not only as a direct result of the breach of the supply contracts, but also due to the proximate causes of that breach, including loss of customers, decreased demand for Redbox rentals and sales, and loss of customer goodwill.

**DEMAND FOR JURY**

Plaintiffs hereby demands a trial by jury in this action for all issues so triable pursuant to Fed. R. Civ. P. 38.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that this Court award the following relief:

a. A declaration that Defendants' conduct constitutes copyright misuse, and thereby renders copyrights for Universal DVDs – however marketed, sold or distributed - unenforceable during the period of misconduct;

b. Injunctive relief prohibiting USHE from engaging in any efforts to limit the supply of Universal DVDs to Redbox;

c. A declaration that the Revenue Sharing Agreement and USHE's threatened action against VPD and Ingram violate the Sherman Antitrust Act;

d. Damages to the full extent permitted by law;

e. Attorneys' fees and costs; and

f. Such further relief as this Court deems just and appropriate.

Of Counsel:

Charles S. Bergen
Michael S. Gulland
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Fax: (312) 558-1195

Frederick W. Stein
Redbox Automated Retail, LLC
One Tower Lane, Suite 1200
Oakbrook Terrace, Illinois 60181
Phone: (630) 756-8255
Fax: (630) 756-8885

Dated: October 10, 2008

/s/ Henry E. Gallagher, Jr.
Henry E. Gallagher, Jr. (DE Bar ID #495)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE  19801
Telephone:  (302) 658-9141
Facsimile:   (302) 658-5614

*Attorneys for Plaintiff*