**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| REDBOX AUTOMATED RETAIL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | **Civil Action No. 08-766 (RBK)** |
| | ) | |
| vs. | ) | |
| | ) | |
| UNIVERSAL STUDIOS HOME | ) | **JURY TRIAL DEMANDED** |
| ENTERTAINMENT, LLC, UNIVERSAL | ) | |
| CITY STUDIOS, LLLP, UNIVERSAL | ) | |
| CITY STUDIOS PRODUCTIONS, LLLP, | ) | **REDACTED** |
| and FOCUS FEATURES, LLC, | ) | **PUBLIC VERSION** |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR**
**MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(B)(6)**

OF COUNSEL:
Paul H. Zoubek
(PA Bar I.D. No. 36716)
R. Monica Hennessy
(PA Bar I.D. No. 77928)
**MONTGOMERY, MCCRACKEN,**
 **WALKER & RHOADS, LLP**
Liberty View
457 Haddonfield Road, Suite 600
Cherry Hill, NJ 08002
(856) 488-7700

Glenn D. Pomerantz (State Bar No. 112503)
David C. Dinielli (State Bar No. 177904)
**MUNGER, TOLLES & OLSON LLP**
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
(213) 683-9100

Dated:  December 5, 2008

R. Montgomery Donaldson (DE Bar ID 4367)
*rdonaldson@mmwr.com*
Lisa Zwally Brown (DE Bar ID 4328)
*lzbrown@mmwr.com*
**MONTGOMERY, MCCRACKEN,**
**WALKER & RHOADS, LLP**
1105 N. Market St, Suite 1500
Wilmington, DE 19801
(302) 504-7800
*Counsel for Defendants Universal Studios Home Entertainment, LLC, Universal City Studios, LLLP, Universal City Studios Productions, LLLP, and Focus Features, LLC*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   BACKGROUND ................................................................................. 3

    A.    THE COMPLAINT ................................................................... 3

    B.    UNIVERSAL'S CONTRACTS WITH ITS DISTRIBUTORS ........................... 4

III.  ARGUMENT ..................................................................................... 6

    A.    LEGAL STANDARD ................................................................ 6

    B.    PLAINTIFF'S COPYRIGHT MISUSE CLAIM (COUNT I) FAILS AS A MATTER OF LAW AND MUST BE DISMISSED ............................................ 7

        1.    Copyright Misuse Is An Equitable Defense, Not A Cause of Action ........ 7

        2.    Even If Copyright Misuse Were A Cause Of Action, Redbox Has Not Alleged Any Misuse, As A Matter Of Law ..................................... 10

    C.    THE ANTITRUST CLAIMS MUST BE DISMISSED ..................................... 11

        1.    The Rule-Of-Reason Claim Should Be Dismissed  (Count III) .............. 12

            a.    Anticompetitive Effects ............................................. 13

                (i)    No Allegations Of Reduced Output Or Increased Price ........... 13

                (ii)    No Sufficient Allegations Of Market Power ................... 15

            b.    Product Market ........................................................ 17

        2.    The "Quick Look" Claim (Count II) Must Be Dismissed Because That Doctrine Has No Application Here, And Necessarily Fails Because The Rule Of Reason Claim Fails ............................................... 19

    D.    THE INTERFERENCE CLAIM (COUNT IV) MUST BE DISMISSED .......... 20

        1.    An Interference Claim Cannot Be Founded On A Defendant's Exercise Of A Legal Right ..................................................... 21

        2.    Because Universal Has The Legal Right To Tell Its Distributors How To Distribute Its Products, It Cannot Be Liable For "Interference" For Doing So ..................................................... 22

        3.    Universal's Legal Right Is Set Forth In Its Written Contracts; There Are No Issues Of Fact To Preclude Dismissal ........................... 23

IV.   CONCLUSION ................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*A & M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ......................................................................10

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
  166 F.3d 772 (5th Cir. 1999) .......................................................................10

*Altera Corp. v. Clear Logic, Inc.*,
  424 F.3d 1079 (9th Cir. 2005) ....................................................................8, 9

*American Franklin Life Ins., Co. v. Galati*,
  776 F. Supp. 1054 (E.D. Pa. 1991) ..............................................................26

*Angelico v. Lehigh Valley Hosp., Inc.*,
  184 F.3d 268 (3d Cir. 1999) ........................................................................13

*Arista Records, Inc. v. Flea World, Inc.*,
  356 F. Supp. 2d 411 (D.N.J. 2005) ..............................................................10

*Barkan v. Dunkin Donuts, Inc.*,
  520 F. Supp. 2d 333 (D.R.I. 2007) ..............................................................26

*Bell Atlantic Corp. v. Twombly*,
  127 S. Ct. 1955 (2007) ....................................................................6, 7, 26

*Bilbrey v. Brown*,
  738 F.2d 1462 (9th Cir. 1984) .......................................................................9

*Bobbs-Merrill Co. v. Straus*,
  210 U.S. 339 (1908) .......................................................................................11

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ..................................................................................2, 17

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*,
  239 F. Supp. 2d 550 (E.D. Pa. 2002) ...................................................1, 12, 13

*Cal. State Council of Associated Gen. Contractors of Cal., Inc. v. Carpenters*,
  459 U.S. 519 (1983) ..................................................................................6, 14

*California Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) .......................................................................................20

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984) .......................................................................7

*CCPI Inc. v. American Premier, Inc.*,
  967 F. Supp. 813 (D. Del. 1997) ...................................................................7

*Commonwealth of Pennsylvania v. PepsiCo, Inc.*,
  836 F.2d 173 (3d Cir. 1988) ....................................................................7, 13

*Continental T.V., Inc. v. GTE Sylvania, Inc.*,
  433 U.S. 36 (1977) ....................................................................................2, 14

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Corning Inc. v. SRU Biosystems, LLC*,
    292 F. Supp. 2d 583 (D. Del. 2003).....................................................................24, 25

*E-Z Bowz, LLC v. Prof'l Prod. Research Co.*,
    No. 00 8670, 2003 WL 22068573 (S.D.N.Y. Sept. 5, 2003)....................................18

*Edward J. Sweeney & Sons., Inc. v. Texaco, Inc.*,
    478 F. Supp. 243 (E.D. Pa. 1979), *aff'd*, 637 F.2d 105 (3d Cir. 1980)...................15

*FTC v. Indiana Federation of Dentists*,
    476 U.S. 447 (1986)....................................................................................................19

*Glacier Optical, Inc. v. Optique du Monde, Ltd.*,
    816 F. Supp 646 (D. Or. 1993) ..................................................................................14

*Gordon v. Lewistown Hospital*,
    423 F.3d 184 (3d Cir. 2005)..................................................................................19, 20

*Illinois Tool Works Inc. v. Independent Ink, Inc.*,
    547 U.S. 28 (2006)......................................................................................................16

*In re Donald J. Trump Casino Sec. Litig.*,
    7 F.3d 357 (3d Cir. 1993)..............................................................................................4

*Iqbal v. Hasty*,
    490 F.3d 143 (2d Cir. 2007)...........................................................................................6

*K.M.B. Warehouse Distrbs., Inc. v. Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995)..........................................................................................17

*Lasercomb Am., Inc. v. Reynolds*,
    911 F.2d 970 (4th Cir. 1990) ........................................................................................8

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)......................................................................................................7

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    269 F. Supp. 2d 1213 (C.D. Cal. 2003), *aff'd*, 380 F.3d 1154,
    *cert. granted*, 543 U.S. 1032 (2004) .........................................................................8, 9

*NCAA v. Board of Regents*,
    468 U.S. 85 (1984)......................................................................................................19

*O.S.C. Corporation v. Apple Computer, Inc.*,
    792 F.2d 1464 (9th Cir. 1984) ....................................................................................15

*Online Policy Group v. Diebold, Inc.*,
    337 F. Supp. 2d 1195 (N.D. Cal. 2004) ........................................................................8

*Open Source Yoga Unity v. Choudhury*,
    No. C03-3182 PJH, 2005 WL 756558 (N.D. Cal. 2005)..............................................9

*Orson Inc. v. Miramax Film Corp.*,
    79 F.3d 1358 (3d Cir. 1996).......................................................................................19

*Parfums Givenchy, Inc. v. Drug Emporium, Inc.*,
    38 F.3d 477 (9th Cir. 1994) ........................................................................................10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Pension Benefit Guar. Corp. v. White Consol. Indus.*,
  998 F.2d 1192 (3d Cir. 1993)................................................................................4

*People's Mortgage Co. v. Federal Nat'l Mortgage Ass'n*,
  856 F. Supp. 910 (E.D. Pa. 1994) ....................................................................2, 22

*Philips v. County of Allegheny*,
  515 F.3d 224 (3d Cir. 2008)..............................................................................26

*Practice Mgmt. Info. Corp. v. American Medical Ass'n*,
  121 F.3d 516 (9th Cir. 1997) ............................................................................8, 9

*Quality King Distribs. v. L'anza Research Int'l, Inc.*,
  523 U.S. 135 (1998)........................................................................................1, 11

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)................................................................1, 17, 18, 19

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises, LLC*,
  532 F.3d 963 (9th Cir. 2008) ............................................................................16

*Ryoko Mfg. Co. v. Eden Servs.*,
  823 F.2d 1215 (8th Cir. 1987) ..........................................................................17

*Thompson Everett, Inc. v. National Cable Advertising*, L.P.,
  57 F.3d 1317 (4th Cir. 1995) ............................................................................22

*Ticketmaster, L.L.C. v. RMG Technologies*,
  536 F. Supp. 2d 1191 (C.D. Cal. 2008) ............................................................1, 8

*Tower Air, Inc. v. Federal Express Corp.*,
  956 F. Supp. 270 (E.D.N.Y 1996) ....................................................................18

*UGG Holdings v. Severn*,
  No. 04-1137, 2004 WL 5458426 (C.D. Cal. Oct. 1, 2004)................................18

*United States v. Brown Univ.*,
  5 F.3d 658 (3d Cir. 1993)..................................................................................13

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919)............................................................................................2

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) ..........................................................................................18

*United States v. Syufy Enterprises*,
  712 F. Supp. 1386 (N.D. Cal. 1989) ...............................................................6, 20

*Universal City Studios, Inc. v. Reimerdes*,
  111 F. Supp. 2d 294 (S.D.N.Y. 2000)..............................................................5, 20

*Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*,
  342 F.3d 191 (3rd Cir. 2003) ..............................................................................8

*Winter Hill Frozen Foods & Servs., Inc. v. Haagen-Dasz Co.*,
  691 F. Supp. 539 (D. Mass. 1988) ....................................................................17

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

### REGULATORY CASES

*American Bus. Sys. v. Panasonic Industrial Co.*,
   89-1 Trade Cases ¶ 68,631 (E.D. La. 1988)............................................................14

*IDT Corp. v. Building Owners & Managers Ass'n*,
   2006-1 Trade Cases ¶ 75,151, No. Civ. A. 03-4113 (JAG)
   2005 WL 3447615 (D.N.J. Dec. 15, 2005).....................................................12, 13

### FEDERAL STATUTES

28 U.S.C. § 2201...........................................................................................................9

### RULES

Rule 12(b)(6)..................................................................................................................6

### TREATISES

44B Am. Jur. 2d Interference § 22 (2008) ...................................................................21

45 Am. Jur. 2d, Interference, § 23 ...............................................................................22

Prosser & Keeton on Torts § 129 (5th ed. 1984) ............................................21, 22, 24

Restatement (Second) of Torts § 773 (1979)..........................................21, 22, 23, 25

Restatement (Second) Torts § 773, illus. 3 .................................................................22

## I.     INTRODUCTION

Redbox Automated Retail, LLC ("Redbox"), a company that rents and sells DVDs to consumers through free-standing kiosk machines, has sued Universal, a supplier of DVDs. Redbox's Complaint displays a fundamental misunderstanding of the nature and purpose of both the copyright and the antitrust laws.

The first cause of action purports to state a claim for "Copyright Misuse."  However, the law does not recognize this "claim" as a cause of action; rather, copyright misuse is an *equitable defense* to a copyright infringement action.  *See Ticketmaster, L.L.C. v. RMG Technologies*, 536 F. Supp. 2d 1191, 1198-99 (C.D. Cal. 2008).  Moreover, Redbox has not alleged any "misuse" of the power conferred by copyright, as a matter of law.  Suppliers of copyrighted products (books, CDs, DVDs), just like other suppliers, can decide for themselves whether and when and to whom to sell their products.  And Universal, just like any other supplier, can direct its distributors to follow its marketing plan.  Nothing about the fact that DVDs are subject to copyright -- including the "First Sale Doctrine," which does nothing more than limit Universal's right to sue for copyright infringement after it has sold its products to distributors -- alters these fundamental rights.  *See Quality King Distribs. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 143 (1998).

Redbox's antitrust claims (Counts II & III) also must be dismissed, for a number of reasons.  First, Redbox has failed to allege facts to satisfy the strict pleading requirements for such a claim, including factual allegations that would support a finding of actual anticompetitive effect, or market power, within a properly defined product market.  *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997); *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 566 (E.D. Pa. 2002).  And the facts that Redbox *does* allege -- that Universal decided to deal with Redbox directly, on revenue-sharing terms that Universal proposed, and then instructed its distributors no longer to sell Universal DVDs to Redbox when Redbox rejected the proposed revenue-sharing terms -- show that Redbox has pleaded itself out of an antitrust claims because the alleged facts are directly at odds with at least three tenets of antitrust law:

- Redbox seeks redress for injury that Redbox claims *it* will suffer if *it* is unable to stock Universal DVDs and rent them to consumers at low prices through *its* kiosks, but the law is crystal clear:  the antitrust laws are not designed to protect a single competitor, but rather are designed to preserve the *competitive process*.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).

- Redbox attempts to penalize Universal's distribution decisions, even though the law permits Universal to decide on its own whether to sell or not to sell its products to whomever it chooses, on whatever terms it chooses.  *See United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).

- Redbox attacks Universal's ability to direct its distributors to implement Universal's marketing plans -- in this case, through agreements with its distributors that give Universal the right to decide to whom the distributors may or may not resell Universal DVDs -- despite the fact that courts routinely conclude that vertical agreements of these sorts tend to promote "interbrand" competition between suppliers (for example, competition between Universal and Disney and Warner Bros.), which is the "primary concern of antitrust law."  *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 52 n.19, 55 (1977).

The "quick look" antitrust claim (Count II) must be dismissed for an additional reason.  The quick look doctrine -- a method of antitrust analysis more abbreviated than a "rule of reason" analysis -- cannot be applied to vertical restraints, including the ones alleged here, as a matter of law.

Finally, the interference claim fails because Universal cannot be held liable for enforcing its legal right to instruct its distributors not to ship products to Redbox.  The exercise of a legal right cannot be the predicate for an interference claim, as a matter of law.  *See People's Mortgage Co. v. Federal Nat'l Mortgage Ass'n*, 856 F. Supp. 910, 934 (E.D. Pa. 1994).

* * * *

The law makes clear that it does not matter if Redbox is, or is not, "an innovator"; or that consumers may, or may not, "love Redbox"; or that kiosk sales and rentals of DVDs may, or may not, be "highly-convenient, yet low-cost."  *See* Complaint ¶¶ 22-23.  There is simply no role for Redbox or for this Court to second guess Universal's decisions regarding whether to deal with particular retailers directly or indirectly and how it chooses to compete with its competitors. The Complaint should be dismissed with prejudice.

## II.      BACKGROUND

### A.      THE COMPLAINT

Redbox alleges the following facts:  Redbox rents and sells DVDs to consumers through "self-service kiosks located in various retail outlets."  Complaint ¶ 1.  Redbox kiosks are located in retail outlets such as McDonald's restaurants, Wal-Mart stores, and Stop & Shop grocery stores.  Complaint ¶ 24.

Redbox was founded in July 2002.  Redbox generally has acquired DVDs supplied by Universal through two distributors:  Ingram and VPD.  *Id.* ¶ 29.  Redbox's acquisition of Universal DVDs from Ingram and VPD has been pursuant to contracts between Redbox and those distributors that give Redbox the right to purchase Universal DVDs from Ingram and VPD, and require Ingram and VPD to sell Universal DVDs to Redbox.  *Id.* ¶ 30-33.  Universal titles account for approximately 15% of the DVDs that Redbox purchases from Ingram and VPD.  *Id.* ¶ 34.

On August 26, 2008, Universal presented to Redbox a proposed "Revenue Sharing Agreement," whereby Universal would license its DVD directly to Redbox (and share in the revenue from each of Redbox's retail rental transactions), rather than selling the DVDs indirectly to Redbox through distributors.  *Id.* ¶ 39 & Complaint Exh. A.  In addition, the Revenue Sharing Agreement would, among other things, impose a "window," the effect of which would be to "prohibit Redbox from renting or selling Universal DVDs until after 45 days from when they otherwise become available to the public."  *Id.* ¶ 2.

Universal told Redbox that if Redbox did not agree to the proposed Revenue Sharing Agreement, Universal would compel Ingram and VPD to "stop selling any Universal DVDs to VPD and Ingram." *Id*. ¶ 40.

### B.   UNIVERSAL'S CONTRACTS WITH ITS DISTRIBUTORS

Redbox also alleges that Universal has contracts with Ingram and VPD. *See* Complaint ¶ 36. Because Redbox's Complaint references these contracts and their terms, this Court may examine them on this motion to dismiss. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document"); *see also In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n. 9 (3d Cir. 1993).[1]

Redbox alleges that these contracts set forth the "right to terminate those contracts at will if VPD and Ingram do not distribute Universal DVDs in accordance with [Universal's] wishes." *Id*. ¶ 36   In fact, these contracts do far more than that.

The first thing these contracts do is confirm these two distributors' central role in Universal's efforts to compete in the home entertainment marketplace against *its studio competitors* (Disney, Paramount, Twentieth Century Fox, Warner Bros., etc.) by marketing its DVDs to retailers in an effective and powerful way. Thus, for example, the contracts provide that these distributors ████████████████████████████████████████████████████████ ████████████████████████████████████████████████. They require that these distributors ████████████████████████████████████████████████████████ ████████████ The contracts require the distributors to ████████████████████████████████████████████████████████ ███████████████████████

---

[1] Universal has provided these contracts to the Court, provisionally under seal, and has filed a motion seeking an order maintaining these confidential contracts under seal. There are a total of four contracts -- two running between Universal and Ingram, and two running between Universal and VPD. These four contracts are nearly identical in all substantive provisions that bear on this motion, and collectively cover the period from October 2000 through the end of 2008.



The contracts require that each distributor

In short, these contracts obligate these

distributors to

The contracts also make clear

Finally, the contracts reflect the practice, common in the industry, of permitting retail sales beginning only on a particular date that Universal determines.  This date is called the "Street Date."

The setting of a Street Date for the release of DVDs is one step in the broader practice of motion picture studios called "windowing," in which a studio makes its motion pictures available in different formats -- theatrical release, home entertainment, pay-per-view television, for example -- at different times.  Courts repeatedly have acknowledged that "windowing" is an important and legitimate strategy by which a studio may try to maximize the value of its copyrighted motion pictures, and to compete with the motion pictures released by other studios.  *See, e.g.*, *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 309 (S.D.N.Y. 2000) ("The major motion picture studios typically distribute films in a sequence of so-called windows, each window referring to a separate channel of distribution and thus to a separate source of revenue.  The first window generally is theatrical release, distribution and

exhibition.  Subsequently, films are distributed to airlines and hotels, then to the home market, then to pay television, cable and, eventually, free television broadcast.").[2]

Together, these three rights that are reflected in the contracts -- the right to direct the distributor's marketing efforts in order to maximize sales, the right to determine whether Universal's interests are best served by dealing directly with a retailer or indirectly, and the ability to determine *when* Universal's motion pictures ought to be made available to the public in which format -- constitute important tools that permit Universal to maximize the value of its copyrighted motion pictures and compete effectively against its studio rivals.

## III.   ARGUMENT

### A.   LEGAL STANDARD

A complaint must be dismissed under Rule 12(b)(6) if it fails to plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).  In particular, the *Twombly* Court admonished that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 1964-65 (internal citations and quotations omitted).  The *Twombly* decision "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*."  *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007).  The *Twombly* court emphasized the particular importance of requiring factual support for allegations in the antitrust context where proceeding to discovery can be prolonged and expensive: "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."  127 S. Ct. at 1967 (citing *Cal. State Council of Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)).

---

[2] *See also United States v. Syufy Enterprises*, 712 F. Supp. 1386, 1388 (N.D. Cal. 1989) (describing various "windows" generally used in the distribution of motion pictures, including theatrical exhibition, "home video," and licensing for exhibition on cable and broadcast television).

Even prior to *Twombly*, courts in this Circuit recognized the important gate-keeping role served by motions to dismiss in antitrust cases.  The Third Circuit, for example, noted over twenty years ago that "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint."  *See Commonwealth of Pennsylvania v. PepsiCo, Inc.*, 836 F.2d 173, 182 (3d Cir. 1988) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)); *see also CCPI Inc. v. American Premier, Inc.*, 967 F. Supp. 813, 816 (D. Del. 1997) (plaintiff "cannot simply cry 'antitrust' or 'Sherman Act' in a crowded courtroom and occupy its opponents and the Court with head-scratching attempts to peer through the smoke").

*Twombly*, moreover, reveals yet another reason why courts should ferret out antitrust complaints at the earliest possible stage if the claims alleged cannot support a finding of antitrust liability:  antitrust claims oftentimes are based on conduct that is "just as much in line with a wide swath of rational and competitive business strategy" as it is with an antitrust violation, *see Twombly*, 127 S. Ct. at 1964, and legal standards that permit antitrust cases to proceed "when such inferences [of an antitrust violation] are implausible . . . deter procompetitive conduct."  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 593 (1986).

## B.   PLAINTIFF'S COPYRIGHT MISUSE CLAIM (COUNT I) FAILS AS A MATTER OF LAW AND MUST BE DISMISSED

### 1.   Copyright Misuse Is An Equitable Defense, Not A Cause of Action

Redbox purports to state a cause of action for copyright misuse, alleging that Universal's actions to control the distribution of its own product constitute copyright misuse, and seeking a declaration that Universal's copyrights are unenforceable as long as it attempts to control the distribution of its own copyrighted DVDs.  *See* Complaint ¶ 57-62.  This claim finds no support in the law.

The claim fails at the outset because there is no such thing as a cause of action for copyright misuse.  Rather, "copyright misuse" is an *equitable defense to a copyright action* that

precludes recovery by a plaintiff that has used its copyright in a manner violative of the public policy embodied in the grant of copyright.[3]  Numerous courts, including the Third Circuit, have rejected efforts by plaintiffs to raise "copyright misuse" as an affirmative cause of action giving rise to money damages or other forms of relief.  *See, e.g.*, *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 342 F.3d 191, 203-4 (3rd Cir. 2003) (declining to apply copyright misuse doctrine to licensing agreements at issue); *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1090 (9th Cir. 2005) (copyright misuse not an independent claim when there has been no allegation of copyright infringement); *Ticketmaster, L.L.C.*, 536 F. Supp. 2d at 1198-99 (holding that copyright misuse is only an affirmative defense to a claim for copyright infringement, and does not support an independent claim for damages); *Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1198 n.4 (N.D. Cal. 2004) ("Plaintiffs cite no legal authority, and the Court is aware of none, that allows an affirmative claim for damages for copyright misuse."); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1225 (C.D. Cal. 2003) (noting that, as even defendant conceded, "copyright misuse cannot found a claim for damages," and subsequently dismissing defendant's counterclaim for declaratory relief as to copyright misuse), *aff'd*, 380 F.3d 1154, *cert. granted*, 543 U.S. 1032 (2004).

Redbox cannot avoid this rule by purporting to assert a cause of action for declaratory judgment with respect to Universal's purported misuse.  Some courts have suggested that a party that finds itself under threat of a copyright infringement action may seek a declaration that it could not be liable for infringement given the threatening party's misuse of its copyrights.  But this possibility is limited to circumstances in which the party, in light of the threat of, or an actual, infringement action, reasonably seeks clarification that the threatened or actual action would lack merit because the party's affirmative defense of misuse would bar the claim.  *See,*

---

[3]  The copyright misuse doctrine is a recent development in copyright law, deriving from the defense of patent misuse, and has been recognized only in select circuits.  *Practice Mgmt. Info. Corp. v. American Medical Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997); *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 975-78 (4th Cir. 1990).

*e.g., Ticketmaster LLC,*, 536 F. Supp. 2d at 1199 (acknowledging in dicta that a claim for declaratory relief with respect to copyright misuse may be proper even though no claim for copyright infringement actually has been asserted); *Open Source Yoga Unity v. Choudhury*, No. C03-3182 PJH, 2005 WL 756558, *8 n.5 (N.D. Cal. 2005) (emphasizing that declaratory relief plaintiff "asserts the claim [of copyright misuse] simply as an affirmative defense should it be found liable for infringement" and "is thus permitted to 'assert' a claim for copyright misuse because the declaratory relief plaintiff is in fact likely to be accused of copyright infringement.") (*citing Practice Management Info. v. American Medical Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997) (allowing a declaratory relief plaintiff to assert a copyright misuse defense)).

Of course, any such claim would need to meet the traditional standards for an action for declaratory relief pursuant to 28 U.S.C. § 2201, including the requirement that the claim "serve the purposes of declaratory relief, such as clarifying and settling the legal relations of the parties, or affording a declaratory plaintiff relief from the 'uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Metro-Goldwyn-Mayer Studios*, 269 F. Supp. 2d at 1226 (quoting *Bilbrey v. Brown*, 738 F.2d 1462, 1470 (9th Cir. 1984)).

Redbox's claim does not meet these requirements. Redbox does not allege that Universal has threatened it, or anyone else for that matter, with a claim for copyright infringement as a result of unauthorized distribution or reproduction of its DVDs. Rather, Redbox alleges that Universal has (1) told Redbox that it wants to deal with it directly, and on certain terms (Complaint ¶¶ 2, 37-39, 45); and (2) threatened to tell its distributors to stop shipping product to Redbox (Complaint ¶¶ 40-44). Because there is no allegation that Universal has asserted or threatened any copyright claims against Redbox, either formally or informally, Redbox has not alleged, and cannot allege, any "actual controversy" regarding any copyright issue for this Court to decide. *Cf. Altera Corp.,* 424 F.3d at 1090 ("We cannot now void the licensing agreements under the pretext of refusing to enforce a copyright that has not been asserted."). The purported cause of action should be dismissed on these grounds alone.

### 2. Even If Copyright Misuse Were A Cause Of Action, Redbox Has Not Alleged Any Misuse, As A Matter Of Law

In any event, none of the allegations in the Complaint would support a conclusion that Universal has misused its copyrights.

Copyright misuse typically is invoked as a defense in cases in which a plaintiff uses its rightful ownership of a copyright to gain control over material for which it has no copyright. *See, e.g., A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001) ("The misuse defense prevents copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly."); *Alcatel USA, Inc. v. DGI Techs., Inc.,* 166 F.3d 772, 792-94 (5th Cir. 1999) (finding that a reasonable juror could conclude that plaintiff used copyrights to "indirectly gain commercial control" over microprocessor cards that were not copyrighted).

Redbox makes no such allegation here. Redbox alleges that Universal proposed to license its DVDs to Redbox on terms that Redbox does not like, and has directed its distributors not to supply Universal DVDs to Redbox. But nothing in the Complaint provides any factual support for the notion that Universal seeks to control areas outside its limited grant of copyright. *Cf. Arista Records, Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411, 428 (D.N.J. 2005) (dismissing defendant's copyright misuse counter-claim where plaintiff did not purport to leverage its copyright to protect uncopyrightable information but merely to enforce its copyrights).

Instead, Redbox advances the novel theory that Universal's exercise of its contractual right to direct its distributors not to ship DVDs to Redbox constitutes misuse because it violates the "'first sale' doctrine." Complaint ¶ 50. This theory is completely off base and reveals Redbox's complete misapprehension of the law. The "first sale doctrine" provides that a copyright owner, once it has sold a copyrighted good, *cannot sue for copyright infringement* with respect to any further distribution or resale of that good. *E.g.*, *Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, 38 F.3d 477, 480 (9th Cir. 1994).

But the first sale doctrine does not preclude suppliers from *contracting* with distributors to limit the resale or other forms of downstream re-distribution of the copyrighted good.  In *Quality King Distrib., Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135 (1998), for example, the Supreme Court noted that an early Supreme Court decision, later codified in subsequent versions of the Copyright Act's explication of the first sale doctrine, emphasized the "critical distinction between statutory rights and contract rights."  *See Quality King*, 523 U.S. at 143 (citing *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350 (1908)); *see also Bobbs-Merrill*, 210 U.S. at 350 ("We do not think that the statute can be given such a construction, and it is to be remembered that this is purely a question of statutory construction.  There is no claim in this case of contract limitation, nor license agreement controlling the subsequent sales of the book.") (interpreting earlier codification of first sale doctrine).

It is for this reason that the *Quality King* Court took as a given that the plaintiff in that case properly had "relie[d] on the terms of its contracts with its domestic distributors to limit their sales to authorized retail outlets."  *See Quality King*, 523 U.S. at 143.  Simply put, a supplier, such as Universal, is not stripped of its ability to direct and implement a distribution plan with respect to its goods just because elements of those goods are copyrighted.  We are aware of no case applying the "first sale doctrine" in the manner Redbox proposes, or concluding that contractual restrictions on downstream distribution constitute "misuse."  This Count must be dismissed.

### C.      THE ANTITRUST CLAIMS MUST BE DISMISSED

Redbox purports to state two separate causes of action under Section 1 of the Sherman Act.  Count II is entitled "Sherman Antitrust Act: Quick Look Doctrine."  Count III is entitled "Sherman Antitrust Act:  Rule of Reason."  Both counts challenge the legality of Universal's "vertical" agreements with VPD and Ingram by which the distributors agreed not to sell DVDs to Redbox.  *See* Complaint ¶ 68 (Universal's "unlawful agreement with its distributors not to sell DVDs to Redbox unless Redbox enters into the Revenue Sharing Agreement constitutes an illegal restraint of trade") (Count II); Complaint ¶ 75 ("by combining with its distributors to

boycott Redbox if Redbox refuses to sign the Revenue Sharing Agreement, [Universal] has

violated Section 1 of the Sherman Act") (Count III).[4]  And both counts must be dismissed.  The

"Rule of Reason" claim must be dismissed because Redbox fails to allege facts necessary to

support such a claim and/or alleges facts that are inconsistent with such a claim.  And the "Quick

Look" claim must be dismissed for the additional reason that that doctrine -- which requires  a

less searching analysis of the effects of a challenged restraint than does the rule of reason -- has

no application to purely vertical agreements as a matter of law.

### 1.      The Rule-Of-Reason Claim Should Be Dismissed  (Count III)

Plaintiffs in Section 1 rule-of-reason cases face strict pleading requirements

corresponding to the substantive proof elements of a rule-of-reason claim.

> In order to plead a claim that a defendant's practices violate
> the rule of reason under Section 1 of the Sherman Act, a plaintiff
> must allege four 'elements':
>
> (1) that the defendants contracted, combined or conspired among
> each other; (2) that the combination or conspiracy produced
> adverse, anti-competitive effects within the relevant product and
> geographic markets; (3) that the objects of the conduct pursuant to
> that contact or conspiracy were illegal; and (4) that the plaintiffs
> were injured as a proximate result of that conspiracy.

*Brunson Communications, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 564-65 (E.D. Pa. 2002).

Moreover, "[i]n order to establish the second element, that the Defendant's actions produced

anticompetitive effects within the relevant product and geographic markets, the plaintiff must

allege that particular, actual anticompetitive effects occurred within these markets, such as price

increases or output reduction."  *IDT Corp. v. Building Owners & Managers Ass'n*, 2006-1 Trade

Cases ¶ 75,151, No. Civ. A. 03-4113 (JAG) 2005 WL 3447615, at * 8 (D.N.J. Dec. 15, 2005).

Redbox has not alleged, and cannot allege, facts that satisfy the second element of this

pleading standard.  Specifically, Redbox has not alleged anti-competitive effects (either by

alleging any facts regarding reduced output or higher prices traceable to the challenged restraints,

---

[4]  Redbox does not allege any "horizontal" agreement as between Ingram and VPD.

or by alleging a factual basis for concluding that Universal has market power).  Nor has Redbox alleged a valid "product market"; rather, Redbox's allegation that each DVD title constitutes its own product market is untenable as a matter of law.

### a.       Anticompetitive Effects

A plaintiff may satisfy the requirement that it plead facts regarding "anti-competitive effect" by alleging facts demonstrating actual harm to competition -- such as facts reflecting decreased output or increased prices.  *See IDT*, 2005 WL 3447615, at *8.  But because of the difficulty of isolating the market effects of a particular challenged restraint, courts in this Circuit permit a plaintiff instead to plead and prove "market power," which is the "ability to raise prices above those that would prevail in a competitive market."  *See United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993); *see also IDT*, 2005 WL 3447615, at *8 (dismissal appropriate because plaintiff failed to plead market power in the relevant product market).  Redbox has done neither.

### (i)       No Allegations Of Reduced Output Or Increased Price

Redbox has alleged no facts that demonstrate any actual anticompetitive effects of any sort in any market resulting from the alleged agreements whereby Universal's distributors agreed not to supply product to Redbox.  *See Brunson*, 239 F. Supp. 2d at 566 ("There is absolutely no allegation of diminution in competition in the overall market, which is necessary to state a claim for restraint of trade under the rule of reason.") (citing *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268 (3d Cir. 1999)); *cf. Commonwealth of Pennsylvania v. Pepsico, Inc.*, 836 F.2d 173, 177 (3d Cir. 1998) (affirming dismissal of rule of reason claim for state's failure to allege required facts regarding the absence of effective competition within relevant market).

Even though the Complaint makes all sorts of dire predictions about what would happen if Redbox were to agree to the purportedly onerous terms contained in the proposed Revenue Sharing Agreement, *see, e.g.*, Complaint ¶ 48, the Complaint includes *no allegations whatsoever* about how the agreements of Universal's distributors not to ship to Redbox have led or could lead to "price increases or output reductions" in any relevant market.  *Cf. IDT*, 205 WL 3447615

at *8 (dismissing complaint for failure to allege any such effects), or otherwise injure competition as between Universal and the other studios.[5]

This is not surprising.  The agreements that Redbox challenges -- whereby Universal's distributors have agreed to sell Universal DVDs only to retailers that Universal approves -- are nearly identical to the sorts of vertical agreements that courts *routinely* uphold, precisely because these sorts of vertical agreements serve as an important vehicle by which suppliers compete *with each other* to promote their own products in the manner that they determine to be most effective. In other words, these sorts of agreements promote competition; they do not stifle it.  *See Continental T.V., Inc. v. GTE Sylvania*, 433 U.S. 36, 54 (1977) ("[v]ertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products"); *see also id.* at 55 ("manufacturers can use such restrictions to compete more effectively against other manufacturers").  If Universal concludes that it is better able to compete with Paramount, Warner Bros., or Disney by establishing a window for kiosk rentals that is different than the window for other methods of retail rentals and sales, or by dealing with Redbox directly rather than indirectly, that is a right that the law reserves to Universal.

Thus, for example, an eyewear supplier may, without violating the rule of reason, seek to ensure that its product maintains "cachet" by being sold only in a limited type of outlet.  *See Glacier Optical, Inc. v. Optique du Monde, Ltd.*, 816 F. Supp 646 (D. Or. 1993) (upholding defendant's policy restricting distribution of its eyewear to optometrists, ophthalmologists, and retail opticians).  Similarly, a photocopy manufacturer may, without violating the rule of reason, require its distributors to agree to sell only to the general public, but not to other distributors.  *See American Bus. Sys. v. Panasonic Industrial Co.*, 89-1 Trade Cases ¶ 68,631 (E.D. La. 1988).

---

[5]  Redbox's failure to allege these facts cannot be excused, or presumed to have resulted from oversight. *See Associated General Contractors v. California State Counsel of Carpenters*, 459 U.S. 519, 526 (1983) ("It is not, however, proper to assume that [the plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.").

And a computer manufacturer may, without violating the rule of reason, prohibit its distributors by contract from re-selling computers by mail-order.  *See O.S.C. Corporation v. Apple Computer, Inc.*, 792 F.2d 1464, 1468, 1469 (9th Cir. 1984) (approving supplier's no-mail-order policy, which was instituted "to ensure Apple's products were sold only by face-to-face transactions," because the policy had "any actual adverse effect on competition").

Redbox has failed to allege any output reduction or price increases resulting from any harm to interbrand competition as between Universal and other motion picture studios, for the simple reason that it cannot any such allegation.  If Universal's decision not to permit its distributors to sell to Redbox turns out to be unwise, and leaves open a market opportunity that demands to be filled, other studios presumably will fill it.  Other studios may continue to sell or license their DVDs to Redbox (directly or indirectly) as they choose, and Universal may suffer market consequences by losing sales to other studios.  But absolutely *nothing* about Universal's agreement with its distributors not to sell Universal DVDs to Redbox could possibly impair this sort of competition, because nothing in the agreements prevents other studios from continuing to sell their DVDs to Redbox, on whatever terms those other studios see fit.

Perhaps because Redbox realizes that it cannot allege facts reflecting any actual harm to competition, Redbox asserts instead that the challenged agreements should be deemed to have anticompetitive effects because they reflect what Redbox labels "copyright misuse."  *See* Complaint ¶ 72-74.  This assertion fails for at least two reasons.  First, as explained above, Redbox is flat wrong in describing any of Universal's conduct as copyright misuse.  *See supra* section III.B.2.  Second, even if Redbox were correct, the law in the Third Circuit is clear:  an improper purpose, in the absence of any showing of anticompetitive effect, is not enough to make out a rule-of-reason claim.  *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 478 F. Supp. 243 (E.D. Pa. 1979), *aff'd*, 637 F.2d 105 (3d Cir. 1980).

### (ii)    No Sufficient Allegations Of Market Power

Redbox also has failed to allege facts that could support a conclusion that Universal possesses "market power" in any relevant market sufficient to cause any harm to competition

through its contracts with distributors.  The first step in assessing an allegation of market power is an examination of the alleged product and geographic markets.  As described below, however, Redbox has not alleged facts to support its proposed single-title-DVD product market.  *See infra* section III.C.1.b.

Moreover, the only basis on which Redbox alleges that Universal possesses market power (in the single-title-DVD market or in any other) is by virtue of the "limited governmental monopoly" granted by copyright.  *See* Complaint ¶ 71.  But this assertion is flatly foreclosed by the landmark decision of *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006), which reasoned that ownership of an exclusive intellectual property right in a product does not by itself confer market power for purposes of antitrust analysis.  *See also Rick-Mik Enterprises, Inc. v. Equilon Enterprises, LLC*, 532 F.3d 963, 973 (9th Cir. 2008) (affirming dismissal; rejecting contention that defendant had market power in branded gasoline by virtue of copyrights; holding that "[b]ecause intellectual property rights are no longer presumed to confer market power, [plaintiff's] conclusory allegation that [defendant's] intellectual property rights nonetheless do confer market power, unaccompanied by supporting facts, is insufficient") (citing *Independent Ink*, 547 U.S. at 42-43).

Finally, Redbox affirmatively has alleged facts that show that it cannot make the necessary showing that Universal possesses "market power" in any relevant market relating to competition among the studios.  Specifically, Redbox alleges that it acquires DVDs originally released not just by Universal, but also by Universal's competitors.  *See, e.g.*, Complaint ¶ 22 (describing how a family can rent a *Disney* movie at a McDonald's, then return it elsewhere).  And Redbox further alleges that its success is dependent on its ability to stock multiple copies of new releases, presumably from a variety of motion picture studios.  *See id.* ¶ 28.  Yet Redbox alleges that *only 15%* of the DVDs it purchases from VPD and Ingram are titles that are "marketed and sold" *by Universal*, as opposed to by one of Universal's motion picture studio rivals.  *See id.* ¶ 34.  Redbox fails to allege how Universal, which provides only 15% of the product that Redbox acquires, could be found to possess market power, or that any such market

power could be exercised through these two challenged agreements with Ingram and VPD, in a manner that could injure competition generally in any market. *Cf. K.M.B. Warehouse Distrbs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123 (2d Cir. 1995) (even market share of 60%, without more, is insufficient to demonstrate market power to affect competition in case involving refusal to deal); *Winter Hill Frozen Foods & Servs., Inc. v. Haagen-Dasz Co.*, 691 F. Supp. 539 (D. Mass. 1988) (43% share of market insufficient by itself to demonstrate market power); *Ryoko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215 (8th Cir. 1987) (district court should have granted judgment notwithstanding verdict where manufacturer had no more than 10% market share).

### b.      Product Market

The rule-of-reason claim also is subject to dismissal because Redbox has not alleged a tenable product market. In this Circuit, a plaintiff must *plead* facts demonstrating the legitimacy of the plaintiff's proposed product market. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (rejecting contention that determination of product market is inappropriate for disposition on 12(b)(6) motion and holding that plaintiffs have the burden, at the pleading stage, to define a relevant product market).

Here, Redbox alleges that "[e]ach copyrighted work recorded on DVD constitutes an individual product market." *See* Complaint ¶ 71. But Redbox alleges no facts to support this exceedingly narrow, overly restrictive, and facially untenable proposed "product market." For purposes of antitrust analysis, the boundaries of a product market are defined by "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *See Brown Shoe*, 370 U.S. at 325. Failure to plead facts that would support such a conclusion requires dismissal:

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

*Queen City*, 124 F.3d at 436; *see also Tower Air, Inc. v. Federal Express Corp.*, 956 F. Supp. 270 (E.D.N.Y 1996) ("plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal").

Redbox makes absolutely no allegations relating to product interchangeability, or cross-elasticity of demand.  *Cf. UGG Holdings v. Severn*, No. 04-1137, 2004 WL 5458426, at *4 (C.D. Cal. Oct. 1, 2004) (dismissing complaint that alleged product market consisting of "sheepskin, fleece-lined boots" for failure to allege why other styles of boots were not substitutes).

Moreover, the proposed single-title-DVD markets "clearly" do not "encompass all interchangeable products."  *See Queen City*, 124 F.3d at 436.  Redbox fails to allege, for example, why a distributor or consumer or retailer that cannot rent or purchase a Universal title such as "Mamma Mia!" (*See* Complaint ¶ 43 & Exh. C.) cannot simply offer or rent some other DVD title instead.  Remember here that Redbox alleges that its kiosks typically stock *between 70 and 200 separate titles*.  (*See id*. ¶ 22.)  By Redbox's own allegations, fully 85% of its current offerings are provided by studios other than Universal.[6]

Even assuming that each DVD title is, like any copyrighted work, in some sense, "unique" (*See id*. ¶ 71.), that plainly is not enough to turn each title into its own product market, under settled law.  Courts long have held, for example, that proposed single-brand product markets -- which would include, by definition, products that are "unique" -- are untenable.  *E.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956) (trademarked products do not themselves constitute product markets); *E-Z Bowz, LLC v. Prof'l Prod. Research Co.*, No. 00 8670, 2003 WL 22068573, at *27 (S.D.N.Y. Sept. 5, 2003) ("it is obvious that merely obtaining a patent for a product does not create a product market for antitrust purposes") (quotation omitted).

---

[6]  Nor does Redbox allege facts to demonstrate, for example, why a consumer who wanted to watch "Mamma Mia!," but couldn't find it at that same kiosk outside the WalMart, might not simply walk into the WalMart and buy it, or drive to the Blockbuster to rent it, or order it or download it from Netflix, or await its release on pay-per-view, or cable, or broadcast television.

In short, Redbox has failed utterly to plead a valid product market, which alone justifies dismissal of the antitrust claims. *See Queen City*, 124 F.3d at 442 (affirming dismissal of Section 1 claim because products inside the proposed product market -- pizza ingredients sold by Domino's to its own franchisees -- were interchangeable with products from outside the proposed market -- pizza ingredients sold by other suppliers).

> **2.     The "Quick Look" Claim (Count II) Must Be Dismissed Because That Doctrine Has No Application Here, And Necessarily Fails Because The Rule Of Reason Claim Fails**

Redbox also alleges that the vertical agreements it challenges are illegal under the "quick look" doctrine. *See* Count II ("Sherman Antitrust Act:  Quick Look Doctrine").  Redbox is wrong on this as well.

The "quick look" doctrine is a truncated form of antitrust analysis (and a departure from the default rule-of-reason analysis) that the Supreme Court has utilized and approved only in connection with certain *horizontal* restrictions among competitors.  *See NCAA v. Board of Regents*, 468 U.S. 85 (1984) (agreement among colleges to restrict number of televised football games); *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986) (agreement among competing dentists not to provide x-rays to insurers).  A "quick look" analysis permits a court to dispense with the ordinary inquiry into market power, if the restraint, on its face, obviously has produced anticompetitive effects.  The reasoning behind these decisions is that market power is only a "surrogate for detrimental effects."  *See Indiana Federation of Dentists*, 476 U.S. at 461. If those effects are manifest, an inquiry into market power is unnecessary.  *See id.*

The problem for Redbox is that, as shown above, Redbox does not allege any horizontal agreement between competitors, only vertical agreements.  The law in the Third Circuit is clear: vertical restraints are judged under the rule of reason, not the quick look doctrine.  *See Gordon v. Lewistown Hospital*, 423 F.3d 184, 209-10 (3d Cir. 2005) (rejecting proposed application of quick look doctrine to a vertical restraint) (citing *Orson Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1368 (3d Cir. 1996) (vertical restraints "are evaluated under the rule of reason")).

In any event, Redbox has made no factual allegations whatsoever that would support or even suggest a finding of harm to competition in any market resulting from the challenged vertical agreements.  Redbox certainly has not made allegations of any "obvious anticompetitive effect that triggers abbreviated analysis."  *See California Dental Ass'n v. FTC*, 526 U.S. 756, 778 (1999) (reversing Ninth Circuit conclusion that horizontal advertising restrictions among dentists were illegal under the "quick look" doctrine); *see also Gordon*, 423 F.3d at 210 ("the quick look approach may be applied only when an observer with even a rudimentary understanding of ecomimics could conclude that the arrangement in question would have an anticompetitive effect on customers and markets").[7]

The "quick look doctrine" therefore has no application here.  Count II must therefore be dismissed, with prejudice.

### D.    THE INTERFERENCE CLAIM (COUNT IV) MUST BE DISMISSED

Redbox also purports to state a claim for interference with its "contracts" with VPD and Ingram.  Specifically, Redbox asserts "a valid and existing contract with Ingram" and a "valid and existing contract with VPD" "to purchase, among other things, Universal DVDs."  *See* Complaint ¶¶ 77, 78.[8]  Redbox alleges that Universal's directive to its distributors not to sell

---

[7]  In this cause of action and elsewhere, Redbox improperly conflates its (incorrect) allegations regarding the purported anticompetitive effects of the Revenue Sharing Agreement, with its allegations regarding the actual agreements as between Universal, and Ingram and VPD, which are the agreements targeted in the Sherman Act claims.  *See*, *e.g,*, Complaint ¶ 65 ("The restrictions demanded  . . . in the Revenue Sharing Agreement constitute a naked restraint on output . . . .").  Redbox rejected the Revenue Sharing Agreement; its terms therefore cannot have caused any anticompetitive effect.  In any event, to the extent that Redbox's principal concern with the Revenue Sharing Agreement is that it would impose a "window," we already have demonstrated that "windowing" is a legitimate and common way for studios to maximize the revenues from their copyrighted works, and to compete with other studios.  *See Universal City*, 111 F. Supp. at 309; *Syufy*, 712 F. Supp. 2d at 1388.

To be clear, though, Redbox makes no allegations regarding any purported anticompetitive effect flowing from the vertical agreements *between Universal and its distributors*, in support of its "quick look" claim or anywhere else in the Complaint.

[8]  Redbox alleges that its contract with Ingram is in writing, and Redbox has attached that agreement as Exhibit B to its Complaint (under seal).  That contract is dated August 27, 2008, *see* Exhibit B, at p.1, which is the day *after* the date on which Redbox alleges that Universal presented the Revenue Sharing Agreement at the August 26, 2008 meeting at Redbox's Illinois headquarters.  *See* Complaint ¶ 37.  This

Continued…

Universal product to Redbox constitutes "interference" with those contracts: "[Universal's] threat to no longer supply Universal DVDs to VPD and Ingram constitutes an intentional inducement to those distributors to breach their supply agreements with Redbox."  Complaint ¶ 80.

### 1.   An Interference Claim Cannot Be Founded On A Defendant's Exercise Of A Legal Right

This theory of liability is fatally flawed.  It is a settled principle of tort law that a defendant cannot be held liable for interference with contract simply for asserting his own legal interests.  This principle is set forth in the Restatement (Second) Torts, in a section that various state and federal courts -- including the Third Circuit, the Ninth Circuit, the District of Delaware, the Delaware Chancery Court, and the California Court of Appeal -- all have cited with approval.

**Asserting Bona Fide Claim**

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

Restatement (Second) of Torts § 773 (1979).  Other secondary authorities state this rule in similar terms.  *See* 44B Am. Jur. 2d Interference § 22 (2008) ("[T]he following acts do not constitute unjustifiable interference with another's contract:  (1) enforcing or complying with one's own valid contract; . . . (3) and protecting one's contractual right."); Prosser & Keeton on Torts § 129, at 986 (5th ed. 1984) ("The defendant is also permitted to interfere with another's

---

….Continued

timing raises a suspicion that Redbox may have executed this written agreement in an attempt to buttress its interference claim.

With respect to VPD, Redbox alleges that it "has a similar business relationship with VPD" as it has with Ingram, but that "the agreement is not reflected in a single integrated document."  *See* Complaint ¶ 33.  Whether the terms of Redbox's purported "contract" with VPD are similar to the terms in the Ingram written agreement is immaterial to this motion, however.  Regardless of the terms of the purported contracts, Universal cannot be liable for interference with the contracts as a matter of law.

contractual relations to protect his own present economic interests, such as . . . a prior contract of his own . . . .").

Thus, for example:

- Assume an advertising representative has the contractual right to act as the "exclusive" ad rep for a cable television company.  The ad rep's *enforcement* of that exclusivity right cannot give rise to interference liability in a claim brought by a competitor who had tried to sell advertising to that same cable company, because the right to act as the exclusive ad rep is a "legally protected interest[ ]."  *See Thompson Everett, Inc. v. National Cable Advertising*, L.P., 57 F.3d 1317, 1327 (4th Cir. 1995).

- Imagine that Fannie Mae has a letter agreement with a lender permitting Fannie Mae to require the lender to repurchase certain mortgages the lender previously had sold to it.  Fannie Mae cannot be liable on an interference claim for enforcing that right, even if doing so causes a third party to walk away from contract negotiations with the lender.  "[E]nforcing one's own valid contract does not constitute unjustifiable interference with another's contract."  *See People's Mortgage Co. v. Fed. Nat'l Mortgage Ass'n*, 856 F. Supp. 910, 934 (E.D. Pa. 1994) (quoting 45 Am. Jur. 2d, Interference, § 23) (and citing Restatement (Second) Torts § 773).

- Or, assume that "A and B both have contracts with C for the purchase of the same horse from C.  When C is about to deliver the horse to A, B in good faith demands delivery under his contract and threatens to sue C for damages if delivery is not made.  C thereupon makes delivery to B and is disabled from performing the contract with A.  B's interference is not improper . . . ."  *See* Restatement (Second) Torts § 773, illus. 3.

### 2. Because Universal Has The Legal Right To Tell Its Distributors How To Distribute Its Products, It Cannot Be Liable For "Interference" For Doing So

Applying these principles here leads to the conclusion that Universal cannot be liable for any purported interference with Redbox's purchase contracts with Ingram or VPD.  First, as set forth above, Universal has a "legally protected" right (Restatement § 773) to "protect [its] own present existing economic interests" (Prosser & Keeton § 129) by directing its distributors to

distribute its products only in the ways that it sees fit.  *See supra* sections III.A & III.B.  Because neither the antitrust laws nor the copyright laws impede Universal's exercise of this right here, nor can tort law.

Indeed, to hold otherwise would make no sense.  Taken to its extreme, a rule permitting Redbox -- a retailer -- to hold Universal -- a supplier -- liable for interference with Redbox's purchase contracts would hamstring Universal and potentially prevent Universal from making and implementing any number of reasonable decisions regarding the distribution of its DVDs.  If Universal decides that a particular title should be sold only to retailers who will display the title prominently and in a clean setting (in order to help the title compete, for example), should retailers who are unwilling or unable to do so be permitted to sue Universal for interference?  If Universal decides that its titles should be released first in the U.S. market, and only afterwards in a foreign market, should a foreign retailer be permitted to sue Universal for interference?  Or what if Universal decides to start utilizing different distributors altogether, and no longer to sell DVDs through Ingram and VPD.  Could Redbox sue Universal for interfering with its contracts that purportedly give it the "right to purchase Universal DVDs from Ingram" (Complaint ¶ 30) and the right "to buy Universal DVDs from VPD" (Complaint ¶ 33)?

The answer to each of these questions is "no."   Redbox cannot hold Universal liable for interference in any of these situations.  And nor can it pursue its claim here.  Redbox has not and cannot allege that Universal has done anything more than assert a "legally protected interest," and its interference claim must therefore be dismissed.  Restatement § 773.

### 3.    Universal's Legal Right Is Set Forth In Its Written Contracts; There Are No Issues Of Fact To Preclude Dismissal

This conclusion -- that Universal's exercise of its legal right cannot trigger interference liability -- is underscored by the fact that Universal's contracts with Ingram and VPD *expressly* confirm Universal's right to direct these distributors not to sell to particular retailers, and *expressly* confirm its right to sell directly to certain accounts, as opposed to selling through Ingram or VPD.  Universal first entered such written agreements with Ingram and VPD through

Deal Memoranda in October 2000, nearly *two years before* the 2002 founding of Redbox.  *See*

Complaint ¶ 21.  Universal then entered long form "Videogram Distribution Agreement[s]" with

Ingram and VPD in October 2003, nearly *five years before* Universal purportedly "threatened" to

stop selling DVDs to Ingram and VPD if they continued to resell product to Redbox.  *See*

Complaint ¶ 41, 43.[9]

Thus, for example, both the contracts provide expressly that *Universal*



Similarly, both of these contracts provide that Universal may decide on its own to deal

directly, and exclusively, with a particular retail account rather than indirectly through the

distributors ███████████████████████████████, which is just what Universal is

alleged to have attempted to do with Redbox. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

Because these contracts expressly confirm Universal's right to do precisely what it is

alleged to have done -- propose a direct arrangement with Redbox and instruct Ingram and VPD

---

[9]  Universal must emphasize, however, that its substantive right to instruct its distributors to distribute its DVDs in the manner that Universal alone determines -- free from fear of tort liability -- is *not dependent* on the fact that Universal has a written contract that expressly spells out these rights.  The law recognizes that the assertion even of intangible rights and interests, not set forth in a contract, are immune from interference liability.  *See, e.g.*, Prosser & Keeton on Torts § 129, at 986 (5th ed. 1984) ("the defendant may use his business judgment and may protect intangible existing interests, such as good will or good relationships, or the character of his business, as where a hotel interferes with a contract to assure that a concession on its premises operates with standards appropriate to the hotel's clientele . . . .").

not to sell to Redbox -- this case is distinguishable from *Corning Inc. v. SRU Biosystems, LLC*, 292 F. Supp. 2d 583 (D. Del. 2003).  *Corning* was a case in which the court refused to dismiss an interference counterclaim alleging that the plaintiff's filing of the lawsuit itself constituted interference, despite the moving party's argument (citing Restatement (Second) Torts § 773) that the counterclaimant had failed to allege sufficient facts to demonstrate that the filing was made with an improper motive.  *See Corning*, 292 F. Supp. 2d at 585-86.  The *Corning* court (in a case that pre-dated the 2007 Supreme Court decision in *Twombly* that made clear that "labels and conclusions" are not enough) held that allegations that the complaint had been filed "with the improper motive of interfering" with certain negotiations, and "to disrupt [the] receipt of 'financing from potential investors,'" were "sufficient, *at this juncture*, to avoid dismissal on the claim that Corning may not have filed the instant action in good faith."  *See Corning*, 292 F. Supp. 2d at 586 (emphasis added).

In this case, by contrast, Redbox has expressly alleged the existence of contracts that confirm Universal's right to direct Ingram and VPD not to sell Universal DVDs to Redbox.  *See* Complaint ¶ 36 ("On information and belief, VPD and Ingram have contracts with [Universal]. In these contracts, [Universal] has demanded and obtained the right to terminate those contracts at will if VPD and Ingram do not distribute Universal's DVDs in accordance with [Universal's] wishes.").

In making these allegations, Redbox has alleged facts that indisputably *negate* the possibility that Universal's conduct -- in exercising this express contractual right -- constitutes bad faith.  *See American Franklin Life Ins., Co. v. Galati,* 776 F. Supp. 1054 (E.D. Pa. 1991) (Pollack, J.) (granting a motion for judgment on the pleadings, holding that insurance company did not act in bad faith as a matter of law where it acted pursuant to contractual authority).  In *American Franklin*, an insured brought a counterclaim for bad faith denial of an insurance claim against American Franklin alleging that American Franklin had acted in bad faith by investigating the insured's background.  The court disagreed.  It held that, because the policy

expressly recognized American Franklin's right to investigate Galati, the investigation could not constitute bad faith as a matter of law. *See American Franklin*, 776 F. Supp at 1064-65.

Indeed, we are aware of no instance in which a court -- on a pleading motion or at any other stage of litigation -- has concluded that the exercise of a express contractual right could constitute bad faith or trigger interference liability. To the contrary, where, as here, the defendant's actions are specifically authorized by contract, a motion to dismiss is proper. *See Barkan v. Dunkin Donuts, Inc.,* 520 F. Supp. 2d 333 (D.R.I. 2007). In *Barkan*, a franchisee brought a claim for tortious interference based on the franchisors' alleged interference with a prospective sale. The court granted the defendants motion to dismiss on the grounds that the defendants were acting within their *contractual* rights. "[T]he Court holds that Defendants had a bona fide interest to protect in the [proposed sale]. Their efforts to safeguard that interest . . . are therefore privileged and legally justified." *Id.* at 342.

It is impossible for Redbox to overcome this barrier to liability through any further pleading. Redbox has alleged that Universal acted pursuant to contract. In light of this, any "buzzwords" about improper purpose that may be found in the Complaint, as well as Redbox's incorrect legal assertion that Universal's conduct "is not protected by any recognized judicial, statutory, constitutional or other privilege," *see* Complaint ¶ 80, must be disregarded as mere "labels and conclusions." *See Twombly*, 127 S. Ct. at 1964-65; *see also Philips v. County of Allegheny*, 515 F.3d 224, 230-34 (3d Cir. 2008) (holding that *Twombly* is not limited to antitrust context).

## IV.    CONCLUSION

For all the foregoing reasons, Universal respectfully requests that the Court grant this motion, and dismiss the Complaint with prejudice.

                              */s/ R. Montgomery Donaldson*
                              R. Montgomery Donaldson (DE Bar ID 4367)
                              *rdonaldson@mmwr.com*
                              Lisa Zwally Brown (DE Bar ID 4328)
                              *lzbrown@mmwr.com*
                              **MONTGOMERY, MCCRACKEN,**
                               **WALKER & RHOADS, LLP**
                              1105 N. Market St, Suite 1500
                              Wilmington, DE 19801
                              (302) 504-7800
                              *Counsel for Defendants*
                              *Universal Studios Home Entertainment, LLC,*
                              *Universal City Studios, LLLP, Universal City*
                              *Studios Productions, LLLP, and Focus Features,*
                              *LLC*

OF COUNSEL:

Paul H. Zoubek
(PA Bar I.D. No. 36716)
R. Monica Hennessy
(PA Bar I.D. No. 77928)
**MONTGOMERY, MCCRACKEN,**
 **WALKER & RHOADS, LLP**
Liberty View
457 Haddonfield Road, Suite 600
Cherry Hill, NJ 08002
(856) 488-7700

Glenn D. Pomerantz
(State Bar No. 112503)
David C. Dinielli
(State Bar No. 177904)
**MUNGER, TOLLES & OLSON LLP**
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
(213) 683-9100

Dated:  December 5, 2008