## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REDBOX AUTOMATED RETAIL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 08-766-RBK |
| | ) | |
| UNIVERSAL STUDIOS HOME | ) | **JURY TRIAL DEMANDED** |
| ENTERTAINMENT, LLC; UNIVERSAL | ) | |
| CITY STUDIOS, LLLP; UNIVERSAL CITY | ) | |
| STUDIOS PRODUCTIONS, LLLP, and | ) | |
| FOCUS FEATURES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### FIRST AMENDED COMPLAINT

Plaintiff Redbox Automated Retail, LLC ("Redbox") alleges the following:

### OVERVIEW

1.  Redbox rents and sells digital video disks ("DVDs") to consumers through innovative, consumer-friendly means: automated, self-service kiosks located in various retail outlets. Consumer demand for Redbox has exploded since the company's inception in 2002, primarily due to Redbox's efficient means of providing consumers with low-cost, easily accessible DVD releases on the day those new-release DVDs become available to the general public.

2.  Under the guise of a "Revenue Sharing Agreement" (attached as Ex. A), Defendants seek to eliminate Redbox's low-cost rental alternative for consumers. Specifically, Defendants want to prohibit Redbox from renting or selling Universal DVDs until at least 45 days after they first become available to the public. Defendants know, however, that consumer demand for a new-release DVD is at its highest immediately after its release and declines substantially thereafter and within a short time period. Defendants also demand that Redbox

limit the number of copies of Universal DVDs that Redbox kiosks can stock and further require

that Redbox destroy all of its copies of previously-viewed Universal DVDs, so that none of the

previously-viewed new-release DVDs can be sold at a low price to consumers.

3.    To drive home their "take it or leave it" proposition, Defendants have threatened

to terminate Redbox's two main distributors (VPD and Ingram) if they supply Redbox with

Universal DVDs or provide certain other services to Redbox – unless Redbox agrees to sign the

Revenue Sharing Agreement and participate in Defendants' attempts to decrease the supply of

copyrighted DVDs, reduce consumer choice in the marketplace and increase the prices that

consumers must pay during tough economic times.

4.    Faced with Defendants' demands, VPD and Ingram have agreed to Defendants'

scheme and have refused to honor Redbox's orders for Universal DVDs since December 1, 2008.

Moreover, Defendants' have expanded their illegal boycott against Redbox to alternative sources

of supply, including other wholesalers and ordinary retail stores, thereby depriving Redbox of

ready access to new-release Universal DVDs.

5.    Defendants illegally seek to extend and misuse their rights as holders of

copyrights for the new-release Universal DVDs and to either (1) eliminate the channel of low-

cost, highly-convenient kiosk rental and resale; or (2) unlawfully eliminate competition from

Redbox (and other kiosk outlets) at the current and competitive "Dollar-Per-Night" rental rate,

and thereby take control of kiosk distribution for new-release DVD entertainment through one or

more higher-priced automated retail distribution devices, such as the Mediaport Media ATM

system (Ex. D) or Universal's own "POP" machine (Ex. E).

6.    Defendants' actions constitute copyright misuse, violate antitrust laws, and

tortiously interfere with Redbox's existing supply contracts with VPD and Ingram.  Redbox thus

seeks the following relief against and from Defendants:  (1) injunctive relief; (2) declaratory relief; (3) money damages; (4) attorneys' fees and costs; and (5) such further relief as this Court deems just and appropriate.  In particular, Redbox is entitled to a declaration against Defendants that their conduct renders their copyrights unenforceable on Defendants' DVDs distributed during the time frame that Defendants continue to engage in their inequitable and illegal conduct.

## THE PARTIES

7.     Plaintiff Redbox is a Delaware limited liability company with its principal place of business in Oakbrook Terrace, Illinois.

8.     Defendant Universal Studios Home Entertainment, LLC ("USHE") is a Delaware limited liability company with its principal place of business in Universal City, California. USHE markets and sells DVDs that are copies (as that term is defined in Section 101 of the Copyright Act) of copyrighted motion pictures and other copyrighted audiovisual works, such as television programs.  USHE is indirectly owned by NBC Universal, Inc.

9.     Defendant Universal City Studios Productions LLLP ("Universal City Studios Productions") is a limited liability limited partnership organized under the laws of the State of Delaware with its principal place of business located in Universal City, California.  Universal City Studios Productions is one of the world's leading creators and distributors of motion pictures.  Universal City Studios Productions, directly or through its affiliates, is engaged in the business of developing, producing, and distributing to others the right to distribute and exhibit copyrighted motion pictures in the United States and throughout the world. Universal City Studios Productions is wholly and indirectly owned by NBC Universal, Inc.  Universal City Studios Productions also does business as "Universal Studios."

10.     Defendant Universal City Studios LLLP ("Universal City Studios") is a limited liability limited partnership organized under the laws of the State of Delaware with its principal

place of business located in Universal City, California. Universal City Studios, directly or through its affiliates, is engaged in the business of developing, producing, and distributing to others the right to distribute and exhibit copyrighted motion pictures in the United States and throughout the world. Universal City Studios is wholly and indirectly owned by NBC Universal, Inc. Universal City Studios also does business as, and owns the federally registered service mark "Universal Studios."

11.     Defendant Focus Features, LLC ("Focus Features") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located in Universal City, California. Focus Features, directly or through its affiliates, is engaged in the business of developing, producing, and distributing to others the right to distribute and exhibit copyrighted motion pictures in the United States and throughout the world. Focus Features is indirectly owned by NBC Universal, Inc.

12.     USHE is an affiliate of Universal City Studios Productions. Through USHE, Universal City Studios Productions distributes copyrighted motion pictures and television programs on DVD for the home viewing market.

13.     USHE is an affiliate of Universal City Studios. Through USHE, Universal City Studios distributes copyrighted motion pictures and television programs on DVD.

14.     USHE is an affiliate of Focus Features. Through USHE, Focus Features distributes copyrighted motion pictures and television programs on DVD.

15.     Universal City Studios Productions, Universal City Studios and Focus Features are collectively referred to in this Complaint as "Universal Studios." The DVDs distributed by USHE for Universal Studios are referred to as the "Universal DVDs."

## THE NON-PARTY DISTRIBUTORS

16.     On information and belief, Ingram Entertainment, Inc. ("Ingram") is a Tennessee corporation with its principal place of business in La Vergne, Tennessee.  Ingram is a wholesale distributor of DVDs.

17.     On information and belief, Video Product Distributors ("VPD") is a California corporation with its principal place of business in Folsom, California.  VPD is a wholesale distributor of DVDs.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over Counts I, II, III, IV and V of this action pursuant to 28 U.S.C. § 1331, 17 U.S.C. §§ 101, *et seq.* (Copyright Act) and 15 U.S.C. §§ 1, *et seq.* (Sherman Antitrust Act), and 28 U.S.C. §§ 1337, 1338.  This Court has supplemental subject matter jurisdiction over Count VI pursuant to 28 § U.S.C. 1367.

19.     Pursuant to 28 U.S.C. §§ 2201-02, this Court may declare the rights and other legal relations of the parties because there exists an actual controversy.

20.     This Court has personal jurisdiction over USHE, Universal City Studios Production, Universal City Studios and Focus Features because each of them does business and resides in the State of Delaware.

21.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because each Defendant is organized under the laws of the State of Delaware and thus resides in this State.

## FACTUAL ALLEGATIONS

### A.     Redbox's Consumer-Friendly Business Model

22.     Since the introduction of DVDs into the marketplace, the DVD has become the dominant medium for the distribution of movies for home viewing.

23.     Redbox was founded in July 2002, when the company deployed DVD rental kiosks in a "test market" in Washington, D.C. After initial success in that market, Redbox chose Las Vegas, Nevada, as a second "test market" in 2003. These test markets established that consumers would enthusiastically turn to this convenient, low-cost source for new-release DVD rentals and sales, and the company expanded.

24.     Redbox is an innovator. It has developed a highly-convenient, yet low-cost option for consumers wishing to obtain DVDs. Redbox provides DVDs to consumers through a nationwide network of over 12,000 self-service kiosks. Each kiosk features an interactive touch screen and sign, a robotic disk array system and a web-linked electronic communications system that allows customers to rent or buy DVDs. Kiosks typically hold up to 700 DVDs comprising 70-200 individual titles. The kiosks are updated weekly with a supply of new-release DVDs. A single kiosk may hold up to as many as forty-five (45) copies of a popular new-release DVD.

25.     Consumers use credit cards to rent or purchase DVDs from Redbox. They can also search for and reserve DVDs online through Redbox's website. Consumers enjoy the ability to rent DVDs at one location and return them at any other Redbox location, thanks to Redbox's patented rent and return system. For instance, a family can rent the latest Disney movie at a McDonald's restaurant on Friday night, and return it to their neighborhood Albertson's supermarket when shopping the next day. In 2007, readers of "SelfServiceWorld" magazine ranked Redbox as the No. 1 self-service application, besting other kiosks deployed by NCR, IBM, Kodak and Starbucks, among others.

26.     Consumers love Redbox. Consumer demand for Redbox rentals and sales has grown substantially in the last four years. Redbox had 125 kiosks in 2004, had nearly 6500 by the end of 2007 and had over 12,000 kiosks nationwide at the end of 2008. Consumer demand

has enabled Redbox to surpass Blockbuster, Inc. in the number of DVD rental locations in the United States. To date, consumers have rented more than 300 million DVDs from Redbox. Consumers average approximately 50 DVD rentals per day per kiosk. Indeed, consumer demand has supported Redbox's expansion such that Redbox installed a new kiosk, on average, every 90 minutes somewhere in the United States last year. As part of this expansion, Redbox hired over 600 new employees last year.

**B.    The Market For Redbox DVD Rental**

27.    Consumers currently find Redbox kiosks located in retail outlets such as McDonald's restaurants, Walmart stores, grocery stores such as Albertson's, Stop & Shop, Harris Teeter, Meijer's and others, and drug stores such as Walgreen's, throughout the continental United States and Puerto Rico. Redbox typically has contracts with these retail outlets. Much of Redbox's success depends on maintaining a business model that satisfies the expectations of the retail outlets and consumers.

28.    Consumers seeking to rent a new-release DVD generally search by specific title, or by category or genre. Video rental stores are laid out this way. So are video rental websites and so, too, are the menus of Redbox DVD rental kiosks. This is because consumers seeking to rent a new-release musical comedy DVD are generally not interested in renting or buying a new-release action DVD. Accordingly, Redbox, like others in the new-release DVD rental and resale business, categorizes each DVD by title, release date and also by category or genre.

29.    Consumers can rent new-release DVDs from Redbox kiosks for $1 per night – a lower cost than alternative brick-and-mortar outlets or alternative sources for new-release DVD rental. In comparison, Defendants have said in other litigation that some 175 million DVDs were rented in the United States each month, at an average cost of approximately $3.25.

30.     Consumers can also purchase previously-viewed new-release DVDs from Redbox, typically beginning 12 days after their release, for as little as $7. In comparison, according to Defendants, 50 million new-release DVD movies were sold each month at an average price of approximately $18.50 from other sources.

31.     Consumer preference for Redbox rentals can largely be attributed to its ability to conveniently provide consumers with low-cost rentals on the same day that a DVD is released by a studio and made available for home viewing. This release date is known as the "street date." By industry convention, the "street date" for nearly every new-release DVD is on Tuesday of the week of its release. Consumer demand for a new-release DVD is the highest during the weekend immediately after its street date and declines substantially thereafter. Over thirty percent of a new-release DVD's revenue is generated during the first two weeks of its release. More than sixty percent of the rental demand for a particular title occurs within forty-five days of the street date. In this Complaint, a "new-release" DVD refers to those DVDs that are within the 45-day period following their street date.

32.     Because demand peaks for a new-release DVD in the first weekend following its release, consumers value Redbox's ability to stock multiple copies (as stated above, as many as 45 copies per kiosk in some instances) of popular, high-demand new-release DVDs.

C.     **Redbox's Relationship With VPD And Ingram**

33.     Until Defendants implemented their boycott on December 1, 2008, Redbox had been able to meet consumer demand for multiple copies of new-release DVDs for rental on a title's street date because of its longstanding contractual and business relationships with its distributors, VPD and Ingram. Before Defendants implemented their boycott on December 1, 2008, Redbox had purchased all, or nearly all, of its supply of new-release DVDs including new-release Universal DVDs from VPD and Ingram. Until December 1, 2008, Redbox had enjoyed

long term, mutually beneficial business relationships with VPD and Ingram. However, beginning December 1, 2008, in response to unlawful pressure from Defendants, these distributors refused to fill Redbox's orders for Universal DVDs, as discussed more thoroughly below. Absent interference from Defendants, Redbox would have continued to purchase all, or nearly all, of its supply of Universal DVDs from VPD and Ingram into the foreseeable future.

34.    Redbox has a supply contract with Ingram (the "Ingram Supply Contract" (attached as Ex. B, redacted so as to protect sensitive commercial information)) that gives Redbox the right to purchase Universal DVDs from Ingram, and similarly obligates Ingram to sell to Redbox, upon Redbox's request, Universal DVDs marketed by USHE. Specifically, Redbox's Supply Contract with Ingram requires Ingram to order DVDs from the studios. The term "studios" has, throughout the relationship between Redbox and Ingram, always included Universal Studios and its affiliates, including Defendants.

35.    The Ingram Supply Contract also contains a "DVD Buy Back" clause that permits Redbox to sell and obligates Ingram to "repurchase from Redbox ('Buy Back') new-release DVD product" pursuant to a timeframe tied to the title's street date. Under this arrangement, Ingram purchases back significant amounts of previously-viewed DVDs from Redbox, and in turn sells them to other buyers in the distribution stream.

36.    Redbox has a similar business relationship with VPD, although the agreement is not reflected in a single integrated document. However, until December 1, 2008, the VPD contract had always permitted Redbox to buy Universal DVDs from VPD and receive these Universal DVDs in advance of their street date. VPD, like Ingram, holds itself out as having the ability to provide retailers like Redbox access to all of the titles released by the major Hollywood studios, which includes Universal Studios. As with Ingram, Redbox is able to sell back

significant amounts of previously-viewed DVDs to VPD, which in turn sells them to other buyers in the distribution stream.

37.    Before Defendants' and the distributors' boycott of Redbox, which began December 1, 2008, Redbox purchased all, or nearly all of its supply of new-release Universal DVDs from VPD and Ingram.

**D.    The New-Release DVD Industry And Market**

38.    New-release DVDs for rental or resale are perishable goods, like milk or fruit; their value drops rapidly and materially almost from the first date they appear on the shelf. Because consumer demand for a particular new-release DVD is highest while new on the market, consumer demand for a new-release DVD is different from consumer demand for back-catalog DVDs, *i.e.,* DVDs that have been on the market for longer than forty-five days. Like the difference between first-run theatrical films and older films that are displayed in smaller theaters and at lower prices, new-release DVDs constitute a separate market. In economic terms, the cross-elasticity of demand between new-release DVDs and back catalog items is low. This is reflected, among other ways, by different pricing and different marketing for new-release DVDs, as opposed to older, back-catalog DVDs.

39.    Because of consumer preference and industry practice, a particular new-release DVD is not an acceptable substitute for another new-release DVD. Studios work hard to ensure that a release in a particular category, or genre, does not share its street date with another release in the same category or genre. Consumers seeking to rent a new-release DVD generally search by title and by category or genre. Video rental stores are laid out this way. So are video rental websites and so, too, are the menus of Redbox DVD rental kiosks. This is because consumers seeking a family-oriented new-release DVD will not often rent a new-release action DVD instead. Accordingly, Redbox, like others in the new-release DVD rental business, categorizes

- 10 -

DVDs by titles, release date and also by their genre. Each category, or genre, constitutes a distinct submarket within the overall new-release DVD market. Common categories, or genres, include: action/adventure, comedy, drama, family and kids, horror and sci-fi, suspense and others. There is low cross-elasticity of demand among consumers for new-release DVDs of different genres. Consumers who want to see Angelina Jolie in an action shoot-'em-up (*e.g.* "*Wanted*") are unlikely to accept a Meryl Streep musical comedy ("*Mama Mia!*") instead.

40.     Release dates for new-release DVDs are timed so that a particular new-release DVD title will face as little competition as possible with other new-release DVDs in the same genre. Thus, for example, the Universal DVD "*Wanted*," was released on Tuesday, December 2, 2008, when it directly competed with few, if any, other new-release action-adventure DVDs.

41.     Because of the inelastic demand for each particular new-release DVD, Defendants possess significant market power for a new-release DVD and, in the alternative, within a specific category or genre during the forty-five days following the street date. Consumers have few, if any, acceptable substitutes for a particular new-release DVD in a particular category or genre during the relevant time period.

**E.     August 26, 2008 Meeting Between Redbox And USHE**

42.     On Tuesday, August 26, 2008, USHE representatives visited Redbox's headquarters in Oakbrook Terrace, Illinois. Specifically, USHE Vice Presidents Jamie Guzzaldo and Dick Longwell, as well as a USHE in-house lawyer and an account representative, attended the meeting on behalf of USHE. Redbox personnel at the meeting included Chief Operating Officer Mitch Lowe, Vice President of Purchasing Scott Goldberg, and Senior Buyer Eric Litynski.

43.     During the meeting, USHE provided the Revenue Sharing Agreement to Redbox, stating that Redbox had until the close of business the following day (*i.e.*, August 27, 2008) to

sign the Revenue Sharing Agreement. Redbox had no prior notice as to the nature of this proposal, which would materially and adversely alter the conditions under which consumers are able to rent and buy DVDs from Redbox kiosks.

44.    During the meeting, USHE threatened that if Redbox refused to sign the Revenue Sharing Agreement and the distributors continued to supply Universal DVDs to Redbox, USHE would stop selling any Universal DVDs to VPD and Ingram.

45.    USHE also threatened to cut off sales to VPD and Ingram if they continued to provide other services to Redbox, if Redbox did not sign the Revenue Sharing Agreement. These other services include barcode labeling, packaging DVDs into Redbox jewel cases, sorting, shipping and storage of the original DVD cases and artwork prior to street date, as well as DVD repair.

46.    USHE made these threats despite being aware of Redbox's longstanding business and contractual relationships with Ingram and VPD.

47.    Redbox has not signed the Revenue Sharing Agreement. In response, Defendants have wrongfully compelled Ingram and VPD to cease shipping and selling Universal DVDs to Redbox as of December 1, 2008. VPD and Ingram have now complied with Defendants' demands, and as a result, Redbox no longer has access through its normal distribution channels to new-release Universal DVDs.

48.    Defendants have no contractual or other legally recognized right to restrict or govern how or to whom VPD and Ingram resell Universal DVDs that they have purchased. However, because of their dominant market power and position within the industry, Defendants have the ability to unlawfully coerce VPD and Ingram to not sell Universal DVDs to Redbox. Faced with the prospect of being denied access to Universal DVDs, VPD and Ingram have had

- 12 -

no choice but to acquiesce to Defendants' demands, and accordingly have refused to fill

Redbox's orders for Universal DVDs – items which Redbox is entitled to pursuant to its supply

contracts with VPD and Ingram.

49.     Following implementation of the boycott by VPD and Ingram, Redbox has been

forced to turn to other more costly and inconvenient channels from which to purchase Universal

DVDs since December 1, 2008.  However, Defendants have sought to prevent Redbox from

buying new-release Universal DVDs from other wholesalers and retailers, and in some instances

have succeeded in expanding the boycott.

50.     For example, Defendants have demanded that Best Buy and Walmart retail stores

cease or severely limit their sales of Universal DVDs to Redbox.  This is evidenced by various

attempts by Redbox personnel to purchase multiple copies of Universal DVDs from Best Buys

and Walmarts after December 1, 2008.  In some instances, these retailers canceled orders and

refused to sell Universal DVDs to Redbox personnel.  In other instances, Redbox personnel were

told by retail stores that the stores would sell them no more than five copies of any Universal

DVD.  In at least one instance a Redbox employee was escorted out of a retail store for

attempting to purchase multiple copies of a Universal DVD title.

51.     Thus, Defendants' boycott of Redbox has now gone beyond an illegal agreement

with Redbox's primary distributors, and now has expanded into a concerted boycott at both the

wholesale and retail level.  Defendants' actions have harmed consumers and harmed Redbox.

Consumers have been deprived of Redbox's low-cost, highly convenient medium for renting or

purchasing Universal DVDs and have been forced to turn to more expensive and burdensome

options for access to these movies.  Redbox has been cut out of its normal distribution channels

and has further been denied the ability to acquire Universal DVDs from alternative wholesale and retail channels, thereby resulting in harm to the company.

**F.    Defendants' Revenue Sharing Agreement And Related Actions Are Unlawful And Substantially Harms Consumers, As Well As Redbox**

52.    The Revenue Sharing Agreement demanded by Universal is a naked restriction on output that directly reduces the supply of new-release DVDs available to consumers and artificially increases the prices that consumers must pay.  The Revenue Sharing Agreement is unlawful, among other reasons, because it has the effect of (1) artificially constraining output by prohibiting Redbox from renting to consumers any DVD until "forty-five (45) days following [the] DVD sell-through street date established by USHE with respect to a Title;" (2) limiting the number of DVDs of a single copyrighted work that any particular kiosk may carry based upon a formula that correlates to the gross box office revenue of the movie; and (3) seeking to require Redbox to "destroy 100% of the units removed from an active rental machine" and certify that it has done so.

53.    The Revenue Sharing Agreement will have the effect of restricting output, eliminating competition in the rental and sales markets and artificially raising prices to consumers.

54.    In other litigation, Universal Studios has said "Studios have worked hard to create distribution channels that:  (a) provide consumers with choices about how they wish to access entertainment programming at different price points for different time periods and different purposes; and (b) allow us, as content owners, to earn revenues *depending* on how consumers choose to access that programming."  Plainly, Universal Studios seeks to reduce output, increase prices, and artificially control the market for new-release DVD rentals and re-sales.

55.     Universal Studios seeks to use the monopoly power conferred by the Copyright Act over first sale of a copyrighted DVD to either control or eliminate independent kiosk operators, including Redbox, from the new-release DVD rental market.  Universal Studios seeks to do this because (1) the kiosk distribution system used by Redbox provides new-release DVDs to consumers at a lower cost than Universal's favored methods of providing DVDs to consumers ($1 per night vs. $3.25 for the average rental; $7 sale price for a 12-day old DVD vs. $18.50 for a new one) and (2) the kiosk distribution system allocates a much smaller share of revenue from new-release DVD rentals and re-sales to Universal Studios than the distribution channels preferred by Universal.

56.     Redbox is a far less expensive way for consumers seeking to rent new-release DVD's than the other methods that Universal Studios seeks to impose, such as internet download services (the typical price of a new full-length movie purchased on iTunes, for example, is $14.99 and the so-called "rental" price for time-limited access to the downloaded copy is $3.99, Universal has said) and Video-on-Demand (the average price of watching a video-on-demand movie is $4.00).  Defendants' true purpose in seeking to impose the Revenue Sharing Agreement, and in orchestrating the boycott discussed herein, is to eliminate the independent kiosk as a low-cost consumer choice and thereby create an artificial shortage of product and a correspondingly high artificial price for rental or re-sale of new-release Universal DVDs. Defendants seek to eliminate the low-cost, highly convenient and fast-growing Redbox channel, preferred by consumers for one or more of the following reasons:  because (1) Redbox (and other independent kiosk vendors) threaten to undercut the artificial pricing of the distribution structure that Defendants seek to establish; (2) By virtue of its monopoly power, Universal Studios seeks to capture additional revenue from artificially high prices for new-release DVD rentals and re-

sales and; (3) Defendants seek to unlawfully eliminate competition in the new-release DVD

kiosk rental business to clear the way for its own, higher-priced automated distribution systems.

**COUNT I**

**DECLARATORY RELIEF:  COPYRIGHT MISUSE**

57.    Redbox incorporates the allegations set forth in paragraphs 1 through 56, above,

as if fully set forth herein.

58.    Copyright law provides copyright holders only a limited monopoly in order to

enhance retail competition and maximize dissemination of copyrighted works to the general

public.  The first-sale doctrine prevents copyright holders from extending the monopoly beyond

the initial sale of the copyrighted work.  Thus, Congress expressly provided that "[T]he owner of

a particular copy . . . lawfully made under [Title 17 of the United States Code] . . . is entitled,

without the authority of the copyright owner, to sell or otherwise dispose of the possession of

that copy . . ." 17 U.S.C. § 109(a).

59.    The public policy behind copyright law favors the enhancement of retail

competition and the maximization of dissemination of copyrighted works.  Anti-competitive

agreements or anti-competitive behavior, such as an unlawful group boycott, conflicts with this

public policy, subverts the goals of copyright law and constitutes "copyright misuse."  The

doctrine of copyright misuse prevents copyright holders from using their copyright and extend

their government-sanctioned monopoly beyond its proper scope.  The existence of such anti-

competitive agreements or unlawful activity precludes the enforcement of the copyright during

the period of copyright misuse.

60.    As indicated above, if Redbox had signed the Revenue Sharing Agreement,

Defendants would have continued to sell Universal DVDs to VPD and Ingram for distribution to

Redbox.  The Revenue Sharing Agreement would, *inter alia*, restrict the output of each

- 16 -

copyrighted DVD, eliminate competition for sales of recently released DVDs, and require

Redbox and its distributors to participate in a restraint of trade with Universal Studios, all of

which would stifle invention, creative expression and dissemination of copyrighted works.

Defendants' actions and the Revenue Sharing Agreement violate the public policy underlying

copyright law and therefore constitute copyright misuse.

61.    Because Redbox did not agree to restrict output and raise prices, as required by

the Revenue Sharing Agreement, Defendants coerced an agreement from VPD and Ingram not to

distribute Universal DVDs to Redbox. Defendants coerced other potential sources of supply to

boycott Redbox, as well. Defendants' unlawful boycott is contrary to, and violative of, the first

sale doctrine, restricting the statutory right of VPD, Ingram and others "to sell or otherwise

dispose" of the Universal DVDs that they have purchased. Defendants' attempts to thwart the

first sale doctrine of Section 109(a) of the Copyright Act violate the public policy embodied in

the grant of copyright, and constitute copyright misuse.

62.    There is an actual controversy over Defendants' copyright misuse, because they

are actively attempting to force Redbox to agree to the proposed Revenue Sharing Agreement,

and have now cut off Redbox's usual sources of supply and numerous other wholesale and retail

sources, as well. Both consumers and Redbox have already suffered harm as a result of

Defendants' coercion of VPD, Ingram, other distributors and major retailers to cease selling

Universal DVDs to Redbox as of December 1, 2008.

63.    Redbox is entitled to a declaration that Defendants' actions constitute copyright

misuse and that Defendants are precluded from enforcing copyrights for new-release Universal

DVDs. Further, Redbox is entitled to a declaration that so long as Defendants continue to

engage in their inequitable conduct, Redbox may lawfully reproduce and sell copies of

copyrighted Universal DVDs, including but not limited to those listed on Ex. C, without

incurring any liability pursuant to copyright law.

## COUNT II

## SHERMAN ANTITRUST ACT: QUICK LOOK DOCTRINE

64.    Redbox incorporates the allegations set forth in paragraphs 1 through 63, above,

as if fully set forth herein.

65.    Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) states that "Every contract,

combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

among the several States, or with foreign nations, is declared to be illegal."

66.    The boycott of Redbox orchestrated by Defendants, and in the alternative, the

restrictions demanded by USHE in the Revenue Sharing Agreement, constitute naked restraints

on output that decrease the supply of copyrighted new-release DVDs in many, or all genres,

reduce consumer choice in the various submarkets in the new-release DVD marketplace and

artificially increase prices that consumers will have to pay to rent or buy new-release DVDs in

those submarkets, thereby negatively affecting consumer welfare. In simple terms, because of

the boycott, there are consumers who wanted to rent *"Wanted"* or *"Mama Mia!"* from Redbox

for $1 per-night, but were unable to do so because of the boycott. These consumers either had to

do without, or pay more elsewhere.

67.    In the alternative, compliance with Defendants' Revenue Sharing Agreement

would limit the number of copies of new-release Universal DVDs that individual kiosks may

contain; prevent consumers from renting new-release DVDs until forty-five days after their street

date; would require the ultimate destruction, rather than resale, of all previously-viewed

Universal new-release DVDs. Here, too, consumers would face artificially constrained supply

and artificially higher prices.

68.    The boycott of Redbox, designed to unlawfully eliminate Redbox's ability to rent

or re-sell new-release Universal DVDs, or, in the alternative, the restrictions required by the

Revenue Sharing Agreement, cannot possibly result in a net pro-competitive effect that would

enhance intra-brand competition with rentals or resales through other channels, such as brick-

and-mortar stores or the POP machine and Media ATM being introduced by Universal Studios.

They nakedly reduce output and increase prices paid by consumers.  Nor does Defendants'

scheme enhance competition with new-release DVDs released by other copyright holders.

Defendants' boycott and the restrictions in the Revenue Sharing Agreement constitute activities

that are so plainly anti-competitive that even a "cursory exam" demonstrates that they constitute

unlawful and illegal restraint of trade in violation of Section 1 of the Sherman Act.

## COUNT III

## SHERMAN ANTITRUST ACT:
## RULE OF REASON

69.    Redbox incorporates the allegations set forth in paragraphs 1 through 68, above,

as if fully set forth herein.

70.    Each copyrighted work recorded on DVD constitutes an individual product

market.  Each copyrighted work is unique, and each such unique work has been granted a limited

governmental monopoly.  The geographic market for each such copyrighted work is nationwide.

71.    A copyright holder enjoys a "distribution right" and may initially sell, or not sell,

copies of a copyrighted work to others on such terms as he or she sees fit.  However, the

copyright holder's distribution right is limited to the first sale of the copyrighted item.  Under the

"first sale" doctrine, codified at 17 U.S.C. § 109(a) "the distribution right may be exercised

solely with respect to the initial disposition of copies of a work, not to prevent or restrict the

resale or other further transfer of possession of such copies."

72.     Defendants' right to control distribution of copyrighted new-release Universal DVDs ends once the DVD has been sold.  The distribution right may not lawfully be exercised after the initial sale, "to prevent or restrict the resale or further transfer of possession of such copies."

73.     Defendants' boycott, as well as their threats of termination of sales of all product to Ingram, VPD, other distributors and major retailers if they "transfer possession of copies" (*i.e.*, sell DVDs), to Redbox exceeds the scope of the government-granted distribution right, and violates the antitrust laws as an illegal restraint of trade.

74.     As such, by combining with its distributors and major retailers to boycott Redbox because Redbox refused to sign the Revenue Sharing Agreement, Defendants have violated Section 1 of the Sherman Act and unlawfully entered into an agreement to restrain commerce within the United States.

## COUNT IV

## SHERMAN ANTITRUST ACT: RESTRAINT OF TRADE

75.     Redbox incorporates the allegations set forth in paragraphs 1 through 74, above, as if fully set forth herein, and pleads, as an alternative to Count III, as follows.

76.     Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) states that, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

77.     New-release DVDs are introduced to the nationwide marketplace on a weekly basis.  Within the new-release market, a particular new-release DVD competes with another only to the extent that consumers view one as a reasonable substitute for the other.  As described above, each DVD category, or genre, constitutes a separate submarket.  The reason that Redbox

kiosks, like all new-release DVD outlets, carry dozens of titles at a time is because consumer behavior plainly demonstrates that there are few, if any, substitutes for a given new-release DVD title. If new-release DVDs were fungible, consumers would be satisfied with rental/resale outlets that carried only a handful of titles. Consumers would be indifferent if rental and resale outlets stocked ten, or a hundred, individual titles at one time. Thus, even if one does not accept the premise that each copyrighted title is a monopoly (paragraph 70, *supra*), well-established consumer preferences, as reflected by industry practice, demonstrates that there is low cross-elasticity of demand among new-release titles belonging to different categories, or genres, and that each such genre constitutes a distinct submarket.

78.     The boycott imposed by Defendants, or in the alternative, the restrictions demanded by USHE in the Revenue Sharing Agreement, will eliminate or significantly decrease the supply of new-release DVDs in each relevant submarket, will reduce consumer choice in the marketplace and will artificially increase prices that consumers have to pay to rent and/or buy new-release DVDs.

79.     By boycotting Redbox (and orchestrating a boycott of Redbox by others) for Redbox's refusal to sign the unlawful Revenue Sharing Agreement, Defendants are in violation of Section 1 of the Sherman Act and has entered into an unlawful agreement to restrain commerce within the United States.

## COUNT V

## SHERMAN ANTITRUST ACT:
## VIOLATION OF SECTION 1

80.     Redbox incorporates the allegations set forth in paragraphs 1 to 79 as part of this Count.

81.     Under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

82.     Despite the clear language of Section 1, Defendants, Ingram and VPD have entered into an agreement that forbids Ingram and VPD from selling Universal DVDs to Redbox and other kiosk operators.  Defendants also obtained the agreement of other distributors and major retailers not to sell (or to severely restrict sales) to Redbox.

83.     Defendants have orchestrated this boycott to force Redbox to artificially restrain output, raise prices and give Defendants a bigger cut of the revenues, or in the alternative to force Redbox out of business or replace Redbox kiosks with Defendants' own "POP" and "MediaATM" kiosk systems.  Either way, Defendants will be able to reduce supply and increase prices that consumers must pay to rent or buy Universal DVDs.

84.     Defendants' agreements with distributors and retailers that they not sell to Redbox is a group boycott in violation of the antitrust laws.  For the same reason, the restraints on output and pricing sought by the threatened Revenue Sharing Agreement represent an attempt to artificially reduce output and raise prices in violation of the antitrust laws.

## COUNT VI

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL/BUSINESS RELATIONSHIPS

85.     Redbox hereby incorporates the allegations set forth in paragraphs 1 through 84, above, as if fully set forth herein.

86.     Redbox has a valid and existing contract with Ingram to purchase, among other things, Universal DVDs.

87.    Redbox has a valid and existing contract with VPD to purchase, among other things, Universal DVDs.

88.    Defendants are aware of the existence of Redbox's supply contracts with its distributors. This is evidenced by Defendants' threat to stop selling to VPD and Ingram if they continue to sell Universal DVDs or otherwise provide services to Redbox.

89.    Defendants' threat to no longer supply Universal DVDs to VPD and Ingram constitutes an intentional inducement to those distributors to breach their supply agreements with Redbox. This inducement is not protected by any recognized judicial, statutory, constitutional or other privilege and therefore is not justified.

90.    Defendants' threatened action to no longer supply Universal DVDs to VPD and Ingram have made it impossible for those distributors to satisfy their contractual obligations to Redbox. Indeed, Defendants' coercion of VPD and Ingram has caused those distributors to stop selling Universal DVDs to Redbox notwithstanding Redbox's purchase orders for such product, thereby resulting in a breach of their supply contracts with Redbox.

91.    Defendants' actions, including but not limited to its attempt to force Redbox to sign the Revenue Sharing Agreement, have been carried out with the improper motive of, *inter alia*, interfering with Redbox's contracts with VPD and Ingram.

92.    Defendants' threatened action to no longer supply Universal DVDs to VPD and Ingram has and will continue to result in substantial damages to Redbox. Damages have and will continue to accrue not only as a direct result of the breach of the supply contracts, but also due to the proximate causes of that breach, including loss of customers, decreased demand for Redbox rentals and sales, and loss of customer goodwill.

## DEMAND FOR JURY

Redbox demands a trial by jury in this action for all issues so triable pursuant to

Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

WHEREFORE, Redbox respectfully requests that this Court award the following

relief:

a.    A declaration that Defendants' conduct constitutes copyright misuse, and thereby renders copyrights for Universal DVDs – however marketed, sold or distributed - unenforceable during the period of misconduct;

b.    Injunctive relief prohibiting Defendants from engaging in any efforts to limit the supply of Universal DVDs to Redbox;

c.    A declaration that the Revenue Sharing Agreement and Defendants' threatened action against VPD and Ingram violate the Sherman Antitrust Act;

d.    Damages to the full extent permitted by law;

e.    Attorneys' fees and costs; and

f.    Such further relief as this Court deems just and appropriate.

Of Counsel:

Charles S. Bergen
George R. Dougherty
Michael S. Gulland
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 704-7700
Facsimile: (312) 558-1195

Frederick W. Stein
Redbox Automated Retail, LLC
One Tower Lane, Suite 1200
Oakbrook Terrace, Illinois 60181
Telephone: (630) 756-8255
Facsimile: (630) 756-8885

Dated: January 22, 2009

/s/ Chad S.C. Stover
Henry E. Gallagher, Jr. (No. 495)
Chad S.C. Stover (No. 4919)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE 19801
Telephone: (302) 658-9141
Facsimile: (302) 658-5614
hgallagher@cblh.com
cstover@cblh.com

*Attorneys for Plaintiff*

- 24 -