## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| REDBOX AUTOMATED RETAIL, LLC, | |
| Plaintiff, | |
| v. | **Civil Action No. 08-766 (RBK)** |
| UNIVERSAL STUDIOS HOME ENTERTAINMENT, LLC, UNIVERSAL CITY STUDIOS, LLLP, UNIVERSAL CITY STUDIOS PRODUCTIONS, LLLP, and FOCUS FEATURES, LLC, | |
| Defendants. | |

## **DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**

OF COUNSEL:

Glenn D. Pomerantz (CA Bar No. 112503)
David C. Dinielli (CA Bar No. 177904)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560

Paul H. Zoubek (PA Bar No. 36716)
R. Monica Hennessy (PA Bar No. 77928)
MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP
457 Haddonfield Road, Suite 600
Cherry Hill, NJ  08002

Dated:  February 5, 2009

R. Montgomery Donaldson (DE Bar 4367)
Lisa Zwally Brown (DE Bar 4328)
MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP
1105 N. Market St., Suite 1500
Wilmington, DE  19801
(302) 504-7800
*Counsel for Defendants*
*Universal Studios Home Entertainment, LLC,*
*Universal City Studios, LLLP, Universal City*
*Studios Productions, LLLP, and Focus*
*Features LLC*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................ 1

II.    NEW AND REMOVED FACTUAL ALLEGATIONS ...................................... 4

    A.    New Factual Allegations .......................................................................... 4

    B.    Deleted Factual Allegations .................................................................... 5

III.   ARGUMENT .............................................................................................. 6

    A.    The Amendments Do Nothing To Save The Copyright Misuse Claim ................ 6

        1.    The Amendments Have No Bearing On The Principal Basis For Dismissal:  Copyright Misuse Is An Equitable Defense, Not A Cause of Action........................................................................... 6

        2.    The Amendments Do Nothing To Change The Fact That There Is No "Actual Controversy" Regarding Copyright Infringement ................ 7

        3.    None Of The New Allegations Could Support A Finding Of Misuse In Any Event ............................................................... 8

    B.    The Antitrust Claims Must Still Be Dismissed.................................................. 10

        1.    Count II Should Still Be Dismissed:  A "Quick Look" Is Not Appropriate Because Redbox Still Alleges Only Vertical Restraints...... 10

        2.    Count III Should Still Be Dismissed:  Its Product Market Of Single-DVDs Remains Untenable Despite Allegations Of "Inelasticity" ......................................................................... 11

        3.    Count IV Should Be Dismissed:  Redbox Still Does Not Allege Anticompetitive Effects And Its New Market Is Also Untenable .......... 12

            a.    Anticompetitive Effects ............................................................. 13

                (i)    No Allegation Of Market Wide Impact ........................... 13

                (ii)    No Allegations Of Market Power ................................... 15

            b.    Product Market........................................................................... 16

        4.    Count V Should Be Dismissed: Allegations Of Vertical Integration And "Group Boycott" Do Not Affect The Rule-Of-Reason Analysis Applicable To The Restraints At Issue In This Case................ 18

            a.    Universal Could Distribute Its Own DVDs Through Its Own Kiosks Without Violating the Antitrust Laws..................... 18

            b.    Even If Universal Did Instruct Other Retailers Not To Sell To Redbox, That Alleged Fact Would Not Change Anything ................................................................................... 19

**TABLE OF CONTENTS**
**(continued)**

**Page**

      5.     Redbox's Allegations About The Proposed Revenue Sharing Agreement Are Irrelevant Because There Was No Agreement ............... 20

   C.     The Interference Claim Must Still Be Dismissed ................................................ 20

IV.   CONCLUSION ................................................................................................................. 22

7055662.1

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*A & M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ..................................................................9

*Adidas America, Inc. v. Nat'l Collegiate Athletic Assoc.*,
64 F. Supp. 2d 1097 (D. Kan. 1999) ........................................................16

*ALA, Inc. v. CCAIR, Inc.*,
29 F.3d 855 (3d Cir. 1994)..........................................................................2

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
166 F.3d 772 (5th Cir. 1999) ......................................................................9

*American Franklin Life Ins., Co. v. Galati*,
776 F. Supp. 1054 (E.D. Pa. 1991) ..........................................................22

*Assam Drug Co., Inc. v. Miller Brewing Co., Inc.*,
798 F.2d 311 (8th Cir. 1986) ....................................................................15

*Barkan v. Dunkin Donuts, Inc.*,
520 F. Supp. 2d 333 (D.R.I. 2007)............................................................22

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007) ........................................................................12, 19

*Bradley v. Chiron Corp.*,
136 F.3d 1317 (Fed. Cir. 1998)...................................................................2

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)...................................................................................17

*Brunson Communications, Inc. v. Arbitron, Inc.*,
239 F. Supp. 2d 550 (E.D. Pa. 2002) .......................................................20

*Swierkeiwicz v. Sorema*,
534 U.S. 506 (2002)...................................................................................12

*Corning Inc. v. SRU Biosystems, LLC*,
292 F. Supp. 2d 583 (D. Del. 2003)..........................................................22

*Cupp v. Alberto-Culver USA, Inc.*,
310 F. Supp. 2d 963 (W.D. Tenn. 2004)...................................................17

*DM Research, Inc. v. College of Am. Pathologists*,
170 F.3d 53 (1999).....................................................................................19

*Donald B. Rice Tire Co. v. Michelin Tire Corp.*,
483 F. Supp. 750 (D. Md. 1980), *aff'd*, 638 F.2d 15 (4th Cir. 1981) ......15

*Gordon v. Lewistown Hospital*,
423 F.3d 184 (3d Cir. 2005).......................................................................11

*Green Counrty Food Market, Inc. v. Bottling Group, LLC*,
371 F.3d 1275 (10th Cir. 2004) .................................................................12

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Hack v. President and Fellows of Yale College*,
  237 F. 3d 81 (2d Cir. 2000)...................................................................12

*Holdings v. Severn*,
  No. 04-1137, 2004 WL 5458426 (C.D. Cal. Oct. 1, 2004)....................18

*Jacobs. V. Tempur-Pedic Int'l, Inc.*,
  2007 WL 4373980 (N.D. Ga. Dec. 11, 2007)........................................18

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
  127 S.Ct. 2705 (2007)....................................................................14, 18

*Nishimatsu Constr. Co. v. Houston Nat'l Bank*,
  515 F.2d 1200 (5th Cir. 1975) ...............................................................2

*Nynex Corp. v. Discon Inc.*,
  525 U.S. 128 (1998).............................................................................19

*O.S.C. Corp. v. Apple Computer, Inc.*,
  601 F. Supp. 1274 (C.D. Cal. 1985), *aff'd*, 792 F.2d 1464 (9th Cir. 1986)............16

*Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.*,
  998 F.2d 1192 (3d Cir. 1993)...............................................................21

*Peoples Mortgage Co. v. Fed. Nat'l Mortgage Ass'n*,
  856 F. Supp. 910 (E.D. Pa. 1994) .......................................................20

*PepsiCo. Inc. v. Coca-Cola Co., Inc.*,
  315 F.3d 101 (2d Cir. 2002)................................................................17

*Quality King Distrib., Inc. v. L'anza Research Int'l, Inc.*,
  523 U.S. 135 (1998)...............................................................................8

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ...............................................................15

*Shaw v. Rolex Watch, USA*,
  673 F. Supp. 674 (S.D.N.Y. 1987) ......................................................12

*Spahr v. Leegin Creative Leather Products, Inc.*
  2008 WL 3914461 (E.D. Tenn. Aug. 20, 2008) ...................................12

*T.B. Harms Co. v. Jem Records, Inc.*,
  655 F. Supp. 1575 (D.N.J. 1987) ...........................................................9

*Ticketmaster L.L.C. v. RMG Technologies*,
  536 F. Supp. 2d 1191 (C.D. Cal. 2008) ..................................................7

*Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*,
  342 F.3d 191 (3d Cir. 2003)...................................................................6

7055662.1

## TABLE OF AUTHORITIES
### (continued)

Page(s)

### REGULATORY CASES

*IDT Corp. v. Building Owners & Managers Ass'n*,
2006-1 Trade Cases ¶ 75,151, No. Civ. A. 03-4113 (JAG), 2005 WL 3447615 (D.N.J. Dec. 15, 2004)................................................................................................................13, 14

### FEDERAL STATUTES

17 U.S.C. § 106.....................................................................................................................9
17 U.S.C. § 106(3)................................................................................................................9
17 U.S.C. § 109(a)................................................................................................................8
28 U.S.C. § 2201(a)..............................................................................................................7

### TREATISES

45 Am. Jur. 2d, Interference § 23 (2008).........................................................................20
Restatement (Second) Torts 2d § 773 (1979) ..................................................................20

### OTHER AUTHORITIES

Philip A. Areeda & Herbert Hovencamp, *Antitrust Law* (3d ed. 2007) ¶ 562..............................11

7055662.1

I.      **INTRODUCTION**

On October 10, 2008, Redbox, a self-service kiosk operator, sued Universal because Universal directed its distributors to stop selling Universal DVDs to Redbox.  Universal moved to dismiss the complaint in its entirety on December 5, 2008.  Rather than oppose that motion, Redbox filed a First Amended Complaint ("FAC") on January 22, 2009.

Most of the new and amended allegations in the FAC are unremarkable and/or immaterial.  But there is one that must be noted at the outset, because it constitutes a stunning example of impermissible pleading gamesmanship, and one that completely undermines Redbox's core antitrust theory.  The heart of this lawsuit is Redbox's theory that Universal's agreements with its distributors – VPD and Ingram – which permitted Universal to direct these distributors no longer to sell Universal DVDs to Redbox, constitute illegal agreements in violation of Section 1 of the Sherman Act.  Redbox originally alleged the existence and terms of these agreements, *see* Orig. Complaint ¶ 36, so Universal submitted them to the Court in connection with its motion to dismiss.  Universal then relied on these contracts, in part to demonstrate that Universal by the clear terms of the contracts has had the right to tell its distributors to whom they can sell Universal DVDs since long before Redbox even existed, *see* Op. Br. at 23-24, and in part to demonstrate that Universal's exercise of its legal right to tell its distributors to whom they may or may not sell Universal DVDs cannot serve as the predicate for an interference claim.  *See* Op. Br. at 25 - 26.

So what does Redbox do?  In the FAC, Redbox simply *deletes* the prior reference to the contracts, and now actually alleges that Universal *did not have* the contractual right to tell its distributors to whom they can sell Universal DVDs, in direct contradiction to the express terms of the contracts that Universal specifically called out and quoted in its motion to dismiss.  *See*

FAC ¶ 48.  This maneuver does not permit Redbox to avoid the clear import of the contracts, however, which already are a part of the record on this motion.  *See ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994) ("Where there is a disparity between a written instrument annexed to a pleadings and an allegation in the pleading based thereon, the written instrument will control.") (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206-07 (5th Cir. 1975)); *cf. Bradley v. Chiron Corp.*, 136 F.3d 1317, 1324-26 (Fed. Cir. 1998) (court need not accept truth of allegations that contradict inconsistent prior allegations).

Moreover, this "amendment" to the allegations is insufficient to save the interference claim, and it seriously undermines the credibility of the antitrust claims.  If the antitrust claims are not based on these contracts and these rights, as Redbox previously alleged, what agreements are they based on?  The other changes to the complaint fare no better.  The FAC contains a handful of new factual allegations, and two new antitrust counts.  None of these amendments or new counts can prevent dismissal, however.

**Redbox's "Copyright Misuse" claim still fails.**  Universal already demonstrated that there is no such thing as a cause of action for copyright misuse absent a threat of an infringement suit.  The law has not changed.  Redbox still has not alleged that it faces an infringement suit from Universal, and still has not alleged that Universal engaged in any "misuse" of its copyrights in any event.  The claim must be dismissed.

**Redbox's antitrust claims still fail.**  Redbox has doubled the number of antitrust counts, from two to four, but all four of these counts still fail for the same fundamental reasons as did the original counts.  The FAC purports to add a new, alternative, "product market" within which to judge anticompetitive effects – "new release DVDs of different categories" – but Redbox still does not allege any anticompetitive effect within that market.  The only thing it now alleges is

7055662.1

that *Universal's* prices went up.  Putting aside whether the facts support this allegation, the allegation is of no moment.  Even if the new proposed product market were tenable, Redbox must allege a *market-wide impact* at the wholesale or retail level for the distribution or sale of DVDs in that proposed market.  An allegation that consumers cannot get Universal titles at a particular price through one particular company's kiosks (while consumers presumably can continue to rent or buy all the other studios' titles at Redbox, and consumers presumably can continue to rent or buy Universal titles through all sorts of other distribution channels, such as Blockbuster or Wal-Mart or Amazon.com or Netflix.com, at whatever prices those outlets determine to charge) simply is insufficient to suggest any market-wide impact.

The FAC also alleges Universal has directed *retailers* like Wal-Mart and Best Buy not to resell Universal DVDs to Redbox, in addition to issuing that same directive to Universal's distributors.  Redbox calls this a "group boycott."  But this is a label without a purpose – no matter what these purported agreements are called (Universal denies that it entered any such agreements with retailers and disputes that Redbox adequately has alleged the existence of any of these purported agreements), they still are vertical, they still are judged under the rule of reason, and the claims based on them still fail for all the reasons the original counts failed.

Finally, the FAC attempts to lend an air of intrigue to all these antitrust allegations by suggesting that Universal's true motive is to disable Redbox in order to make room in the marketplace for Universal's own kiosks.  First, this purported conduct – downstream integration into the kiosk market – is not the basis for the antitrust claims in this lawsuit.  But even if the allegations were true, they are irrelevant.  The law would allow Universal, if it so chose, to integrate vertically and rent and sell its own DVDs through kiosks, or through any other retail channel.

**Redbox's intentional interference claim still fails.**  Universal demonstrated that it cannot be held liable for interfering with Redbox's purported supply contracts with Universal's distributors because Universal's exercise of its legal right to tell its distributors to whom they may resell Universal DVDs cannot serve as the predicate for an interference claim as a matter of law.  Redbox's deletion of its prior reference to the contracts confirming those rights changes nothing.  This count must still be dismissed as well.

The truth is, Redbox is a jilted distributor.  It carried Universal's DVDs in its kiosks and would like to continue carrying Universal's DVDs in its kiosks on its, not Universal's, terms.  But like many jilted distributors, when it failed to achieve its goals in the business world, it turned to the courts.  Redbox's claims must fail, as have the claims of legions of jilted distributors that came before.  Universal is entitled to determine, on its own and for its own reasons, who sells its DVDs to consumers and how those DVDs are sold.  None of Redbox's new allegations undermine that right.

## II.      NEW AND REMOVED FACTUAL ALLEGATIONS

### A.      New Factual Allegations

Redbox has added a handful of new factual allegations, but none changes the outcome of this motion.  First, it is important to highlight that Redbox still does not allege any horizontal agreements.  It has added other actors to the story, such as Wal-Mart and Best Buy, and calls their alleged refusal to sell Universal DVDs a "group boycott," but Redbox does not allege that any of these actors entered into agreements with each other, and so does not affect the conclusion that the "rule of reason" governs all the antitrust claims in this case.  FAC ¶¶ 4, 49-51.  It has also added allegations that Universal is trying to "force Redbox out of business or replace Redbox kiosks with Defendants' own POP and Media ATM kiosk systems."  FAC ¶ 83.

The FAC also adds allegations about the relevant product market.  It attempts to bolster its original product market – single titles of DVDs – by adding the conclusory assertion that there is an "inelastic demand for each particular new-release DVD."  FAC ¶ 41.  It also alleges a new, alternative, and somewhat broader product market within which to judge anticompetitive effects:  "new release titles belonging to different categories or genres."  FAC ¶ 77.  To support this new product market, Redbox alleges that new releases do not compete with older releases, FAC ¶¶ 2, 31, 38, and that DVDs in one genre do not compete with DVDs in another genre. FAC ¶¶ 28, 39.

But Redbox still does not allege any anticompetitive effect in those relevant markets.  It alleges that consumers will be harmed because they are deprived of Redbox's low-cost alternative.  FAC ¶¶ 51, 56.  But those conclusory allegations regarding price relate only to Universal's products, not to any market wide price impact.  Redbox also does not allege that Universal has market power even within this new, alternative product market.  The closest it comes is to allege that, on December 2, 2008, Universal's DVD *"Wanted"* "competed with few, if any, other new release action-adventure DVDs."  FAC ¶ 40.

### B.    Deleted Factual Allegations

In addition to adding allegations, Redbox notably deleted allegations that it realized hurt it.  Redbox, in its original complaint, alleged that only 15% of the DVDs it sold came from Universal.  Orig. Compl. ¶ 34.  Because Universal argued in its Opening Brief that this fact indicated that Universal, as only one of many competitors in the DVD supply industry, could not as a matter of law have market power in any relevant market for DVDs, Redbox simply deleted it.

As stated above, Redbox also deleted an allegation about Universal's contractual rights

with its distributors, VPD and Ingram.  In its original complaint, Redbox alleged that Universal

"obtained the right" to order VPD and Ingram to stop supplying Redbox, on the penalty of

termination, "in [the] contracts" Universal had with VPD and Ingram.  Orig. Comp. ¶ 36.

Redbox has now deleted this assertion as well, presumably because the assertion demonstrates

conclusively that Redbox cannot pin an interference claim on such conduct.  But, even worse,

Redbox now has done a complete 180-degree turn, and alleges the exact opposite of what it

originally alleged.  Redbox now alleges (wrongly) that "Defendants have no contractual . . . right

to restrict or govern how or to whom VPD and Ingram resell Universal DVDs."  *See* FAC ¶ 48.

## III.   ARGUMENT

### A.    The Amendments Do Nothing To Save The Copyright Misuse Claim

#### 1.    The Amendments Have No Bearing On The Principal Basis For Dismissal:  Copyright Misuse Is An Equitable Defense, Not A Cause of Action

Universal demonstrated conclusively in the opening papers that copyright misuse is a

*defense to a copyright infringement claim*, not a cause of action that would provide Redbox an

independent vehicle by which to seek to invalidate Universal's copyrights or seek damages.  *See*

Op. Br. at 7-9.  In particular, Universal cited *Video Pipeline, Inc. v. Buena Vista Home*

*Entertainment, Inc.*, 342 F.3d 191 (3d Cir. 2003), in which the Third Circuit for the first time

recognized the copyright misuse defense.  *Video Pipeline*, like every other case recognizing the

defense, was a case involving a copyright holder's infringement action against an alleged

infringer.  In all of these cases, the alleged infringer defended by arguing that the copyright

holder's conduct had been inequitable, and the copyright holder therefore should not be

permitted to enforce its copyrights through an infringement action.  *See*, *e.g.*, *Video Pipeline*, 343

F.3d at 203 (defendant in infringement action "contends that Disney has misused its copyright

and, as a result, should not receive the protection of copyright law").  None of Redbox's new

allegations purport to solve this first fundamental problem of Redbox's claim – that copyright misuse simply is not a cause of action.

>    **2.      The Amendments Do Nothing To Change The Fact That There Is No "Actual Controversy" Regarding Copyright Infringement**

Universal also demonstrated in the Opening Brief that Redbox cannot get around this problem by labeling its claim as one for "Declaratory Relief." *See* Op. Br. at 8-9.  Universal explained that some courts have acknowledged that *a party that finds itself under threat of a copyright infringement action* might be able seek a declaration that such an action would be barred by the copyright holder's "copyright misuse." *See, e.g., Ticketmaster L.L.C. v. RMG Technologies*, 536 F. Supp. 2d 1191, 1199 (C.D. Cal. 2008) (acknowledging in dicta that a claim for declaratory relief with respect to copyright misuse may be proper even though no claim for copyright infringement actually has been asserted).  But none of these cases concludes that a party *that is not under threat of any infringement action* could seek such a declaration.  Absent a threat of infringement, there is no "actual controversy" over which this Court can assume jurisdiction and "declare" the parties' respective copyright rights pursuant to 28 U.S.C. § 2201(a), the statute conferring on this Court the authority to enter declaratory judgments.

In its amendments, Redbox has attempted to beef up its allegations describing the purported "actual controversy" between Redbox and Universal that is necessary for the Court to assert jurisdiction.  In particular, Redbox now alleges:

>    There is an actual controversy over Defendants' copyright misuse, because they are actively attempting to force Redbox to agree to the proposed Revenue Sharing Agreement, and have now cut off Redbox's usual sources of supply and numerous other wholesale and retail sources, as well.

FAC ¶ 62.  Universal fully agrees that there currently is a live dispute with Redbox; indeed, this is why Universal is so eager to have this motion decided promptly.  But the controversy has

nothing at all to do with Universal's copyrights or its efforts to enforce those copyrights as against Redbox or anyone else; the dispute is about whether Universal gets to make distribution decisions that it believes are best for its products, or whether instead those decisions can be challenged and second-guessed by Redbox through litigation.

> **3.     None Of The New Allegations Could Support A Finding Of Misuse In Any Event**

In any event, Redbox's amendments do nothing to support its assertion that Universal's conduct constitutes copyright misuse – under any definition.  For example, Redbox continues to contend, completely erroneously, that Universal's effort to control its distributors' resale of DVDs amounts to misuse because the restrictions violate the first sale doctrine.  In fact, new allegations in the FAC now expressly cite the Copyright Act's codification of that doctrine.  *See* FAC ¶ 58 (citing 17 U.S.C. § 109(a)), FAC ¶ 61 (same).

But Universal demonstrated in the opening papers that courts long have understood that the first sale doctrine provides merely that the owner of a particular, lawfully made "copy" of a copyrighted work can sell or dispose of that copy without being held liable for *copyright infringement.  See* Op. Br. at 10-11; *see also Quality King Distrib., Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 143 (1998) (assuming that it was no violation of the Copyright Act for supplier to have "relie[d] on the *terms of its contracts with its domestic distributors* to limit their sales to authorized retail outlets") (emphasis added).  There is no case that holds that the first sale doctrine prevents a supplier of copyrighted goods, such as Universal, from contracting with a distributor regarding restrictions on resale, or from imposing such restrictions unilaterally.  Such a rule would preclude suppliers of copyrighted goods – but not suppliers of other types of goods – from controlling downstream distribution, a result that plainly is at odds with the Copyright Act's intended purpose of *expanding* the control rights copyright owners enjoy, not

curtailing them.  Nothing in Redbox's amendments changes these legal principles.[1]

Finally, Redbox's new allegations regarding the purported "coercion" of Redbox's "other potential Sources of Supply" not to sell to Redbox, FAC ¶ 61, cannot support a finding of "misuse," as a matter of law.  Courts have recognized the defense when a copyright owner uses its rightful ownership of a copyright to gain control over material for which it has no copyright.  *See, e.g.*, *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001) ("The misuse defense prevents copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly."); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 792-94 (5th Cir. 1999) (finding that a reasonable juror could conclude that plaintiff used copyrights to "indirectly gain commercial control" over microprocessor cards that were not copyrighted).  First, as shown below in our discussion of the antitrust issues, the purported "coercion" not to supply DVDs to Redbox is not illegal and it is not anticompetitive.  *See infra* section III.B.4.b.  To the contrary, the law permits the conduct about which Redbox complains specifically because suppliers, not distributors, are best positioned to decide how to compete and how to distribute their products.  Moreover, the conduct alleged bears no relationship to the sort described in *Napster*, *Alcatel*, or other cases.  There are no allegations – no new ones and no old ones – that suggest Universal has tried to leverage its copyrights in its DVDs to gain control of

---

[1] Redbox's continued confusion on this point may stem from a misunderstanding of the nature of the "distribution right" conferred by the Copyright Act.  The Act expressly confers on copyright holders certain exclusive rights.  *See generally* 17 U.S.C. § 106 (listing copyright owners' exclusive rights).  One of these rights is often called the distribution right.  *See* 17 U.S.C. § 106(3) (right to "distribute copies" of the copyrighted work).  Thus, one decision from the District of New Jersey described the "first sale doctrine" as "a limitation on a copyright owner's exclusive rights under the Act," and observed that "when a copyrighted work is the subject of a valid first sale, the distribution rights of the copyright holder are extinguished and title passes to the buyer."  *See T.B. Harms Co. v. Jem Records, Inc.*, 655 F. Supp. 1575, 1582 (D.N.J. 1987).  But the *T.B. Harms* court in that passage was discussing the termination of the "distribution rights" *as conferred by the Copyright Act*; the case was about whether the importation of certain phonorecords constituted infringement.  *T.B. Harms* says nothing about the ability of a supplier to contract with a distributor regarding the terms of distribution.  And no case holds that the termination of the "distribution rights" conferred by the Copyright Act disables suppliers of copyrighted goods (books, CDs, DVDs, video games) from controlling when and how distributors resell their products.  Indeed, the entire structure of the entertainment distribution system depends on the contrary conclusion – that the suppliers who own the copyrights *do* get to make, and enforce, these sorts of decisions, through contract.

- 9 -

other markets or other products.

The copyright claim must be dismissed.

**B.      The Antitrust Claims Must Still Be Dismissed**

Redbox's original complaint contained two counts under Section 1 of the Sherman Act,

Count II "Sherman Antitrust Act: Quick Look Doctrine" and Count III, "Sherman Antitrust Act:

Rule of Reason."  Redbox has added some new allegations and labels to these two original

counts, and has added two purportedly "new" counts:  Count IV, "Sherman Act: Restraint of

Trade" and Count V, "Violation of Section 1."[2]  None of the additions changes the result.

### 1.      Count II Should Still Be Dismissed:  A "Quick Look" Is Not Appropriate Because Redbox Still Alleges Only Vertical Restraints

Universal demonstrated conclusively in its Opening Brief that the "Quick Look" doctrine

has been applied only in cases involving horizontal conspiracies.  Op. Br. at 19-20.  Nothing in

Redbox's new complaint alters that fundamental failing in its allegations.  Redbox now labels

Universal's actions a "boycott."  FAC ¶¶ 66, 68.  But that changes nothing.  Redbox still

continues to allege only vertical agreements between Universal and its distributors or retailers.  It

does not allege any horizontal agreements.  Therefore, the "Quick Look" doctrine remains

inappropriate.  *See Gordon v. Lewistown Hospital*, 423 F.3d 184, 209-10 (3d Cir. 2005)

(rejecting proposed application of quick look doctrine to a vertical restraint).

### 2.      Count III Should Still Be Dismissed:  Its Product Market Of Single-DVDs Remains Untenable Despite Allegations Of "Inelasticity"

This claim, in distinction to the new counts, continues to rely on the unsustainable

assertion that "[e]ach copyrighted work recorded on DVD constitutes an individual product

---

[2] These labels make no sense:  there is no such thing as a "Restraint of Trade" cause of action that is any different from a "Violation of Section 1" cause of action – Section 1 prohibits agreements "in restraint of trade" – and both would be judged under either the "Rule of Reason" or the "Quick Look Doctrine" depending on whether a horizontal or a vertical restraint was alleged.

market."  *See* FAC ¶ 70.  Redbox has attempted to respond to Universal's explanation in its

Opening Brief  (*see* Op. Br. at 17-19) that this is an invalid product market by asserting, with no

factual support, that the demand for each individual DVD is "inelastic."  FAC ¶ 41.  Presumably,

Redbox is responding to the Third Circuit's requirement that a plaintiff must support its

allegations regarding the relevant product market "with reference to the rules of

interchangeability and cross-elasticity of demand."  Mere recitation of the terms, however, does

not suffice.

Redbox has not alleged – nor could it allege – any facts to support its conclusion that

demand for each separate DVD is "inelastic."  Cross-elasticity of demand is an economic

concept that refers to a customer's willingness to buy one product instead of another.  Products

with high elasticity are fairly fungible and products with low elasticity are not.  *See* Philip A.

Areeda & Herbert Hovencamp, *Antitrust Law* (3d ed. 2007) ¶ 562.  To say that demand for a

product is "inelastic" is to say that even if the manufacturer substantially increased the price, the

consumer would still buy it because there is no substitute for it.  In other words, in order to

support the allegation that demand for individual titles of DVDs is inelastic, Redbox would have

to allege that Universal could – contrary to marketplace reality – jack up the price for "*Wanted*"

(to use Redbox's example of a Universal title) and consumers would still buy it because there is

no substitute for it.  Redbox has made no factual allegations to support that outlandish claim.

Redbox's invocation of the buzzword "inelastic" is "precisely the type of conclusory allegation

the Supreme Court cautioned against in *Twombly*, 127 S. Ct. 1966."  *Spahr v. Leegin Creative*

*Leather Products, Inc.*, 2008 WL 3914461, at *9 (E.D. Tenn. Aug. 20, 2008) (dismissing

complaint with prejudice on grounds that single-brand market was legally untenable despite

allegations that demand for the product was "inelastic").

Nor could Redbox allege that consumer demand for a single DVD is truly "inelastic." Court after court has rejected that idea; no matter how unique, no matter how much loyalty a brand may engender, courts have held that single-brand product markets fail as a matter of law. "Even where brand loyalty is intense, courts reject the argument that a single branded product constitutes a relevant market." *Green Counrty Food Market, Inc. v. Bottling Group, LLC,* 371 F.3d 1275, 1282 (10th Cir. 2004); *see also Hack v. President and Fellows of Yale College,* 237 F. 3d 81, 86 (2d Cir. 2000) (allegation that Yale was "without substitute or equal" and so there was a product market consisting of "Yale education" was untenable), *abrogated on other grounds by Swierkeiwicz v. Sorema*, 534 U.S. 506 (2002); *Shaw v. Rolex Watch, USA,* 673 F. Supp. 674, 679 (S.D.N.Y. 1987) ("This Court does not need protracted discovery to state with confidence that Rolex watches are reasonably interchangeable with other high quality timepieces.").[3]

> **3.   Count IV Should Be Dismissed:  Redbox Still Does Not Allege Anticompetitive Effects And Its New Market Is Also Untenable**

Redbox's new Count IV is different from Count III only in that it alleges an alternative product market, "new release titles belonging to different categories."  FAC ¶ 77.  Redbox's alternative product market does not permit Redbox to proceed past this motion to dismiss, however, because Redbox still has not alleged anticompetitive effects in that relevant market (or any other market).  Moreover, this new, alternative proposed market, is legally untenable as well.

> **a.   Anticompetitive Effects**

As Universal argued in its motion to dismiss, a plaintiff in a rule of reason case must allege that "particular, actual anticompetitive effects occurred within [the relevant product and

---

[3] As discussed below, this Count also must be dismissed because Redbox continues to fail to allege any facts regarding any injury to competition in any product market – whether the proposed markets are single title DVDs, new release DVD's in a particular genre, or any other proposed product market.  *See infra* section III.B.3.

geographic] markets, such as price increases or output reduction." *IDT Corp. v. Building Owners & Managers Ass'n*, 2006-1 Trade Cases ¶ 75,151, No. Civ. A. 03-4113 (JAG), 2005 WL 3447615, at * 8 (D.N.J. Dec. 15, 2004).

### (i)    No Allegation Of *Market Wide* Impact

Redbox does not allege that Universal's actions have caused any injury to competition or had any anticompetitive impact in the market.  Redbox merely alleges that some consumers will have to pay more for Universal's DVD's because they cannot rent or purchase them through Redbox's low-cost alternative, and that output of Universal's DVDs is reduced because Redbox cannot distribute them.  *See*, *e.g.*, FAC ¶ 78 (Universal's actions have "decrease[d] the supply of new-release DVDs" and "artificially increase[d] prices that consumers have to pay.").

As an initial matter, Redbox's factual allegations do not support its conclusion of reduced output or increased prices even for Universal's products.  Redbox has not alleged that Universal is making or producing or releasing or supplying fewer DVDs into the marketplace.  Nor has it alleged that Universal has raised the wholesale price of its DVDs.  The only thing that Redbox alleges is that consumers cannot rent or purchase Universal's DVDs through Redbox.[4] Consumers can still, presumably, obtain all the other motion picture studios' DVDs through Redbox, and can still, presumably, obtain Universal titles through any number of other distribution channels, including traditional retailers such as Wal-Mart and Target, online stores such as Amazon.com, and online "rentailers" such as Netflix.com.  It is not injury to competition if a consumer walks up to a Redbox kiosk outside a Wal-Mart, does not find the title he is looking for, and walks inside the Wal-Mart to find it instead.

And even if Universal had increased its prices or reduced its output, it would not matter.

---

[4] This assertion conflicts with statements reported in the press in which Redbox apparently has touted that it has in fact continued to be able to acquire Universal DVDs to rent and sell through its kiosks.

The antitrust laws are not concerned about the increased prices or reduced output of a single competitor without some allegation of adverse effect on competition.  As the Supreme Court recently noted,

> [M]any decisions a manufacturer makes and carries out through concerted action can lead to higher prices.  A manufacturer might, for example, contract with different suppliers to obtain better inputs that improve product quality.  Or it might hire an advertising agency to promote awareness of its goods.  Yet no one would think these actions violate the Sherman Act because they lead to higher prices.

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 127 S. Ct. 2705, 2719 (2007).  The Supreme Court and other courts have refused to find that an increase in price is alone sufficient to support a claim that a restraint has caused injury to competition or an anticompetitive effect.  *See*, *e.g.*, *id.* at 2718 ("Respondent is mistaken in relying on pricing effects absent a further showing of anticompetitive conduct.").

Redbox has made no allegations of any impact on any wider market.  It made no such allegations in its Original Complaint, and it makes no such allegations in the FAC.  *Cf. IDT Corp.*, 2005 WL 3447617 at *8 (holding plaintiff's allegations of anticompetitive effects failed because plaintiff had made no allegations about a market-wide impact).  Redbox has not alleged, for instance, that Universal's decision has caused the price of other DVDs supplied by other motion pictures studios to increase, or the supply to have been constrained, or the quality to have gone down.  There simply are no allegations of any injury to competition whatsoever.

### (ii)     No Allegations Of Market Power

Redbox also fails to allege that Universal has market power within this new, proposed alternative product market.  The closest Redbox comes is to allege that new release DVDs are timed such that they "face as little competition as possible with other new release DVDs in the same genre."  FAC ¶ 40.  Redbox then gives the example of Universal's release of "*Wanted*" and

states that it "was released on Tuesday, December 2, 2008, when it directly competed with few, if any, other new-release action-adventure DVDs." *Id.* At most this might be viewed as an allegation that, on December 2, 2008, Universal had market power in the action-adventure DVD genre. But what about the week before or the week after? Redbox does not allege that Universal maintained that market power over time. Market power that arises in a single week that then disappears the next week is not the type of market power with which the antitrust laws are concerned. Courts measure market power over the long-term looking not just to the competitors in the market at a particular point in time but also to the competitors that could enter the market in response to a non-transitory increase in prices or reduction in output. *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1432 (9th Cir. 1995) (noting that if other manufacturers can shift production to enter a market, a defendant does not have market power).

Nor could Redbox allege that Universal maintains market power over time. The truth is, Universal is but one DVD supplier in a highly competitive market. Redbox's own, now deleted, allegation is illustrative of that. In its original complaint, Redbox alleged that Universal's DVDs comprised only 15% of the DVDs it sold. Orig. Comp. ¶ 34. No manufacturer with 15% of the market can possibly have market power under the law. *See, e.g.*, *Assam Drug Co., Inc. v. Miller Brewing Co., Inc.*, 798 F.2d 311, 318 n.18 (8th Cir. 1986) (affirming summary judgment of no market power where defendant submitted expert affidavit showing a market share of only 19.1%); *Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 483 F. Supp. 750 (D. Md. 1980) (20-25% market share does not constitute market power), *aff'd*, 638 F.2d 15 (4th Cir. 1981); *O.S.C. Corp. v. Apple Computer, Inc.*, 601 F. Supp. 1274, 1279-81 (C.D. Cal. 1985) (up to 20% market share does not constitute market power), *aff'd*, 792 F.2d 1464 (9th Cir. 1986).

### b.    Product Market

Count IV should also be dismissed because the proposed product market is untenable as a

matter of law.[5]  For purposes of this Count, Redbox proposes that the relevant product market

should be "new release titles belonging to different categories."  FAC ¶ 77.  It defines "new

release" as "those DVDs that are within the 45-day period following their street date."  FAC ¶

31.  And it alleges that "each such genre [of DVDs] constitutes a distinct submarket."  FAC ¶ 77.

These new allegations show that Redbox, like many plaintiffs, is "intentionally gerrymander[ing]

and narrow[ing] its proposed relevant market in an effort [to] manufacture a prima facie antitrust

injury."  *Adidas America, Inc. v. Nat'l Collegiate Athletic Assoc.*, 64 F. Supp. 2d 1097, 1103 (D.

Kan. 1999) (granting motion for judgment on the pleadings utilizing the motion to dismiss

standard).

      This proposed market fails at the outset because it purports to include submarkets –

"different categories of DVDs" – that Redbox has totally failed to define.  Even if Redbox is

trying to allege the existence of meaningful "submarkets", it has not alleged any of the facts

required to support them.  As an initial matter, Redbox has not even *listed* its proposed

submarkets.  It has given examples that hint at what these different categories might be –

"[c]ommon categories, or genres, include: action/adventure, comedy, drama, family and kids,

horror and sci-fi, suspense and others" (FAC ¶ 39) – but even these examples conflict with other

parts of the FAC.  For instance, paragraph 28 makes mention of a "musical comedy DVD."

Likewise, Exhibit C lists genres like "period adventure," "sports drama," and "historical drama."

Is "musical comedy" a separate submarket from "comedy," "sports drama" separate from

"drama," "period adventure" separate from "adventure"?  Redbox does not say.  This failure to

define the proposed submarkets is alone sufficient grounds for holding it insufficient as a matter

---

[5] It bears mention here that this shift to an alternative proposed product market reflects Redbox's *second* attempt to define a proper product market, made *after* the benefit of Universal's briefing in its original moving papers of the pleading requirements regarding a relevant market.  Having failed twice, Redbox should not, Universal submits, be given a third chance.

of law.  "Without a more specific definition and accounting of the brands and suppliers to be

included in the relevant market, the Court cannot determine the boundaries of the market." *Cupp*

*v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004) (dismissing complaint

because "Plaintiff's attempted definition of the relevant product market [was] insufficient and

fatally vague."). *Id.* at 970.[6]

      The only thing that Redbox does do is to allege that "consumers seeking to rent a new-

release musical comedy DVD are generally not interested in renting or buying a new-release

action DVD." FAC ¶ 28.  But a "general interest" in one product over another is an insufficient

basis for delineating a product market.  Consumer preferences alone do not justify limiting a

product market to one type of product or another.  *Jacobs. V. Tempur-Pedic Int'l, Inc.*, 2007 WL

4373980, *4  (N.D. Ga. Dec. 11, 2007) (holding that the relevant product market could not be

limited to one type of mattress and instead needed to include all mattress types:  "[V]isco-elastic

foam mattresses may be very different from innerspring mattresses, but they are still a product on

which people sleep."); *Holdings v. Severn,* No. 04-1137, 2004 WL 5458426, at *4 (C.D. Cal.

Oct. 1, 2004) (dismissing complaint that limited the relevant market to "sheepskin, fleece-lined

boots" because plaintiffs failed to explain why other types of boots were not acceptable

substitutes).

---

[6] Even if Redbox had defined its proposed submarkets, those submarkets still would fail because Redbox has not alleged any of the facts necessary to support a conclusion that "different categories" of DVDs constitute distinct submarkets for purposes of antitrust analysis.  The Supreme Court in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), enunciated six "practical indicia" for determining the existence of a separate submarket:  (1) unique production facilities; (2) specialized vendors; (3) distinct customers; (4) sensitivity to price changes; (5) industry or public recognition of the proposed submarket as a separate economic entity; and (6) peculiar characteristics and uses of the product.  *Id.* at 324; *see also PepsiCo. Inc. v. Coca-Cola Co.,, Inc.,* 315 F.3d 101, 106-07 (2d Cir. 2002) (quoting *Brown Shoe*).  Redbox has not alleged, and cannot allege, that its proposed submarkets meet any of these indicia.  It has not alleged, for instance, that different genres are made in different production facilities, that different genres have different vendors, that they have distinct customers or are sensitive to price changes, that different genres are a distinct economic entity or that there are peculiar uses for the different genres.  In short, Redbox has alleged none of the facts required to establish that "different categories" constitute distinct submarkets.  *Cf. PepsiCo.*, 315 F.3d at 107 (holding that submarkets are not justified where plaintiff had failed to demonstrate that its proposed submarket met the *Brown Shoe* practical indicia).

4.      **Count V Should Be Dismissed: Allegations Of Vertical Integration And "Group Boycott" Do Not Affect The Rule-Of-Reason Analysis Applicable To The Restraints At Issue In This Case**

Finally, Redbox adds a fourth antitrust count labeled "violation of Section 1." This is puzzling; all of its other antitrust counts also allege violations of Section 1. This Count contains two new aspects, neither of which affects the analysis of Redbox's claims.

a.      **Universal Could Distribute Its Own DVDs Through Its Own Kiosks Without Violating the Antitrust Laws**

First, Redbox alleges that Universal is attempting to push Redbox out of business to make room for its own "MediaATM" and "POP" kiosks.[7] FAC ¶ 83. So what? Universal would be allowed to do that. It is called "vertical integration" and a manufacturer is entitled to "integrat[e] downstream and sell [ ] its products directly to consumers." *Leegin*, 127 S. Ct. at 2723 (discussing pro-competitive options manufacturers have for selling their products). Redbox clearly prefers that Universal sell its DVDs through Redbox's kiosks. But Universal would not violate Section 1 by vertically integrating its DVD distribution.

b.      **Even If Universal Did Instruct Other Retailers Not To Sell To Redbox, That Alleged Fact Would Not Change Anything**

Second, Redbox alleges that Universal forced other retailers not to sell its products to Redbox and calls this a "group boycott." FAC ¶ 82, 84. Presumably Redbox hopes to get some mileage out of that label. It will be disappointed. The Supreme Court has held that group boycotts involving vertical restraints – like the one alleged here – are judged under the rule of reason. *Nynex Corp. v. Discon Inc.*, 525 U.S. 128, 136 (1998) (holding rule of reason is the

---

[7] Neither of the news articles that Redbox attaches to the FAC actually supports this assertion. Exhibit D, Patrick Avery, "Digital media kiosks grow in numbers," Jan. 15, 2008 discusses *digital* kiosks – as opposed to kiosks that rent and sell actual DVDs – including Mediaport's MediaATM. Exhibit E, Stevie Smith, "Sony planning PlayStation 3 and Blu-ray vending machines," Nov. 6, 2008, describes the launch of the "PoP" vending machines in the United Kingdom, not the United States. Neither of these articles says anything about any plans on the part of Universal to use kiosks to distribute DVDs in the United States.

appropriate standard for a group boycott "concern[ing] only a vertical agreement and a vertical restraint"). Redbox has not alleged that Wal-Mart or Best Buy had agreements with each other, just that (at most) they each agreed separately with Universal.[8] That is purely vertical conduct. Accordingly, alleging agreements with other retailers, even calling all of this a "group boycott," adds nothing of legal significance to Redbox's complaint. Universal's actions must be judged under a rule of reason. For the reasons discussed above, Redbox's rule of reason allegations fail.

### 5.      Redbox's Allegations About The Proposed Revenue Sharing Agreement Are Irrelevant Because There Was No Agreement

Finally, Redbox has sprinkled throughout the antitrust allegations in the FAC the concept that, "in the alternative" to Universal's agreements with VPD and Ingram, "the restrictions demanded by USHE in the Revenue Sharing Agreement" violate the antitrust laws. FAC ¶ 78; *see also id.* ¶¶ 67, 84. Redbox is mistaken. As Redbox itself alleged, it turned down the proposed revenue sharing agreement. *See* FAC ¶ 47. Thus, there is no agreement. The first element of a section 1 claim is agreement. *See, e.g.*, *Brunson Communications, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 564-65 (E.D. Pa. 2002) (noting that the first element of a section one claim is that "the defendants contracted, combined or conspired among each other"). Without an agreement, there is no section 1 violation.

---

[8] Universal denies that it reached agreements with retailers, and Redbox has failed sufficiently to allege that its purported difficulties in obtaining DVDs from retailers results from the existence of actual agreements between Universal and retailers, as opposed to unilateral conduct by Universal, such as Universal's announcing or restating a policy about its intent with respect to resale by its retail customers, or as opposed to independent decisions by those retailers. Redbox has identified none of the retail parties that purportedly entered into these agreements with Universal or when the agreements were entered or any circumstantial facts (other than Redbox's purported difficulties in obtaining product) that might permit this Court to infer the existence of these agreements. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1966 (2007) ("terms like 'conspiracy,' or even 'agreement,' are borderline: they might well be sufficient in conjunction with a more specific allegation – for example, identifying a written agreement or even a basis for inferring a tacit agreement . . . . but a court is not required to accept such terms as a sufficient basis for a complaint") (quoting *DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 56 (1999)). Even Redbox's own allegations support an inference of *independent* conduct by Universal, and not any agreement with any retailer. *See* FAC ¶ 50 ("Defendants *have demanded* that Best Buy and Walmart retail stores cease or severely limit their sales of Universal DVDs to Redbox.") (emphasis added). The amended antitrust claims – to the extent they are premised on purported agreements between Universal and retailers – must be dismissed for this independent reason as well.

- 19 -

C.      **The Interference Claim Must Still Be Dismissed**

Universal showed in its original moving papers that the interference claim – which is premised on Universal's alleged interference with the purported supply contracts between Redbox and Universal's distributors (VPD and Ingram) – is fatally flawed.  The common law recognizes that Universal may exercise its legal right to direct VPD and Ingram with regards to where and to whom those distributors may resell Universal DVDs, without threat of an interference claim.  *See* Op. Br. at 20-23; *see also Peoples Mortgage Co. v. Fed. Nat'l Mortgage Ass'n*, 856 F. Supp. 910, 934 (E.D. Pa. 1994) ("[E]nforcing one's own valid contract does not constitute unjustifiable interference with another's contract.") (quoting 45 Am. Jur. 2d, Interference, § 23 (2008) (citing Restatement (Second) Torts 2d § 773 (1979)).

Redbox's principal strategy for avoiding dismissal is, as discussed above, wholly insufficient.  First, Redbox now alleges that "Defendants have no contractual or other legally recognized right to restrict or govern how or to whom VPD and Ingram resell Universal DVDs that they have purchased."  *See* FAC ¶ 48.  This allegation is demonstrably false, as shown in Universal's Opening Brief.  See Op. Br. 23-24.  Defendants already have, in connection with this motion, submitted to this Court the contracts with VPD and Ingram, because Redbox's original complaint made reference to and relied on the substantive terms of those contracts.  Those contracts expressly and unequivocally give Universal the right to "restrict . . . how or to whom VPD and Ingram resell Universal DVDs."  *Compare* FAC ¶ 48 *with* Op. Br. at 23-26.

Universal submitted those contracts because Redbox in its Original Complaint expressly alleged their existence and described their purported terms.  *See* Orig. Complaint ¶ 36.  Under settled law, these contracts properly became a part of the record on this motion just as if Redbox itself had alleged the terms of the contracts in full.  *See Pension Benefit Guar. Corp. v. White*

*Consol. Indus. Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("a court may consider an undisputedly

authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's

claims are based on the document").  But, magically, the FAC now *omits* the allegation regarding

the existence of these contracts, asserts the *contrary* of what those contracts expressly state, and

*denies* the very rights that those contracts expressly confer.  This Court should not be swayed by

such thinly veiled attempts to divert the Court from the legal import of these contracts.  The

contracts expressly give Universal the right to tell its distributors not to sell to Redbox, and

Universal's decision to exercise this right cannot, as a matter of law, support an interference

claim.

Redbox also has now added the totally conclusory allegation that Universal's actions

"have been carried out with the improper motive of, inter alia, interfering with Redbox's

contracts with VPD and Ingram."  *See* FAC ¶ 91.  Redbox presumably hopes that this new

allegation will permit it take advantage of language in *Corning Inc. v. SRU Biosystems, LLC*, 292

F. Supp. 2d 583 (D. Del. 2003) – a case that Universal raised and distinguished in its Opening

Brief – in which similar allegations were deemed sufficient to permit an interference plaintiff to

proceed past a motion to dismiss.

But, as Universal already explained, *Corning* was not a case like this one, in which

Universal's right to do what it did is expressly confirmed in a written contract.  *There is no case*

of which Universal is aware in which a court has concluded that the exercise of a right set forth

expressly in a contract can serve as the basis for an interference claim, just because plaintiff

includes the buzzwords "improper motive" in its complaint.  To the contrary, the cases hold that

the exercise of a contractual right cannot trigger interference liability, regardless of intent.  *See*

*American Franklin Life Ins., Co. v. Galati*, 776 F. Supp. 1054 (E.D. Pa. 1991) (Pollack, J.)

(holding that insurance company did not act in bad faith *as a matter of law* where it acted

pursuant to contractual authority); *see Barkan v. Dunkin Donuts, Inc.*, 520 F. Supp. 2d 333, 342

(D.R.I. 2007) (granting motion to dismiss where contract demonstrated that "Defendants had a

bona fide interest to protect in the [proposed sale]. Their efforts to safeguard that interest . . . are

therefore privileged and legally justified.").

None of Redbox's new allegations has saved the legally flawed interference claim. This

Court should dismiss it.

## IV.    <u>CONCLUSION</u>

Redbox filed the FAC in response to Universal's Opening Brief, which demonstrated the

various fundamental legal flaws with this case. Redbox apparently has tried its best to meet

those arguments with its FAC, but has failed. For this and for all the foregoing reasons, as well

as those set forth in Universal's Opening Brief, this Court should dismiss the FAC, with

prejudice.

7055662.1

Dated: February  5, 2009

Respectfully submitted,

*/s/ R. Montgomery Donaldson*

R. Montgomery Donaldson (DE Bar ID 4367)
*rdonaldson@mmwr.com*
Lisa Zwally Brown (DE Bar ID 4328)
*lzbrown@mmwr.com*
**MONTGOMERY, MCCRACKEN,**
**WALKER & RHOADS, LLP**
1105 N. Market St, Suite 1500
Wilmington, DE 19801
(302) 504-7800
*Counsel for Defendants Universal Studios*
*Home Entertainment, LLC, Universal City*
*Studios, LLLP, Universal City Studios*
*Productions, LLLP, and Focus Features, LLC*


ATTORNEYS FOR  DEFENDANTS OF
COUNSEL:

*s/David C. Dinielli*

Glenn D. Pomerantz, Bar No. 112503
David C. Dinielli, Bar No. 177904
Munger, Tolles & Olson LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560


Paul H. Zoubek
(PA Bar I.D. No. 36716)
R. Monica Hennessy
(PA Bar I.D. No. 77928)
**MONTGOMERY, MCCRACKEN,**
 **WALKER & RHOADS, LLP**
Liberty View
457 Haddonfield Road, Suite 600
Cherry Hill, NJ 08002
(856) 488-7700

7055662.1