## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REDBOX AUTOMATED RETAIL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 08-766-RBK |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| UNIVERSAL STUDIOS HOME | ) | |
| ENTERTAINMENT, LLC; UNIVERSAL | ) | |
| CITY STUDIOS, LLP; UNIVERSAL CITY | ) | **REDACTED VERSION** |
| STUDIOS PRODUCTIONS, LLP, and FOCUS | ) | |
| FEATURES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## REDBOX'S ANSWERING BRIEF IN
## OPPOSITION TO UNIVERSAL'S MOTION TO DISMISS

Henry E. Gallagher, Jr. (No. 495)
Chad S.C. Stover (No. 4919)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE  19801
(302) 658-9141
hgallagher@cblh.com
cstover@cblh.com

Charles S. Bergen
George R. Dougherty
Michael S. Gulland
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
(312) 704-7700

Frederick W. Stein
Redbox Automated Retail, LLC
One Tower Lane, Suite 1200
Oakbrook Terrace, Illinois 60181
(630) 756-8255

*Attorneys for Plaintiff Redbox Automated
Retail, LLC*

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................... iii

I.      INTRODUCTION ........................................................................................1

II.     NATURE AND STAGE OF THE PROCEEDINGS ....................................1

III.    SUMMARY OF THE ARGUMENT ...........................................................2

IV.     STATEMENT OF FACTS ............................................................................3

        A.      The Parties. ......................................................................................3

        B.      Redbox's Business. ..........................................................................4

        C.      Industry Practice Regarding New-Release DVDs. ...........................5

        D.      The August 26, 2008 Meeting Between Representatives Of Redbox And
                Representatives Of Universal. ..........................................................6

        E.      Defendants' Revenue Sharing Agreement And Related Actions Are
                Unlawful And Substantially Harm Consumers, As Well As Redbox. ...................8

V.      ARGUMENT ................................................................................................9

        A.      Applicable Motion To Dismiss Standard. .........................................9

        B.      Redbox Has Pled A Claim For Copyright Misuse.  Universal's Contention
                That This Claim Should Be Dismissed Should Be Rejected. ...............................10

                1.      Applicable Copyright Standards. ...........................................10

                2.      Redbox's FAC Properly Pleads A Claim For Copyright Misuse. ............12

                3.      Universal's Arguments Demanding Dismissal Are Not
                        Well-Founded.  At The Very Least, They Raise Factual Questions
                        That Cannot Be Decided In Universal's Favor On A Motion To
                        Dismiss. ....................................................................15

                        a)      Redbox's Allegations Support a Finding of Misuse. ...................15

                        b)      The Declaration That Redbox Seeks Should Not Require
                                Actual Infringement. .........................................18

i

c)    Courts Recognize Copyright Misuse as an Affirmative
Claim.................................................................................................19

C.   Counts II-V Of The FAC Properly Allege Section 1 Violations. ............................20

1.    Elements Of A Section 1 Violation. ......................................................20

2.    Count II States A Viable Cause Of Action. .............................................21

3.    Counts III And IV Should Be Sustained....................................................23

a)    Counts III and IV Are Evaluated Under the Traditional
Rule of Reason..............................................................................23

b)    Count III Validly Pleads an Antitrust Violation Pursuant to
the Rule of Reason. ........................................................................24

c)    Redbox's Count IV Also States a Valid Cause of Action. ............27

d)    Redbox Has Sufficiently Alleged in Count V That
Universal Has Engaged in a Horizontal Boycott of Redbox. ........30

4.    Count VI Properly Alleges Intentional Interference With
Contractual/Business Relationships With Redbox's Distributor
Contracts. ................................................................................................33

CONCLUSION................................................................................................................34

684567.1

# TABLE OF AUTHORITIES

**Page**

**Cases**

*All Pro Maids, Inc. v. Layton,*
2004 Del. Ch. LEXIS 116 (Del. Ch. Aug. 9, 2004) ........................................................ 33

*Apple, Inc. v. Psystar Corp.,*
2009 U.S. Dist. LEXIS 14370 (N.D. Cal. Feb. 6, 2009) ........................................... 19, 20

*Assam Drug Co., Inc. v. Miller Brewing Co., Inc.,*
798 F.2d 311 (8th Cir. 1986) ................................................................................ 28

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................ 9, 25, 32

*Bobbs-Merrill Co. v. Straus,*
210 U.S. 339 (1908) ................................................................................ 11

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962) ................................................................................ 28

*CM Paula v. Logan,*
355 F. Supp. 189 (N.D. Tex. 1973) ................................................................... 11

*Columbia Pictures Indus., Inc. v. Redd Horne, Inc.,*
749 F.2d 154 (3d Cir. 1984) ................................................................ 11, 14

*Continental T.V., Inc. v. GTE Sylvania, Inc.,*
433 U.S. 36 (1997) ................................................................................ 23

*Corning Inc. v. SRU Biosystems, LLC,*
292 F. Supp 2d 583 (D. Del. 2003) ................................................................ 33

*Donald B. Rice Tire Co. v. Michelin Tire Corp.,*
483 F. Supp. 750 (D. Md. 1980), *aff'd* 638 F.2d 15 (4th Cir. 1981) ................................ 28

*Eastman Kodak Co. v. Image Technical Svcs., Inc.,*
504 U.S. 451 (1992) ................................................................................ 24

*Eichorn v. AT&T Corp.,*
248 F.3d 131 (3d Cir. 2001) *cert. denied,* 534 U.S. 1014 (2001) ........................ 23, 24, 27

*Ethyl Gasoline Corp. v. United States,*
309 U.S. 436 (1940) ................................................................................ 11

684567.1

*FTC v. Indiana Fed. of Dentists,*
    476 U.S. 447 (1986)..................................................................................... 20

*Glacier Optical, Inc. v. Optique du Monde, Ltd.,*
    816 F. Supp. 646 (D. Or. 1993) .................................................................. 29

*Gordon, M.D. v. Lewistown Hosp.,*
    423 F.3d 184 (3d Cir. 2005)........................................................... 20, 21, 22, 23

*Hedges v. United States,*
    404 F.3d 744 (3d Cir. 2005).......................................................................... 9

*Hewlett-Packard Co. v. Arch Assocs. Corp.,*
    908 F. Supp. 265 (E.D. Pa. 1995) ............................................................... 26

*HPI Health Care Servs., Inc. v. Mt. Vernon Hospital, Inc.,*
    131 Ill. 2d 145 (1989) ................................................................................. 33

*Klor's, Inc. v. Broadway-Hale Stores, Inc.,*
    359 U.S. 207 (1959)..................................................................................... 30

*Lasercomb America, Inc. v. Reynolds,*
    911 F.2d 970 (4th Cir. 1990) ........................................................... 12, 13, 15

*Leegin Creative Leather Prods. v. PSKS, Inc.,*
    127 S. Ct. 2705 (2007)................................................................................. 23

*Lucasarts Ent. Co. v. Humongous Enter. Co.,*
    870 F. Supp. 285 (N.D. Cal. 1993) ............................................................. 13

*MGM v. Grokster,*
    269 F. Supp. 2d 1213 (C.D. Cal. 2003) ...................................................... 20

*Mitel Corp. v. A&A Connections, Inc.,*
    1998 U.S. Dist. LEXIS 3576 (E.D. Pa. Mar. 20, 1998).............................. 26

*Morton Salt Co. v. G.S. Suppiger Co.,*
    314 U.S. 488 (1942)..................................................................................... 15

*Nat'l Society of Prof. Engineers v. United States,*
    435 U.S. 679 (1978)..................................................................................... 21

*NCAA v. Bd. of Regents,*
    468 U.S. 85 (1984)........................................................................... 21, 24, 25

*O.S.C. Corp. v. Apple Computer, Inc.,*
    601 F. Supp. 1274 (C.D. Cal. 1985), *aff'd* 792 F.2d 1464 (9th Cir. 1986)................. 28, 29

684567.1

*Orson, Inc. v. Miramax Film Corp.*,
    79 F.3d 1358 (3d Cir. 1996)......................................................................... 23

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
    998 F.2d 1192 (3d Cir. 1993)........................................................................ 17

*Phillips v. County of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)........................................................................... 9

*Pinker v. Roche Holdings, Ltd.*,
    292 F.3d 361 (3d Cir. 2002)............................................................................ 9

*Quality King Distribs., Inc. v. L'Anza Research Int'l, Inc.*,
    523 U.S. 135 (1998)................................................................................. 15, 16

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)...................................................................... 20, 26

*Quelimane Co. v. Stewart Title Guaranty Co.*,
    19 Cal. 4th 26 (1998)................................................................................... 33

*Sebastian Internat'l v. Consumer Contacts, Ltd.*,
    847 F.2d 1093 (3d Cir. 1988)....................................................................... 10

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984).................................................................................... 10

*Spahr v. Leegin Creative Leather Prods., Inc.*,
    2008 U.S. Dist. LEXIS 90079 (E.D. Tenn. Aug. 20, 2008) ............................ 24

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997)....................................................................................... 24

*Tarrant Serv. Agency, Inc. v. American Standard Oil, Inc.*,
    12 F.3d 609 (6th Cir. 1993) ......................................................................... 26

*Ticketmaster, LLC v. RMG Technologies, Inc.*,
    536 F. Supp. 2d 1191 (C.D. Cal. 2008) ......................................................... 19

*Toys "R" Us v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ....................................................................... 32

*U.S. Anchor Mfg. Co. v. Rule Indus.*,
    7 F.3d 986 (11th Cir. 1993) ........................................................................ 26

*United States v. Brown Univ.*,
    5 F.3d 658 (3d Cir. 1993)........................................................................ 20, 21

*United States v. Univis Lens Co.*
    62 U.S. 1088 (1942) ........................................................................... 14

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,*
    342 F.3d 191 (3d Cir. 2003) ........................................... 10, 11, 12, 13

*White & White, Inc. v. American Hosp. Supply Corp.,*
    723 F.2d 495 (6th Cir. 1983) ........................................................... 28

*Woods Exploration & Producing Co. v. Aluminum Co. of Am.,*
    438 F.2d 1286 (5th Cir. 1971) ......................................................... 26

**Statutes**

17 U.S.C. § 106(3) ................................................................................. 10

17 U.S.C. § 109(a) ................................................................................. 11

Fed. R. Civ. P. 8(a)(2) ........................................................................... 25

**Other Authorities**

*Black's Law Dictionary* 283 (7th ed. 1999) ......................................... 31

**Treatises**

DAVID NIMMER, NIMMER ON COPYRIGHT, § 8.12[B][1], 8-158 (2008) ....................................... 11

684567.1

## I.     **INTRODUCTION**

Defendants' Universal Studios Home Entertainment, LLC, Universal City Studios, LLP,

Universal City Studios Productions, LLP, and Focus Features, LLC (collectively "Universal")

Motion to Dismiss should be denied.  Making unwarranted attacks on opposing counsel or

stating snappy one-liners is not a substitute for legal reasoning.  Such tactics do not allow

Universal to avoid the effect of Plaintiff Redbox Automated Retail, LLC's ("Redbox") well-pled

allegations.

It required two telephone conferences in the past month with the Court for Redbox to

receive a mere 27 days to respond to the 49 pages of briefing submitted by Universal to support

its Motion to Dismiss.  It is now clear why Universal was so unreasonable.  Universal apparently

believed the less time Redbox had to clear away Universal's attacks and expose its flippant

one-liners, the better.

When the well-pled facts of Redbox's First Amended Complaint (D.I. 30, the "FAC")[1]

are considered, the result is clear — Universal's Motion to Dismiss must be denied.  No amount

of name calling by Universal can, or should, change that result.

## II.    **NATURE AND STAGE OF THE PROCEEDINGS**

Redbox filed its initial Complaint on October 10, 2008, alleging that Universal had

committed copyright misuse, violated the antitrust laws, and intentionally interfered with

Redbox's distributor contracts.  Universal moved to dismiss Redbox's Complaint on

December 8, 2008.  Redbox filed its FAC on January 22, 2009.  Universal supplemented its

motion to dismiss on February 5, 2009.

---

[1]      Capitalized terms used herein have the same meaning as in Redbox's FAC, unless
otherwise defined.

On February 26, 2009, this Court ordered the parties to meet with Magistrate Judge Mary Pat Thynge to discuss the prospects for ADR.  Judge Thynge has ordered the parties to appear via teleconference on March 11, 2009 to discuss possible ADR.  Redbox filed this opposition on March 4, 2009.  Universal's reply in support of its motion to dismiss is due on or before March 13, 2009.

## III.   **SUMMARY OF THE ARGUMENT**

1.   <u>Copyright Misuse</u>:  Redbox has properly pled a claim for copyright misuse because it has alleged:  (a) Universal seeks to expand its limited copyright monopoly to secure other monopoly rights not granted by the Copyright Act, including the right to control the terms of retail rental and resale after the first sale by Universal; (b) Universal's actions to prevent distributors and retailers from selling new-release DVDs to Redbox violates public policy; and (c) Universal seeks to expand its limited copyright monopoly to take control of retail DVD rental and resale to consumers and to drive competition from the retail new-release DVD rental and resale market.  A claim or threat of actual copyright infringement against Redbox is not required because copyright misuse has been recognized as an affirmative stand-alone claim.

2.   <u>Antitrust</u>:

(a)   Count II validly states a violation of Section 1 of the Sherman Act pursuant to the "quick-look" rule because Universal's boycott of Redbox, and the restrictions demanded by Universal in the Revenue Sharing Agreement, constitute inherently unlawful restraints that, *inter alia*, nakedly raise prices and restrict output.

(b)   Counts III and IV properly allege violations of Section I of the Sherman Act pursuant to rule of reason analysis.  Specifically, Count III alleges that because of consumer preference and industry practice, "a particular new-release DVD is not an acceptable substitute for another new-release DVD," and thus each DVD constitutes its own product market.  Courts

2

have repeatedly recognized the use of individual product markets where appropriate, as here. Count IV pleads an alternative definition of the product market: that each category, or genre, of new-release DVDs constitutes a submarket. There is low cross-elasticity of demand among new-release DVDs belonging to distinct genres. Many of the same elements identified by Redbox to establish the viability of Count III apply equally to Count IV.

          (c)    Count V sets forth facts that establish that Universal has engaged in a concerted group boycott of Redbox with others at the wholesale and retail levels thereby imposing an unlawful horizontal restraint. Through its combination with others who have effectively become Universal's joint venturers by signing the unlawful Revenue Sharing Agreement, and through the planned introduction of its own kiosks, Universal has sought to increase prices to new-release DVD consumers while restricting the supply of new-release DVDs available to them through rental or resale.

        3.    <u>Intentional Interference with Contractual/Business Relationships</u>:  Redbox has validly alleged that Universal has wrongfully interfered with its contractual relationships with VPD and Ingram. Universal's sole basis for seeking dismissal is a pair of unauthenticated documents that do not say what Universal claims and by their own language appear to have expired. Universal fails to otherwise attack the adequacy of Redbox's pleadings, effectively conceding the sufficiency of Redbox's allegations by its silence.

## IV.   **STATEMENT OF FACTS**

    **A.**    **The Parties.**

Redbox is a Delaware limited liability company (FAC at ¶ 7) that rents and sells digital video disks ("DVDs") to customers through innovative, consumer-friendly means: automated self-service kiosks located in various retail outlets. *Id.* at ¶ 1.  Universal markets and sells — both to distributors and directly to retailers — DVDs of copyrighted motion pictures and other

copyrighted audiovisual works, such as television programs. *Id.* at ¶¶ 8-15. Ingram and VPD are wholesale distributors of Universal DVDs and have had, until recently, long term, mutually beneficial business relationships with Redbox. *Id.* at ¶¶ 16-17, 33.

**B.    Redbox's Business.**

DVD is the dominant medium for distribution of motion pictures and other audiovisual works for home viewing. *Id.* at ¶ 22. Redbox is an innovator in this field, developing a highly convenient and low cost option for consumers wishing to obtain DVDs. *Id.* at ¶ 24. Redbox provides DVDs to consumers through a nationwide network of over 12,000 self-service kiosks where Redbox's customers can rent or buy DVDs at a cost below that charged by traditional brick-and-mortar outlets or alternative sources for new-release DVD rentals. *Id.* at ¶¶ 26, 29.

Consumer demand for Redbox's rentals and sales has grown substantially in the last four years. *Id.* at ¶ 26. Redbox began with 125 kiosks in 2004 and had expanded in excess of 12,000 kiosks at the end of 2008. *Id.* This growth has enabled Redbox to surpass Blockbuster, Inc. in the number of DVD rental locations in the United States. *Id.* To date, consumers have rented more than 300 million DVDs from Redbox. *Id.*

Consumers can rent new-release DVDs from Redbox kiosks for $1 per night — a lower cost than traditional brick-and-mortar outlets or alternative sources for new-release DVD rental. *Id.* at ¶ 29. As Universal has said in other litigation, some 175 million DVDs are rented in the United States each month, at an average cost of approximately $3.25. *Id.* Moreover, customers can purchase previously-viewed, new-release DVDs from Redbox beginning 12 days after their release for as little as $7.00. *Id.* at ¶ 30. In comparison, new-release DVDs are sold at brick-and-mortar outlets (and other sources) for an average cost of approximately $18.50. *Id.*

4

### C.     Industry Practice Regarding New-Release DVDs.

A critical aspect of Redbox's business is its ability to provide consumers a new-release DVD on the same day it is made available by the studio for home viewing. *Id.* at ¶ 31. This release date is known as the "street date," which is typically a Tuesday. *Id.* Consumer demand for a new-release DVD is the highest during the weekend immediately after its street date and declines substantially thereafter. *Id.* at ¶ 31. Over thirty percent of a new-release DVD's revenue is generated during the first two weeks after its release, and over 60% of the rental demand for a new-release DVD occurs within 45 days of its release. *Id.* Thus, new-release DVDs for rental or resale are perishable goods, like milk or fruit; their value drops rapidly and materially almost from the first day they appear on the shelf. *Id.* at ¶ 38.

Because consumer demand for a particular new-release DVD is highest while the DVD is new in the market, consumer demand for a new-release DVD is different from consumer demand for a back-catalog DVD, *i.e.*, a DVD that has been on the market for longer than 45 days. *Id.* New-release DVDs constitute a separate market. *Id.* In economic terms, the elasticity of demand between new-release DVDs and back-catalog items is low. *Id.*

Release dates for new-release DVDs are timed so that a particular new-release DVD title faces as little competition as possible from other new-release DVDs of the same genre. *Id.* at ¶ 40. For example, the Universal DVD *"Wanted"* was released on Tuesday, December 2, 2008, when it competed with few if any new-release action/adventure DVDs. *Id.*

Consumers seeking to rent a new-release DVD generally search by title and by category or genre. *Id.* at ¶ 39. The industry is structured in this manner, as evidenced by the way in which video rental stores and video rental websites are laid out. *Id.* Each genre or category constitutes a distinct sub-market within the overall new-release DVD market. *Id.* Common categories or genres include action/adventure, comedy, drama, family and kids, horror and sci-fi,

5

suspense. *Id.* There is a low cross elasticity of demand among consumers for new-release DVDs

of different genres. *Id.* For example, consumers who want to see Angelina Jolie in an action

shoot'em-up ("*Wanted*") are unlikely to accept Meryl Streep's musical comedy ("*Mamma

Mia!*") instead. *Id.* Because of the inelastic demand for each particular new-release DVD,

Universal possesses significant market power for each of its new-release DVDs, and, in the

alternative, within a specific category or genre during the 45 days following the DVD's release.

*Id.* at ¶ 41. During this period, consumers have few if any acceptable substitutes for a particular

new-release DVD in a particular category or genre. *Id.*

> **D.     The August 26, 2008 Meeting Between Representatives Of Redbox
>            And Representatives Of Universal.**

In August 2008, Universal representatives visited Redbox's headquarters in Oakbrook

Terrace, Illinois, and demanded that Redbox sign a purported Revenue Sharing Agreement. *Id.*

at ¶¶ 42-43. Redbox had no advance notice as to the nature of the proposal, which was designed

to materially alter the conditions under which consumers would be able to rent or buy Universal

DVDs from Redbox kiosks. *Id.* at ¶ 43. As its name suggests, the Revenue Sharing Agreement

requires the DVD rental facility to "pay to USHE [Universal] the greater of (i) 40% of all Rental

Revenue . . . with respect to each and every Unit of a Title; or (ii) $.40 per Transaction . . . ." and

sets prices with "a floor of $.99 per Transaction." A "Transaction" is defined as a "single night

retail rental." FAC, Ex. A, at 2. Essentially, this creates a joint venture between Universal and

the retail outlet. Moreover, each retailer must keep its participation in this price-fixing joint

venture "confidential except as may be otherwise required to comply with a court order or

federal securities law." *Id.* at 5. Thus, Universal participates at the retail level as a secret,

price-fixing, joint venturer with those retailers who have been unable to withstand the pressure

Universal has applied. *Id.*

During the August 2008 meeting, Universal told Redbox that if it did not sign the Revenue Sharing Agreement, then Universal would cut off sales of Universal product to VPD and Ingram. FAC at ¶¶ 44-45. Because of Universal's market power, Ingram and VPD have acquiesced to Universal's pressure and have refused to supply Universal DVDs to Redbox. *Id.* at ¶ 48. Universal also told Redbox that if it did not sign the Agreement, VPD and Ingram would cease providing other services to Redbox, such as bar code labeling, packaging DVDs in Redbox jewel cases, sorting, shipping and storage of original DVD cases and providing art work prior to the street date. *Id.* at ¶ 45. Universal made these threats notwithstanding its knowledge of Redbox's longstanding business and contractual relationships with Ingram and VPD. *Id.* at ¶ 46.

Redbox did not sign the Revenue Sharing Agreement. *Id.* at ¶ 47. Ingram and VPD have now agreed that they will not ship or sell Universal DVDs to Redbox and have ceased providing the other services that they have traditionally provided to Redbox, described above. *Id.* at ¶¶ 45, 47.

Universal has also obtained the agreement of BestBuy and other retailers to cease or severely limit their sales of Universal DVDs to Redbox. *Id.* at ¶¶ 49-50. Evidence of Universal's agreements with retail stores is set forth in Redbox's FAC. For example, various retailers have cancelled orders or refused to sell Universal DVDs to Redbox personnel. *Id.* at ¶ 50. Other Redbox personnel have been told by retail stores that the stores would not sell Redbox any more than a few copies of any Universal DVD. *Id.* In at least one instance, a Redbox employee was escorted out of a retail store for attempting to purchase multiple copies of a Universal DVD title. *Id.* There is no rational reason for any retail store to ban sales of DVDs to Redbox representatives absent assurances from Universal that other retailers would also refuse to sell to Redbox. Absent these assurances, no rational retailer would choose to allow a

7

competitor to reap the profits from retail sales of thousands of copies of a new-release DVD. Thus, Universal's boycott of Redbox goes beyond its illegal agreements with Redbox's primary distributors and has now expanded into a concerted, group boycott at both the wholesale and retail level. *Id.* at ¶¶ 51, 84.

Universal's actions have harmed consumers and Redbox. *Id.* at ¶ 51. Under the guise of a Revenue Sharing Agreement, Universal seeks to eliminate Redbox's low-cost rental alternative for consumers. *Id.* at ¶ 2. Based on Universal's actions, including its orchestration of a boycott, consumers have been deprived of Redbox's low cost, highly-convenient medium for renting and purchasing Universal DVDs and have been forced to turn to more expensive and burdensome options for access to these movies. *Id.* at ¶ 51. Redbox has been cut out of its normal distribution channels and has been denied the ability to purchase Universal DVDs from alternative wholesale and retail channels, thereby resulting in harm to consumers and to Redbox. *Id.*

## E. Defendants' Revenue Sharing Agreement And Related Actions Are Unlawful And Substantially Harm Consumers, As Well As Redbox.

The orchestrated boycott of Redbox by Universal, its distributors and retailers, and in the alternative, the Revenue Sharing Agreement demanded by Universal, are naked restrictions on output that directly reduce the supply of new-release DVDs available to consumers in many or all genres and artificially increase the prices of new-release DVDs that consumers must pay. The Revenue Sharing Agreement is unlawful, among other reasons, because it has the effect of (1) artificially constraining output by prohibiting kiosk retailers from renting to consumers any DVD until 45 days after the street date; (2) limiting the number of DVDs of a single copyrighted work that a particular kiosk may carry based on a formula that corresponds to the gross box office rental of the movie; (3) seeking to require kiosk retailers to destroy 100% of the units

8

removed from an active rental machine instead of selling them; and (4) requiring retailers who sign it to secretly give Universal "the greater of (i) 40% of all Rental Revenue [ ] with respect to each and every Unit of a Title; or $.40 per Transaction for each Transaction for each Unit of a Title." The effect of Universal's actions, if not remedied by the Court, will be to restrict output, eliminate competition in rental and sales markets and artificially raise prices to consumers. *Id.* at ¶ 53. Universal seeks to extend its rights as a holder of a copyright for new-release DVDs to (1) eliminate the channel of low cost, highly-convenient kiosk rental and resale and (2) unlawfully eliminate competition from Redbox and other kiosk outlets at the current and competitive rental rates they typically charge so that Universal may take control of retail distribution of new-release DVD entertainment rental or resale, either through a compulsory joint venture with those who sign the Revenue Sharing Agreement or directly through its higher-priced automated retail distribution devices, such as Mediaport Media ATM system or Universal's own "POP" machine. *Id.* at ¶¶ 5, 56.

## V.   ARGUMENT

### A.   Applicable Motion To Dismiss Standard.

In deciding a Rule 12(b)(6) motion to dismiss, a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). A defendant bears the burden of showing that "no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). Dismissal is appropriate only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

9

**B.** **Redbox Has Pled A Claim For Copyright Misuse. Universal's Contention That This Claim Should Be Dismissed Should Be Rejected.**

**1.** **Applicable Copyright Standards.**

Copyright law is designed to "stimulate artistic creativity for the general public good." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 204 (3d Cir. 2003) (*citing Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984)). Contrary to Universal's claim that the Copyright Act's intended purpose is to expand the "control rights copyright owners enjoy" (D.I. 33, Defendants' Supplemental Memorandum in Support of Their Motion to Dismiss ("Supp. Mem.") at 8), copyright statutes have been "amended repeatedly in an attempt to balance the authors' interest in the control and exploitation of their writings with society's competing stake in the free flow of ideas, information and commerce." *Sebastian Internat'l v. Consumer Contacts, Ltd.*, 847 F.2d 1093, 1095 (3d Cir. 1988). Although it is important that an author receive a "fair return" for his creative labor, that concept must be balanced against the competing (and more important) goals of stimulating artistic creativity for the public good and society's need for a free flow of ideas and information. *Id.* Ultimately, the copyright law regards "financial reward to the owner as a *secondary consideration.*" *Id.* (emphasis added).

Section 106 of the Copyright Act gives a copyright owner an exclusive right:  "Subject to sections 107 through 122 . . . (3) to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending." 17 U.S.C. § 106(3). But this distribution right is not absolute. It is limited by the "first sale doctrine" codified at section 109(a), which provides expressly:

(a)     Notwithstanding the provisions of section 106(3), the owner of a particular copy . . . lawfully made under this title, or any person authorized by such owner,

10

is entitled, without the authority of the copyright owner, to sell or otherwise
dispose of the possession of that copy . . . . 17 U.S.C. § 109(a).

Under the first sale doctrine, once a copyright owner has authorized the sale of a

particular copy of a copyrighted work, the owner loses the right to control the subsequent

downstream sale or distribution of that copy. *Columbia Pictures Indus., Inc. v. Redd*

*Horne, Inc.*, 749 F.2d 154, 159-60 (3d Cir. 1984) (first sale doctrine "prevents the copyright

owner from controlling the future transfer of a particular copy once its material ownership has

been transferred"), *citing Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350-51 (1908) (striking

down the copyright owner's attempt to prevent the resale of its books at a discounted price). *See*

*also Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 457 (1940) (after authorized first sale

to refiner, producer could not rely on patent to exercise "any control over price" at which product

could be resold). After a sale or authorized disposition by which title passes, DAVID NIMMER,

NIMMER ON COPYRIGHT, § 8.12[B][1], 8-158 (2008) (first sale doctrine applies to any authorized

transfer), continued control over the work by the copyright owner does not serve the purpose of

protecting the owner's rights in the intangible copyright, but rather is "primarily a device for

controlling the disposition of tangible personal property which embodies the copyrighted work."

*CM Paula v. Logan*, 355 F. Supp. 189, 191 (N.D. Tex. 1973). "[A]t this point, the policy

favoring a copyright monopoly for authors gives way to the policy opposing restraints of trade

and to restraints on alienation." *Id.* at 191 (citation omitted), *cf. Video Pipeline*, 342 F.3d at

205-06 (stating a holder's attempt to restrict expression that may be critical of it may "subvert —

as do anti-competitive restrictions — a copyright's policy goal to encourage the creation and

dissemination to the public of creative activity.").

Copyright misuse is an equitable doctrine. *Video Pipeline*, 342 F.3d at 204. Misuse

exists where the "patent or copyright holder has engaged in some form of anticompetitive

behavior." *Id.* The misuse doctrine prevents copyright holders from expanding their limited

monopoly to allow them to control economic activity that is outside the scope of that monopoly.

*Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 976-77 (4th Cir. 1990).

### 2. Redbox's FAC Properly Pleads A Claim For Copyright Misuse.

This case involves a clear effort by a copyright holder (Universal) to use its copyright in a

manner that is contrary to the public policy embodied in the grant of a copyright. *Lasercomb*,

911 F.2d at 978. Because Redbox has refused to join Universal's unlawful scheme to raise

prices, reduce output, and limit consumer choice of new-release DVDs, Redbox is now the

victim of a Universal-orchestrated boycott involving Universal, its distributors, and an array of

retailers. Universal has the power to orchestrate this boycott based on the limited monopoly

permitted by the copyright laws. Moreover, Universal's threats to distributors and retailers that it

would cut off their supply of Universal DVDs absent their agreement not to sell to Redbox is a

naked invasion of the first sale rights granted under the Copyright Act. Thus, contrary to the rule

stated in *Columbia Pictures* and Section 109 of the Act, Universal is seeking to control the

"future transfer" of its new-release DVDs after its initial transfer of ownership of products to the

distributors and to retail stores.

Universal's actions are inconsistent with the ultimate goal of the copyright laws, which is

to increase the public store of creative expression. *Video Pipeline*, 342 F.3d at 205-06.

Universal's actions will have the effect of reducing output and increasing the prices at which

new-release DVDs are made available to the public. When copyright holders engage in such

anticompetitive actions, courts have not hesitated to find misuse.

For example, in *Lasercomb*, the copyright holder's standard license agreement forbade

the licensee from developing any product that competed with the holder's product. 911 F.2d at

12

972-73. This anticompetitive restraint lasted 99 years longer than the copyright. *Id.* Based on these facts, the court found misuse. *Id.* at 979. Similarly in *Video Pipeline*, this Circuit considered whether misuse existed when Disney, the copyright holder, sought to forbid the licenser of its movie trailer from displaying any material derogatory of Disney on their websites. Although the court there rejected the charge of misuse, it specifically stated that anticompetitive licensing agreements may form the basis for misuse, especially to the extent they conflict with the purpose behind a copyright's protection by depriving the public of the would-be competition's creativity. *Video Pipeline*, 342 F.3d at 206.

These cases stand for the proposition that a copyright holder may not, by contract, magnify its rights beyond those sanctioned by the Copyright Act. But that is exactly what Universal is seeking to do here. Under the Act, the copyright holder's right to control distribution is subject to the first sale doctrine. *Lucasarts Ent. Co. v. Humongous Enter. Co.*, 870 F. Supp. 285, 290 (N.D. Cal. 1993) (the "essence of a copyright interest is the power to exclude use of the copyrighted work by those . . . who are not authorized to use it"). Thus, once Universal has sold its DVDs to distributors or retailers or, *a fortiori*, the distributors have re-sold the DVDs to retailers, the first sale doctrine eliminates Universal's power to control the future transfer of the individual DVDs or to impose related restraints. Universal is abusing the limited government monopoly it has received under the Act to compel its distributors and retailers to forego their statutory first sale rights. This sort of improper extension of the copyright monopoly is exactly what the misuse doctrine forbids.

Universal suggests that it should be allowed to restrict the distributors' first sale rights because it is seeking to promote its own interest in obtaining a fair return for the product of its creativity. Op. Br. at 11 ("Universal [ ] is not stripped of its ability to direct and implement a

13

distribution plan with respect to its goods just because elements of those goods are copyrighted."). That argument should be rejected. First, Universal's assertion is contrary to Redbox's well-pled allegation that Universal's actions are motivated not by a desire to better compete, but by its desire to eliminate its low-cost retail rental competitor and to control or take over the kiosk distribution system, all to the detriment of consumers. *Compare* Supp. Mem. at 8 *with* FAC at ¶ 5. Universal's "fair return" argument also completely ignores Redbox's well-pled allegations that Universal has forbidden Ingram and VPD not just from selling Universal DVDs to Redbox, but from providing other services to Redbox, including bar code labeling, packaging DVDs in Redbox jewel cases, sorting, shipping and storage of original DVD cases and providing art work prior to the street date, as well. No defense of these actions is made anywhere in Universal's briefs. Second, copyright law permits Universal to receive its "fair return" when it voluntarily sells product to VPD and Ingram (or to Best Buy or other retailers). Under the law, Universal then loses the monopoly power to control what the subsequent purchasers do with the individual DVDs that they have purchased from Universal at the "first sale" price that Universal is entitled to set. *See* cases cited at 10-13, above; *see also United States v. Univis Lens Co.*, 62 U.S. 1088, 1093-94 (1942) (once patent holder sold invention and received the reward requested, the holder is "no longer free to control the price at which it may be sold").

In sum, Universal's arguments fail. Under the copyright laws, Universal is not entitled to extend its monopoly any further than the first sale. *Columbia Pictures*, 749 F.2d at 159-60. Universal's demand that Count I be dismissed at the pleading stage should be rejected.

14

3.   **Universal's Arguments Demanding Dismissal Are Not Well-Founded.  At The Very Least, They Raise Factual Questions That Cannot Be Decided In Universal's Favor On A Motion To Dismiss.**

Faced with these facts, Universal claims that Redbox is not procedurally entitled to pursue its misuse claims because (a) Redbox's allegations do not support a finding of misuse; (b) Universal has made no claim for infringement; and (c) copyright misuse is a defense, not an affirmative claim.  Supp. Mem. at 6-10.  Each argument should be rejected.

a)   **Redbox's Allegations Support a Finding of Misuse.**

Universal's first argument is based on its assertion that it has not tried to improperly expand its copyright monopoly to "gain control of other markets or other products."  Supp. Mem. at 9-10.  This assertion ignores three key points:  (1) Universal plainly seeks to expand its limited copyright monopoly to secure other monopoly rights — including the right to control the distribution chain after a first sale — not granted by the Copyright Act (*see*, FAC at ¶¶ 48-51); (2) Universal's attempt to prevent distributors (such as Ingram and VPD) and retailers (such as Best Buy and others) from selling new-release DVDs to Redbox is directly contrary to public policy (*i.e.*, the first sale doctrine, *Lasercomb*, 911 F.2d at 976-77, *citing Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 492 (1942)); and (3) Redbox's allegations that Universal is seeking to control through joint ventures or unilaterally take over the kiosk distribution system and drive competition from the market.  FAC at ¶¶ 5, 55-56.  Each of these acts, independently unlawful, also constitutes copyright misuse.

Universal relies upon *Quality King Distribs., Inc. v. L'Anza Research Int'l, Inc.*, 523 U.S. 135 (1998) to support its claim that it is entitled to control the sales policies of its distributors despite its sale and transfer of title to them.  Universal claims that the Supreme Court "took as a given that the plaintiff in that case properly 'had relie[d] on the terms of its contracts with its

domestic distributors to limit their sales to authorized retail outlets.'" *See* D.I. 16, Universal's

Opening Brief in Support of [Its] Motion to Dismiss, filed December 5, 2008 ("Op. Br."), at 11.

Universal fails to disclose that two sentences later, the Supreme Court specifically states that

based on Section 109(a), L'Anza would not be entitled to treat any unauthorized resales as a

copyright violation because those distributors, pursuant to the first sale doctrine, were now the

owners of the product. *Quality King*, 523 U.S. at 143.

      In any event, Universal's entire argument rests on a false and illusory premise — its

purported contracts with VPD and Ingram. Even if one could accept, with no discovery, that the

documents that Universal attached to its initial brief were authentic and valid contracts, complete

and unmodified by subsequent agreements or course of dealing, ███████████████████████

███████████████████████████████ *See* D.I. 17, 12/8/2008 Transmittal Affidavit

of R. Montgomery Donaldson in Support of Defendants' Motion to Dismiss Complaint

("Transmittal Affidavit"), Exs. C and D, at ¶ 4. Moreover, no language in those documents can

be read to give Universal any right to unilaterally forbid the distributors from selling to Redbox.

To support its contention that it has the right to control to whom its distributors may sell,

Universal cites to paragraphs 17 and 6 of the documents. Op. Br. at 5. But neither cited

paragraph supports Universal's contention. ██████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

---
2 ████████████████████████████████████████████

██████████████████████████████████

684567.1

[REDACTED]

[REDACTED] By misstating the content of its own unauthenticated, possibly modified and plainly expired exhibits, Universal underscores just how tenuous its defenses really are.

Furthermore, even if the documents actually said what Universal claims they say, Universal's reliance on them as a means to dismiss Redbox's FAC is improper. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), cited by Universal, holds only that a court may "consider an *undisputably authentic* document that a defendant attaches as an exhibit to a motion to dismiss *if the plaintiff's claims are based on that document*" (emphasis added). Such a result is appropriate because when a complaint "relies on a document . . . the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished." *Id.* at 1196-97.

Redbox, however, was not "on notice" of the content of Universal's alleged distributor contracts at the time it filed its initial Complaint. Indeed, Universal continues to insist that these documents, expired or not, are so super-secret that neither the public nor even Redbox's executives may see them. *See* D.I. 18, Defendants' Memorandum of Law in Support of Their

17

Motion to Seal at 3 (stating "[t]he information contained in the [purported] Ingram and VPD distributor agreements comprises trade secrets and other confidential, sensitive, and/or proprietary business information"). Nor are Redbox's antitrust "core" claims based on these questionable documents. *Compare* Supp. Mem. at 1 (stating that Redbox's decision to drop the information and belief allegation undermines its "core antitrust theory").

Redbox's claims are based on improper agreements between and among Universal, the distributors and many large retailers to not sell new-release DVDs to Redbox and to interfere with services provided by Redbox's distributors as a means of coercing Redbox to sign the illegal Revenue Sharing Agreement. Universal's claim that the documents attached to its opening brief constitute valid contracts with Redbox's distributors, VPD and Ingram, does not excuse the illegality of Universal's actions. In its FAC, Redbox eliminated the "information and belief" allegation concerning the distributor contracts to reflect reality, something that Universal is asking the Court to ignore when it asserts that the expired purported distributor contracts provide a basis for dismissal. Supp. Mem. at 20-22.

### b) The Declaration That Redbox Seeks Should Not Require Actual Infringement.

Universal's second argument — that there is no current claim for existing infringement — is equally unavailing. The parties are clearly at issue. Redbox's traditional supply chain has been cut off, as have numerous alternatives. Redbox claims that Universal has accomplished this result by misusing its copyright to force distributors and retailers not to sell to Redbox. A court of equity should not be bound by labels in seeking to do justice between these parties and to clarify Redbox's rights. Indeed, if a technical copyright infringement is truly needed, that issue may be easily remedied simply by Redbox making its own multiple copies of

one or more popular new-release DVDs that Universal's boycott has prevented it from obtaining from distributors or retail stores.

c)    **Courts Recognize Copyright Misuse as an Affirmative Claim.**

As to Universal's third argument, that copyright misuse may only be asserted as a defense, this is simply untrue. In a recent federal decision, *Apple, Inc. v. Psystar Corp.*, 2009 U.S. Dist. LEXIS 14370, at *7 (N.D. Cal. Feb. 6, 2009), the court expressly rejected the argument that copyright misuse could only be asserted as a defense and held that copyright misuse may be asserted as an affirmative claim. The *Apple, Inc.* court held that the party asserting the claim might well have a "legitimate interest in establishing misuse independent" of any claim that the opposing party may have had. *Id.* at *7. A copyright misuse plaintiff may legitimately seek to "clarify the risks it confronts by marketing the products at issue in this case or others it may wish to develop." *Id.* In identical fashion, Redbox has a legitimate interest in having this Court clarify whether Universal's actions constitute misuse given Universal's actions in leveraging its copyright to prevent VPD and Ingram from exercising their statutory first sale rights. Universal's actions have caused Redbox harm and are ripe for decision by this Court.

Some of the cases on which Universal relies regarding Count I are inapposite, while others are non-binding and outdated. For example, *Ticketmaster, LLC v. RMG Technologies, Inc.*, 536 F. Supp. 2d 1191, 1198 (C.D. Cal. 2008) deals with whether the copyright misuse doctrine could be affirmatively used to seek *monetary damages*. (Plaintiff argues that copyright misuse "is an affirmative defense to a claim for copyright infringement and does not support an independent claim for damages. The Court agrees."). The reasoning in *Ticketmaster* has no application in this case, as Redbox is not seeking pecuniary recovery based on Count I, but rather a declaration that Universal is misusing its copyright. Other cases that Universal cites in support

19

of its contentions are outdated and superseded by more recent developments in the law. Thus,

*MGM v. Grokster*, 269 F. Supp. 2d 1213 (C.D. Cal. 2003) represents a decision from California

(and hence is not binding on this Court) that no longer states the current status of the law there.

As discussed above, *Apple, Inc. v. Psystar* presents the current status of the copyright misuse

doctrine, which is that parties may have a "legitimate interest in establishing misuse independent

of [the copyright holder's] claim against it, for example, to clarify the risks it confronts by

marketing the products at issue in this case or others it may wish to develop." *Apple, Inc.*, at *7.

### C.    Counts II-V Of The FAC Properly Allege Section 1 Violations.

#### 1.    Elements Of A Section 1 Violation.

A Section 1 violation for unreasonable restraint of trade under the Sherman Act is well-

pled when a plaintiff alleges "(1) concerted action by the defendants; (2) that produced

anti-competitive effects within the relevant product and geographic markets; (3) that the

concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the

concerted action." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir.

1997). The first element — concerted action orchestrated by these defendants — is clearly

alleged. FAC at ¶¶ 4, 33, 47-51. The second element may be established by allegations of actual

anticompetitive effects within the relevant market (for example, price increases or output

reductions). *See FTC v. Indiana Fed. of Dentists*, 476 U.S. 447, 460-61 (1986); *Gordon, M.D. v.

Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005) (An anticompetitive effect can be

demonstrated by showing that a restraint is "facially anticompetitive or that its enforcement

reduced output, raised prices or reduced quality"). Alternatively, a plaintiff may establish that

defendants had market power, defined as the ability to "raise prices above those that would

prevail in a competitive market." *See United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir.

1993) (internal citations omitted). Whether a *per se* rule or the rule of reason is employed, the

20

ultimate goal of the analysis is to form a judgment about the "competitive significance of the restraint." *NCAA v. Bd. of Regents*, 468 U.S. 85, 103 (1984), *citing Nat'l Society of Prof. Engineers v. United States*, 435 U.S. 679, 692 (1978). A conclusion that a restraint of trade is unreasonable may be:

> [b]ased either (1) on the nature or character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices. Under either branch of the test, the inquiry is confined to a consideration of impact on competitive conditions.

*NCAA*, 468 U.S. at 103 (internal citations omitted).

The third element, illegality, is alleged throughout the First Amended Complaint. FAC at ¶¶ 5, 48, 51-52, 56. And injury as a proximate result of the concerted action is pled at ¶¶ 49 and 51. All four elements are well-pled, as discussed in more detail below.

### 2. Count II States A Viable Cause Of Action.

Count II pleads a violation of Section 1 of the Sherman Act that should be evaluated under "quick-look" analysis. No elaborate analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint that nakedly raises prices or restricts output. *Brown University*, 5 F.3d at 669. Competitive harm is presumed and, to avoid liability, a defendant must establish some competitive justification for the restraint. *Id.* A quick-look approach is appropriate when an observer with even a rudimentary understanding of economics could conclude that the arrangement in question would have an anticompetitive effect on customers and markets. *Gordon*, 423 F.3d at 210.

Count II identifies two restraints: (1) the boycott of Redbox orchestrated by Universal among and between its distributors and retailers and (2) the restrictions demanded of kiosk retailers by Universal in the Revenue Sharing Agreement. FAC at ¶ 66. Both sets of restraints are alleged to be naked restraints on output that will increase price and reduce consumer choice,

and that have no offsetting pro-competitive effects. FAC at ¶ 68. Universal's true motive in orchestrating the boycott, and in seeking to impose the Revenue Sharing Agreement on Redbox and other retail DVD rental and resale facilities, is not to better compete with other studios, *compare* Op. Br. at 4, 14, but rather to eliminate the independent kiosk as a low-cost option for consumers and to establish and maintain artificially inflated prices for Universal new-release DVDs. FAC at ¶ 56.

These allegations alone are sufficient to establish each of the required elements for a Section 1 claim and that this claim should be evaluated under a quick look analysis. Nevertheless, Universal argues that this count should be dismissed because, it claims, (1) Redbox has only alleged vertical agreements between Universal and others and (2) the "quick look" doctrine is not appropriate when only vertical restraints are alleged. Supp. Mem. at 10, *citing Gordon*, 423 F.3d at 209-10. Universal is wrong on both counts. First, Redbox's FAC clearly alleges horizontal agreements among and between competitors, including (1) that Universal is effectively a joint venturer with direct horizontal competitors of Redbox, and seeks to control retail rental and resale of new-release DVDs through its confidential Revenue Sharing Agreements (FAC, Ex. A, at 2, 5) and (2) that Universal also has plans to sell directly at the retail level by using "retail distribution devices, such as the Mediaport Media ATM system or Universal's own 'POP' machine." *See* FAC at ¶¶ 5, 56. Universal simply ignores these inconvenient, yet undeniable, facts.

Universal is also wrong to the extent it asserts that this Circuit will not apply the quick look doctrine to vertical restraints. In *Gordon*, the court did state that the "non price vertical restraint" at issue in that case would be reviewed under the "traditional rule of reason." *Gordon*, 423 F.3d at 210. In doing so, however, it cited to *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d

22

1358, 1368 (3d Cir. 1996), which it described as standing for the rule that "vertical restraints of trade, which do not present an express and implied agreement to set resale prices, are evaluated under the rule of reason." *Gordon*, 423 F.3d at 210. Here, however, Redbox has specifically alleged that Universal's actions are specifically designed to set and maintain artificially high prices — Universal's own Revenue Sharing Agreement provides for this — by artificially setting minimum prices for rentals and constricting the supply of new-release DVDs for rental or resale, all to the detriment of consumers.

Redbox specifically alleges that there are no pro-competitive reasons for Universal's behavior. FAC at ¶ 68. Rather, Universal has undertaken a scheme to eliminate Redbox, a popular, innovative and low-cost retailer so that Universal can control or take over the distribution channel that Redbox has created. Such behavior is facially anticompetitive and constitutes a violation of Section 1. Redbox is entitled to proceed with its claims, and Universal's motion should be denied.

> ### 3.   Counts III And IV Should Be Sustained.
>
> #### a)   Counts III and IV Are Evaluated Under the Traditional Rule of Reason.

Under the rule of reason, "the fact finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Leegin Creative Leather Prods. v. PSKS, Inc.*, 127 S. Ct. 2705, 2712 (2007) (quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 (1997)); *Gordon*, 423 F.3d at 210 (application of the traditional rule of reason requires that a "fact finder look at the totality of the circumstances in order to determine whether a business combination constitutes an unreasonable restraint of trade"); *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144-45 (3d Cir. 2001) *cert. denied*, 534 U.S. 1014 (2001) (indicating totality of circumstances

considered under rule of reason includes facts peculiar to particular business to determine *the nature and purpose of the alleged restraint*). "Appropriate factors to take into account include 'specific information about the relevant business' and 'the restraint's history, nature and effect.'" *Id.* at 145 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).

### b)   Count III Validly Pleads an Antitrust Violation Pursuant to the Rule of Reason.

In *Eastman Kodak Co. v. Image Technical Svcs., Inc.*, 504 U.S. 451, 481-82 (1992), the Supreme Court recognized that one brand of a product can, under appropriate circumstances, constitute the relevant market when the product is unique and no reasonable substitute exists. This result is proper when there are no substitutes that are reasonably interchangeable with the product in the market. *Spahr v. Leegin Creative Leather Prods., Inc.*, 2008 U.S. Dist. LEXIS 90079, at *22-23 (E.D. Tenn. Aug. 20, 2008).

Count III is based on Redbox's allegation that: "[e]ach copyrighted work recorded on DVD constitutes an individual product market" for which the geographic scope is nationwide. FAC at ¶ 70. Redbox has alleged that each particular new-release DVD is a market unto itself. This claim is based on industry practice — releasing new-release DVDs on schedule to ensure that a particular DVD will not face competition during its 6-week life as a "new release" — and because certain new-release DVDs are uniquely attractive to consumers. A "must-see" movie has no substitutes. FAC at ¶ 39. These factors provide Universal with market power and the ability to charge a supracompetitive price for its unique DVDs. *See, e.g.*, *NCAA*, 468 U.S. at 111 (stating that certain sporting events are unique and constitute a separate market). Thus, Universal's attempt to restrict Redbox's ability to offer a new-release DVD to consumers or eliminate it from the particular market for a new-release title is plainly anticompetitive. Universal's acts raise the price that consumers must pay for a new-release DVD and restrict

24

output. *Id.* at 112 (When a product is "controlled by one interest, without substitutes available in the market, there is monopoly power.").

Universal responds with an unsupported one-liner that "Redbox has made no factual allegations to support [its] outlandish claim" that each DVD constitutes its own product market. Supp. Mem. at 11. This assertion is simply wrong. Redbox has alleged that industry practices, consumer preference and other factors establish each new-release DVD's uniqueness, which is recognized by the product's copyrighted status. FAC at ¶¶ 38-41. There are few, if any, substitutes during the period when the new-release DVD's demand is ripe. *Id.* Universal may disagree with Redbox's factual allegations, but that is a matter of proof, not something that can properly be decided at the pleading stage. F.R.C.P 8(a)(2); *cited in Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face").

Equally unavailing is Universal's claim that Redbox has not alleged sufficient facts to show a lack of reasonable interchangeability among new-release DVDs. Inelasticity does not mean, as Universal contends, that a manufacturer can simply "jack up" the price of a product excessively (Supp. Mem. at 11); rather, inelasticity refers to a situation in which a manufacturer can raise the price of a product, and yet the reduction in demand will not fully offset increased revenue from the price increases. Here, Redbox's claim is based on the proposition that a consumer looking for the latest "must-see" family movie will not "settle" for the latest blood bath featuring Steven Seagal. This proposition hardly seems debatable, let alone one that can be challenged at the pleading stage.

Universal's suggestion that, as a matter of law, individual copyrighted DVDs cannot constitute a valid product market[3] ignores the holding of *Kodak* and numerous other cases decided both before and after *Kodak. See, e.g., Tarrant Serv. Agency, Inc. v. American Standard Oil, Inc.*, 12 F.3d 609, 614 (6th Cir. 1993) ("Clearly, one brand of a product can constitute the relevant market when the product is unique and no relevant substitutes exist"); *U.S. Anchor Mfg. Co. v. Rule Indus.*, 7 F.3d 986, 997-98 (11th Cir. 1993) (particularly expensive anchor excluded from broader market of functionally similar, but less expensive, other anchors because of price disparity); *Woods Exploration & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1307 (5th Cir. 1971) (relevant market limited to single natural gas field); *Mitel Corp. v. A&A Connections, Inc.*, 1998 U.S. Dist. LEXIS 3576, at *13 (E.D. Pa. Mar. 20, 1998) (denying summary judgment on the ground that in "circumstances where the product or service is unique and therefore not interchangeable with other products or services, the single brand can constitute the relevant market"); *Hewlett-Packard Co. v. Arch Assocs. Corp.*, 908 F. Supp. 265, 270 (E.D. Pa. 1995) (complaint adequately pleaded relevant market as limited to Hewlett-Packard printers).

Redbox has alleged that consumer preference and industry practice creates a unique product with no readily available substitutes. Such a claim is entirely consistent with our common-sense experience; all the law requires is that it be "plausible." Moreover, where a market is plausible, the rule of reason requires a thorough factual analysis. The finder-of-fact must consider facts particular to the business and the restraint's history, nature and effect.

---

[3]     Examination of the product market definition in antitrust cases is generally improper at the pleading stage, as market definition "can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza, Inc. v. Domino's Pizza, et al*, 124 F.3d 430, 436 (3d Cir. 1997) (citation omitted). Accordingly, Universal's argument that Redbox has failed to allege a valid market at the pleading stage is disfavored.

*Eichorn*, 248 F.3d at 145.  Redbox has pled facts to support its position that an individual copyrighted DVD, a piece of intellectual property which is unique by definition, constitutes a relevant market.  This conclusion is based on industry practice, consumer preference, and common sense.  Redbox can and will establish this claim, and Universal's motion based upon arguments that ignore Redbox's allegations, should be rejected.

<strong>c)</strong>      <strong>Redbox's Count IV Also States a Valid Cause of Action.</strong>

Count IV is based on an alternative definition of the product market found in Count III. Redbox claims that each genre, or category, of new-release DVDs constitutes a submarket. Redbox further alleges that there is low cross-elasticity of demand among new-release DVDs belonging to the different and distinct genres.

Facts supporting Redbox's alternate market definition include:  (1) consumer preferences and industry practice demonstrate that, "a particular new-release DVD is not an acceptable substitute for another new-release DVD" (FAC at ¶ 39); (2) studios make efforts to ensure that DVDs of one genre are not released on the same day as another new-release in that same genre (*id.* at ¶¶ 39, 40); (3) video rental websites and retail stores follow this model by displaying DVDs by genre or category, influencing consumer options and choice (*id.* at ¶ 39); and (4) the "shelf life" for a new-release DVD is short, lasting just 45 days (*id.* at ¶ 38).  Further, consumer preferences demonstrate that someone who wants to rent the action movie *"Wanted"* is unlikely to rent *"Mamma Mia!"* as a substitute.  *Id.* at ¶ 39.  Because of the calculated manner in which studios release DVDs — effectively limiting consumers' choices of new-release DVDs within a genre — consumers have few, if any, acceptable substitutes for a particular new-release DVD in given category or genre.  *Id.* at ¶¶ 40-41.

27

Antitrust law recognizes that a product market may contain several economically significant submarkets, each of which may constitute a relevant market for antitrust purposes.[4] The boundaries of a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *see also White & White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983).

Both the public and the industry recognize specific genres as separate and distinct (FAC at ¶ 39), and new-release DVDs in separate genres each have their peculiar characteristics (*"Wanted"* as opposed to *"Wall-E"*), distinct customers, distinct prices and a lack of sensitivity to price changes. *Compare* FAC at ¶ 39 *with Brown Shoe*, 370 U.S. at 325. These allegations amply support Redbox's conclusion that distinct submarkets exist.

In response, Universal mocks Redbox's claim of submarkets, asking is a "'sports drama' separate from 'drama,' 'period adventure' separate from 'adventure.'" Supp. Mem. at 16-17. The answer is clearly not. In the examples Universal cites, drama and adventure are the genres, "sports" and "period" are simply adjectives describing the type of drama or adventure DVD,

---

[4]     Universal claims that it should be found not to have market power as a matter of law, *citing Assam Drug Co., Inc. v. Miller Brewing Co., Inc.*, 798 F.2d 311, 318 n.18 (8th Cir. 1986); *Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 483 F. Supp. 750 (D. Md. 1980), *aff'd* 638 F.2d 15 (4th Cir. 1981); *O.S.C. Corp. v. Apple Computer, Inc.*, 601 F. Supp. 1274, 1279-81 (C.D. Cal. 1985), *aff'd* 792 F.2d 1464 (9th Cir. 1986). Supp. Mem. at 15 (stating that no "manufacturer with 15% of the market can possibly have market power under the law).

Each of Universal's cited cases made the determination of market power only upon a fully-developed factual record. None decided the issue at the pleading stage. *Assam*, 798 F.2d at 318 (affirming summary judgment); *Donald B. Rice Tire, Co.*, 483 F. Supp. at 751 (decision after trial); *O.S.C. Corp.*, 601 F. Supp. at 1297 (summary judgment).

28

respectively.  Universal's dilemma is a matter of willful failure to parse standard English, not an insoluble antitrust conundrum that warrants dismissal.

Universal's other arguments are also easily dismissed.  The claim that Redbox has not provided factual allegations to support the conclusion that consumers will face increased prices (Supp. Mem. at 13-14) is simply wrong.  Redbox has provided data — originally published by Universal itself — that shows that Redbox provides DVDs to the public at prices below those of other outlets that rent or resell new-release Universal DVDs.  *See* FAC at ¶ 55 (stating that Redbox provides DVDs for $1 per night versus an average of $3.25 for rentals from other sources.)  If Universal's boycott is successful, consumers will pay more, according to Universal's own data.  *Id.*

Nor does Redbox simply allege higher prices without any further showing of "anticompetitive conduct."  Universal seeks to accomplish its goal of higher prices for new-release DVDs by orchestrating a boycott, requiring that its distributors and retailers relinquish their statutory first sale rights, for the purpose of eliminating an innovative competitor that has figured out a more consumer-beneficial way to distribute DVDs.[5]

\*       \*       \*

Market power that "arises in a single week" and then disappears is, according to Universal, not the kind of power about which antitrust law is concerned.  Supp. Mem. at 14-15.  Universal is wrong.  Here, as with a weekly farmer's market, the goods in the market are

---

[5]     In Op. Br. at 14-15, Universal argued that the "law reserves to Universal" the right to decide how to deal with Redbox.  In support, Universal cited *Glacier Optical, Inc. v. Optique du Monde, Ltd.*, 816 F. Supp. 646 (D. Or. 1993) and *O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464 (9th Cir. 1986).  *Id.*  Both cases reached the conclusion that the challenged practice was acceptable only after the plaintiff was allowed discovery and the opportunity to fully develop the alleged claims.  *Glacier*, 816 F. Supp. at 655 (ruling on summary judgment); *O.S.C.*, 792 F.2d at 1470 (affirming summary judgment).

short-term. This week's cherries will not sell next week. Next week's strawberries are not available now. Demand in the new-release DVD market is short-term — what's new, fresh and available this week. Universal's orchestrated boycott of Redbox — prohibiting distributors and other retailers from selling to Redbox or providing their usual services – damages the competitive structure of the marketplace, and those who shop there, by artificially raising prices and cutting supplies. Here, Redbox has clearly defined relevant submarkets and has set forth facts that support its position. Universal's motion to dismiss Count IV should be denied.

> **d)** **Redbox Has Sufficiently Alleged in Count V That Universal Has Engaged in a Horizontal Boycott of Redbox.**

Group boycotts, or concerted refusals by traders to deal with other traders, have long been held forbidden under the antitrust laws. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959). Such arrangements cannot be saved by allegations that the boycott was "reasonable." *Id.* Indeed, in *Klor's*, the Supreme Court held that such an arrangement was "not to be tolerated merely because the victim is just one merchant." *Id.* at 213.

Redbox has asserted allegations sufficient to show that Universal has engaged in *both improper horizontal and vertical group boycotts.*[6] For example, in paragraph 5 of the FAC, Redbox alleges that Universal is a direct competitor of Redbox both through its joint ventures with other DVD retailers who have submitted to Universal's Revenue Sharing Agreements, or through its planned introduction of its own DVD rental kiosks called "POP" and "MediaATM." Either way, Universal plans to "take control of [the] kiosk distribution for new-release DVD" market. *Id.*; *see also* FAC at ¶ 56 (Universal's illegal scheme is designed to "unlawfully

---

[6]     Redbox has addressed the validity of "Rule of Reason" claims, *supra*, at pp. 23-30, pertaining to other counts in the FAC. Accordingly, the discussion in this section will focus upon its *per se* claim based upon Universal's horizontal restraint of trade, although it is also unlawful under Rule of Reason analysis.

30

eliminate competition" in the market prior to its entry); *id.* at ¶ 83 (Universal seeks "to force

Redbox out of business or replace Redbox kiosks with Defendants'" own rental machines). This

is a horizontal combination in restraint of trade, as well as a vertical one.

     Redbox has plainly alleged "concerted" activity organized by Universal amongst

Redbox's retail competitors. *Compare* Supp. Mem. at 18-19 with FAC at ¶ 4 — Universal has

expanded its boycott to include "wholesalers and ordinary retail stores;" *id.* at ¶ 49 —

"Defendants have sought to prevent Redbox from buying new-release Universal DVDs . . . and

in some instances have succeeded in expanding the boycott;" *id.* at ¶¶ 50, 51, 84 — describing

how the "concerted," "group boycott" has included participation from Universal, Redbox's

distributors, Best Buy and other retailers and alleging that wholesalers and retailers have

canceled Redbox's orders, refused to sell (or sold only single copies of) Universal product to

Redbox, and in at least one instance, have escorted a Redbox employee from the premises

refusing to allow the individual to purchase Universal new-release DVDs. "Concerted action"

means that the individuals and entities have agreed, both among and between themselves, to

engage in the challenged behavior. *See, e.g.*, *Black's Law Dictionary* 283 (7th ed. 1999)

(defining "concerted" action as activity that has been "planned, arranged, and agreed on by

parties *acting together to further some scheme or cause,* so that all involved are liable for the

actions of one another"); *id.* at 181 (defining "group boycott" as a "*concerted* refusal to deal"

and as a "boycott by two or more competitors who refuse to do business with one firm")

(emphasis added). Thus, Redbox's allegations, *see* FAC at ¶¶ 4, 49, 50-51, and 84, are more

than broad enough to encompass agreements orchestrated by Universal among the distributors,

retailers and Universal.

Most importantly, however, Universal simply ignores the facts that Redbox has alleged which show the plausibility of Redbox's claim of unlawful horizontal restraints. This is all the law requires at the pleading stage. *Twombly*, 550 U.S. at 570. In FAC at ¶¶ 49-51, Redbox specifically pleads that separate and distinct retailers throughout the country have refused to sell Universal new-release DVDs to Redbox representatives. No rational retailer would engage in such behavior unless it knew, or had been assured, that the potential customer would not be able to meet the demand by going elsewhere. *See, Toys "R" Us v. FTC*, 221 F.3d 928, 934-35 (7th Cir. 2000) (horizontal conspiracy to boycott enforced by central common trading partner). Why would Best Buy, which is in business to sell to the public, act contrary to its own self-interest by artificially limiting its sales of Universal new-release DVDs (and, in doing so, incur the related enforcement costs of monitoring and enforcing the policy) unless it knew that the same customer would not be able to meet his or her demand by walking down the street and buying the same products at one of its competitors' stores? *Id.* at 935 (noting that evidence that supported the claim of conspiracy included that the alleged action was contrary to the manufacturer's self-interest in that it "deprive[d] itself of a profitable sales outlet" and its behavior was an "abrupt shift from the past"). It would not. It would be irrational and contrary to its own business interests to do so absent a horizontal agreement to boycott Redbox. Indeed, if any demonstration of Universal's market power is needed to establish these antitrust claims, what more compelling evidence could there be than its power to bend both large wholesale distributions and even larger retail chains to its will, and to compel them to boycott Redbox? These facts, which are ignored by Universal, establish the common sense and plausibility of Redbox's claim and, correspondingly, are more than adequate to defeat Universal's alleged right to dismissal.

4.     **Count VI Properly Alleges Intentional Interference With Contractual/Business Relationships With Redbox's Distributor Contracts.**

Universal's arguments against Count VI are based on the purported, but expired, distributor contracts that do not say what Universal claims. Arguments based on these highly-questionable bits of paper should be rejected for the reasons stated above.

To state a claim for tortious interference with contract, a complaint must state: (1) the existence of a valid contract ; (2) the interferer's knowledge of the contract or expectancy; (3) intentional interference; (4) that induces or causes a breach or a termination of the contract; and (5) resulting damages. *Corning Inc. v. SRU Biosystems, LLC*, 292 F. Supp 2d 583, 585-86 (D. Del. 2003); *All Pro Maids, Inc. v. Layton*, 2004 Del. Ch. LEXIS 116, at *24-25 (Del. Ch. Aug. 9, 2004).[7] Redbox has done this. Redbox has alleged the existence of contractual and business relationships with the distributors' contracts (FAC at ¶¶ 33-36, 86-87), Universal's knowledge of those contractual relationships (*id.* at ¶¶ 46, 88), Universal's wrongful inducement and coercion upon VPD and Ingram to breach those contracts (*id.* at ¶¶ 3, 47-48, 88-89), the distributors' subsequent breaches (*i.e.,* refusal to ship Universal DVDs to Redbox) due to Universal's conduct (*id.* at ¶¶ 4, 47-48, 90), and resulting damages (*id.* ¶¶ 49-51, 92).

Universal concedes the sufficiency of Redbox's allegations by its silence. Its arguments based on the distributor contracts are unfounded. Therefore, its motion to dismiss this Count must be denied.

---

[7]     The elements of this tort and pleading requirements are the same in California and Illinois as in Delaware. *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 55-56 (1998); *HPI Health Care Servs., Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 154-55 (1989) (citation omitted).

684567.1

## CONCLUSION

For the foregoing reasons, Universal's Motion to Dismiss should be denied in its entirety.

Respectfully submitted,

Of Counsel:

Charles S. Bergen
George R. Dougherty
Michael S. Gulland
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
(312) 704-7700

Frederick W. Stein
Redbox Automated Retail, LLC
One Tower Lane, Suite 1200
Oakbrook Terrace, Illinois 60181
(630) 756-8255

Dated:  March 4, 2009

  /s/ Chad S.C. Stover
Henry E. Gallagher, Jr. (No. 495)
Chad S.C. Stover (No. 4919)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE  19801
(302) 658-9141
hgallagher@cblh.com
cstover@cblh.com

*Attorneys for Plaintiff*

34

684567.1