**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| REDBOX AUTOMATED RETAIL, LLC, | |
| Plaintiff | |
| v. | **Civil Action No. 08-766 (RBK)** |
| UNIVERSAL STUDIOS HOME ENTERTAINMENT, LLC, UNIVERSAL CITY STUDIOS, LLLP, UNIVERSAL CITY STUDIOS PRODUCTIONS, LLLP, and FOCUS FEATURES, LLC, | |
| Defendants. | |

**DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS**

OF COUNSEL:

Glenn D. Pomerantz (CA Bar No. 112503)
David C. Dinielli (CA Bar No. 177904)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560

Paul H. Zoubek (PA Bar No. 36716)
R. Monica Hennessy (PA Bar No. 77928)
MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP
457 Haddonfield Road, Suite 600
Cherry Hill, NJ  08002

R. Montgomery Donaldson (DE Bar 4367)
Lisa Zwally Brown (DE Bar 4328)
MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP
1105 N. Market St., Suite 1500
Wilmington, DE  19801
(302) 504-7800
*Counsel for Defendants*
*Universal Studios Home Entertainment, LLC,*
*Universal City Studios, LLLP, Universal City*
*Studios Productions, LLLP, and Focus*
*Features LLC*

Dated:  March 13, 2009

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND CASE HISTORY ..................................................... 1

II.   ARGUMENT ............................................................................................. 3

    A.   The Allegations Cannot Support A Claim For Copyright Misuse ........................ 3

        1.   Redbox Cannot State A Declaratory Relief Claim For Copyright Misuse Because It Is Not Threatened By An Infringement Action .......... 4

        2.   The First-Sale Doctrine Does Not Make It Illegal For Universal To Control The Downstream Distribution Of Its DVDs ................................ 5

        3.   No Other Alleged Facts Could Support A Finding Of Misuse ................. 8

    B.   The Antitrust Claims Must Still Be Dismissed ................................................... 10

        1.   Redbox Does Not Allege A Horizontal Conspiracy ............................... 10

            a.   Universal's Alleged Involvement In Retail Sales -- Even If True -- Would Not Make This A Horizontal Conspiracy Case .......................................................................................... 10

            b.   Redbox Has Not Alleged Any Facts To Support Its Assertion of Agreements Between Retailers ............................... 13

            c.   Without A Horizontal Conspiracy, Redbox's "Quick Look" Claim Fails And Its Complaint Must Be Judged Under The Rule of Reason .......................................................................... 15

        2.   The Rule Of Reason Claims Fail Because Redbox Has Not Alleged Market Power Or Injury To Competition In Any Relevant Market ........ 15

            a.   Redbox Has Not Alleged Market-Wide Injury To Competition Or Market Power Sufficient To Cause Any Such Injury .................................................................................. 15

            b.   Redbox's Alleged Product Markets Fail As A Matter Of Law ....................................................................................... 17

    C.   Redbox Makes No Reasoned Defense Of The Interference Claim ..................... 19

III.   CONCLUSION ........................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Apple, Inc. v. Psystar Corp.*,
  2009 WL 303046 (N.D. Cal. February 6, 2009) ..................................................4, 5

*AT&T Corp. v. JMC Telecom, LLC*,
  470 F.3d 525 (3d Cir. 2006) ...............................................................2, 11, 12

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544, 127 S.Ct. 1955 (2007) ................................................2, 13, 14

*Bobbs-Merrill Co. v. Straus*,
  210 U.S. 339 (1908) .......................................................................................6, 7

*Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*,
  749 F.2d 154 (3d Cir. 1984) ..............................................................................6

*Cupp v. Alberto-Culver USA, Inc.*,
  310 F. Supp. 2d 963 (W.D. Tenn. 2004) ..........................................................18

*Davis-Watkins Co. v. Service Merch.*,
  686 F.2d 1190 (6th Cir. 1982) .........................................................................11

*Dimidowich v. Bell & Howell*,
  803 F.2d 1473 (9th Cir. 1986) .........................................................................12

*Disenos Artisticos E. Industriales, S.A. v. Work*,
  714 F. Supp. 46 (E.D.N.Y. 1989) .....................................................................18

*Eastman Kodak Co. v. Image Technical Inc. Servs.*,
  504 U.S. 451 (1992) ..........................................................................................17

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*,
  129 F.3d 240 (2d Cir. 1997) .............................................................................12

*Green Country Food Market, Inc. v. Bottling Group, LLC*,
  371 F.3d 1275 (10th Cir. 2004) .......................................................................18

*Hampton Audio Electronics, Inc. v. Contel Cellular, Inc.*,
  966 F.2d 1442 (4th Cir. 1992) .........................................................................12

*Hewlett-Packard Co. v. Arch Assocs. Corp.*,
  908 F. Supp. 265 (E.D. Pa. 1995) ....................................................................17

*IDT Corp. v. Building Owners & Managers Ass'n Intern.*,
  2006-1 Trade Cases 75,151, No. Civ. A.
  03-4113, 2005 WL 3447615 (D.N.J. Dec. 15, 2004) ........................................15

*Ill. Corporate Travel, Inc. v. Am. Airlines, Inc.*,
  889 F.2d 751 (7th Cir. 1989) ...........................................................................12

*International Logistics Group, Ltd, v. Chrysler Corp*,
  884 F.2d 904 (6th Cir. 1989) ...........................................................................12

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
  127 S. Ct. 2705 (2007) ..............................................................................15, 16

*Little Caesar Enterprises, Inc. v. Smith*,
  34 F. Supp. 2d 459 (E.D. Mich. 1998) .............................................................17

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*LucasArts Entm't Co. v. Humongous Entm't Co.*,
   870 F. Supp. 285 (N.D. Cal. 1993) ................................................................. 7

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, LTD*,
   269 F. Supp. 2d 1213 (C.D. Cal. 2003) .......................................................... 5

*Mitel Corp. v. A&A Connections, Inc.*,
   1998 U.S. Dist. LEXIS 3576 (E.D. Pa. Mar. 20, 1998) ................................ 17

*Nat'l Hockey League Players Assoc. v. Plymouth Whalers Hockey Club*,
   325 F.3d 712 (6th Cir. 2003) ......................................................................... 19

*Orson, Inc. v. Miramax Film Corp.*,
   79 F.3d 1358 (3rd Cir. 1996) ......................................................................... 15

*Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
   129 S. Ct. 1109 (U.S. Sup. Ct., slip op. at 1, February 25, 2009)................... 8

*Rebel Oil Co. v. Atlantic Richfield Co.*,
   51 F.3d 1421 (1995)....................................................................................... 16

*Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*,
   637 F.2d 1001 (5th Cir. 1981) ....................................................................... 12

*Ryko Mfg. Co. v. Eden Services*,
   823 F.2d 1215 (8th Cir. 1987) ....................................................................... 12

*Shaw v. Rolex*,
   673 F. Supp. 674 (S.D.N.Y. 1987) ................................................................ 18

*Smalley & Co. v. Emerson & Cuming, Inc.*,
   13 F.3d 366 (10th Cir. 1993) ......................................................................... 12

*Tarrant Serv. Agency, Inc. v. American Standard Oil, Inc.*,
   12 F.3d 609 (6th Cir. 1993) ........................................................................... 17

*U.S. Anchor Mfg. Co. v. Rule Indus.*,
   7 F.3d 986 (11th Cir. 1993) ........................................................................... 18

*Verizon Commc'n, Inc. v. Law Offices of Curtis V. Trinko*,
   540 U.S. 398 (2004)......................................................................................... 8

*Video Pipeline Inc. v. Buena Vista Home Entm't, Inc.*,
   342 F.3d 191 (3d Cir. 2003)............................................................................ 9

*Woods Exploration & Producing Co v. Aluminum Co. of America*,
   438 F.2d 1286 (5th Cir. 1971) ....................................................................... 17


## FEDERAL STATUTES

17 U.S.C. § 106 ..................................................................................................... 6


## CONSTITUTIONAL PROVISIONS

Const. Art. I, § 8, cl. 8 .......................................................................................... 9

## I.      **INTRODUCTION AND CASE HISTORY**

Redbox alleges that Universal made a business proposal in August 2008 that Redbox did not like.  Specifically, Redbox alleges that Universal proposed to supply DVDs directly to Redbox on "revenue sharing" terms that included the imposition of a 45-day window between the "street date" on which Universal DVDs would be available through certain other retail outlets, and the date on which Redbox would make those DVDs available through its kiosks.  *See* FAC ¶¶ 2 & Exh. A.  Redbox did not accept that proposal.  FAC ¶ 47.  Universal then directed its authorized distributors not to sell Universal DVDs to Redbox.  FAC ¶ 3.  The distributors stopped selling Universal DVDs to Redbox in December 2008.  FAC ¶ 4.

These are the core, salient facts that caused Redbox to sue Universal in October 2008. The original complaint alleged that Universal's agreements with its distributors permitting Universal to direct the distributors not to sell Universal DVDs to Redbox violated Section 1 of the Sherman Act.  *See* Orig. Compl. ¶¶ 68, 75.

Because manufacturers have broad rights to control the distribution of their own products, and because any agreements reflecting those rights are vertical, are subject to scrutiny only under the rule of reason, and generally are permitted, Universal filed a motion to dismiss.

Rather than opposing the motion, Redbox filed an amended complaint.  The amended complaint excised the express allegations regarding the distributor contracts that had been the subject of the antitrust claims in the first complaint.  The amended complaint also added new allegations suggesting that Universal had entered additional, purportedly illegal vertical agreements with "major retailers" not to sell to Redbox.  *E.g.* FAC ¶ 74.  Universal supplemented its motion to dismiss, demonstrating that, even if the new allegations were true, the newly alleged "boycott" would be judged under the rule of reason, and the allegations still

failed to state a cause of action because Redbox has failed to allege any market power and injury to competition (as opposed to mere injury to itself) within any adequately alleged market.

In its Opposition Brief, Redbox has fundamentally changed the basis for its antitrust claims yet again, arguing (despite the absence of sufficient allegations) that the illegal agreements at issue really are *horizontal*, not vertical. In particular, Redbox makes two new antitrust arguments. First, it argues that because Universal purportedly is preparing to enter the kiosk market itself (a contention that is totally unsupported by factual allegations), Universal should be considered a "retailer" for purposes of analyzing its purportedly horizontal agreements with "other" retailers. Binding Third Circuit precedent precludes this argument, however. *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006), holds that a supplier's vertical agreements with distributors or retailers are not to be viewed as horizontal just because the supplier, either on its own or through a subsidiary, also competes in that downstream market, as Redbox argues Universal is preparing to do.

Redbox's second new antitrust argument also is unfounded. Redbox argues that its assertion that there is a horizontal agreement among the "major retailers" (nowhere expressly alleged in the FAC) not to sell to Redbox, coupled with the assertion by Redbox's counsel that the purported refusals could only be explained as an immense conspiracy among retailers orchestrated by Universal, ought to permit it to proceed into discovery. But this is precisely the argument the Supreme Court rejected in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007), the landmark decision clarifying the strict pleading standard regarding the "agreement" element of a Section 1 claim. None of the factual allegations tends to exclude the possibility that the retailers acted independently of one another in declining to fulfill orders from Redbox, as they must to survive this motion to dismiss. This new theory must therefore be

rejected as well.

Finally, although Redbox continues to insist that Universal's efforts to control the manner in which its own products are rented and sold to retailers constitutes copyright misuse and interference with contract, there is nothing in the Opposition Brief that casts doubt on any of the legal principles that Universal already has briefed twice.  There is no viable copyright misuse claim under the facts alleged, and it does not constitute actionable interference for Universal to exercise its right to control the distribution of its own products.

## II.   ARGUMENT

### A.   The Allegations Cannot Support A Claim For Copyright Misuse

None of the arguments Redbox makes, and none of the many cases it cites, undermines any of the core legal reasons requiring dismissal of the purported copyright misuse claim:

- Copyright misuse generally is a defense to a cause of action for infringement;

- The few courts that have allowed a separate cause of action for declaratory relief regarding copyright misuse have done so only where, unlike here, the party seeking the declaration has a reasonable question about whether its own conduct might constitute infringement;

- Universal's purported violation of the "first sale" doctrine cannot support a finding of misuse in any event because efforts to control the downstream distribution of one's own products *by contract* does not even implicate that doctrine;

- None of the other alleged conduct could constitute "misuse" because, as a matter of law, none of it is anticompetitive and none of it is alleged to stifle anyone's creation, authorship, or expression of ideas, which the Third Circuit has

recognized is the principle concern the misuse doctrine is intended to address.

**1.      Redbox Cannot State A Declaratory Relief Claim For Copyright Misuse Because It Is Not Threatened By An Infringement Action**

Universal already has shown that the only circumstances that might support a stand-alone declaratory relief claim for copyright misuse are those in which a party reasonably seeks clarification that its *own* conduct does not constitute infringement in light of the copyright holder's "misuse."  Universal also has shown that Redbox has no basis on which to seek any such clarification here.  *See* Op. Br. at 8-9; Supp. Br. at 7-8.  Redbox faces no "copyright" risks from marketing or renting or selling Universal DVDs.  Universal does not currently even supply its DVDs to Redbox, either directly or indirectly through its authorized distributors.  (Indeed, that is the whole point of this case.)  To the extent that Redbox has acquired Universal DVDs through alternative sources such as by purchasing them from other retailers (*see*, *e.g.*, FAC ¶ 50), Universal never has contended and does not now contend that it would violate Universal's copyrights for Redbox to rent or sell those DVDs to the public.[1]

In response to this argument, Redbox places great emphasis on a very recent case, *Apple, Inc. v. Psystar Corp.*, 2009 WL 303046 (N.D. Cal. February 6, 2009), which Redbox says establishes that copyright misuse may be asserted as an affirmative claim.  In that case, Apple sued a computer manufacturer because Apple believed the manufacturer's product infringed Apple's copyrighted operating system.  *See Apple*, 2009 WL 303046 at *1.  The court in *Apple* did nothing more than permit the defendant, *who had been sued for copyright infringement*, to assert misuse as a counterclaim in that same infringement suit.  *See id.* at *3; *but see Metro-*

---

[1] To buttress its otherwise unsupported legal assertions, Redbox suggests in its Opposition that it "easily" could *create* a live copyright dispute simply by making multiple unauthorized copies of Universal's DVDs and selling or renting those to the public in violation of the copyright law.  *See* Opp. Br. at 18-19.  Redbox does not allege in its FAC that it actually has engaged in such violative conduct.  Universal does not, therefore, further address this specious threat.

*Goldwyn-Mayer Studios Inc. v. Grokster, LTD*, 269 F. Supp. 2d 1213, 1225-26 (C.D. Cal. 2003) (declining to permit infringement defendant to assert counterclaim for declaratory relief for misuse, finding the proposed claim redundant of the already-asserted copyright misuse defense).

The *Apple* court observed in *dicta* that the defendant in that case *might* have an interest in seeking a declaration regarding misuse *even if* Apple had not sued it for infringement, "for example, to clarify the risks it confronts by marketing the products at issue in this case or others it may wish to develop." *See Apple*, 2009 WL 303046 at *2. This *dicta* actually underscores why Redbox's request for a declaration regarding Universal's purported misuse is misplaced here. Unlike the defendant in *Apple*, Redbox has not alleged (and Universal does not contend) that anything about the Redbox business model -- renting and selling DVDs to consumers (FAC ¶ 1) -- might be viewed as constituting copyright infringement, so there is no need for the Court to exercise its discretionary jurisdiction under the Declaratory Judgment Act to decide a non-existent question. Thus, even if the law in this Circuit were to permit a stand-alone claim for declaratory relief regarding copyright misuse (and there is no case in this Circuit so holding or suggesting), the claim would be inapposite on the facts alleged here.

## 2. The First-Sale Doctrine Does Not Make It Illegal For Universal To Control The Downstream Distribution Of Its DVDs

Redbox continues to argue that it is a violation of the "first-sale doctrine" -- and therefore copyright misuse -- for Universal to control the downstream distribution of its goods once it has made a "first sale" to distributors. The argument continues to fail, and none of Redbox's cases revive it.

As Universal has explained, the "distribution" right is one of several exclusive rights that the Copyright Act confers on authors (others being, for example, the right to prepare derivative works, and the right to display copyrighted works publicly, *see* 17 U.S.C. § 106). The first-sale

doctrine does nothing more than prevent the author, once he or she has sold a physical copy of the copyrighted work, from enforcing the "distribution right" conferred by the Copyright Act with respect to that copy.  *See* Op. Br. at 10-11; Supp. Br. at 8-9.

The cases that Redbox cites underscore the limited scope of the first-sale doctrine and confirm that it has no bearing on Universal's efforts to control *by contract* the downstream distribution of DVDs it has sold to distributors.

Redbox cites *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154 (3d Cir. 1984), for example, for the proposition that a first sale terminates "the right to control the subsequent downstream sale or distribution of that copy."  Opp. Br. at 11.  But *Columbia Pictures* says nothing of the sort.  *Columbia Pictures* held that the first-sale doctrine limits an author's ability to exercise or enforce the *distribution right* as conferred by the Copyright Act, but the Third Circuit also held that a first sale leaves untouched all of the author's *other* statutory exclusive rights.  *See Columbia Pictures*, 749 F.2d at 158-160 (rejecting "first sale" defense to claim that defendant had violated movie studio's public exhibition right, which is one of the other exclusive rights the Copyright Act confers).  The case did not even consider -- let alone hold -- that the first-sale doctrine also disables authors from exercising contract or common law rights to control distribution, as Universal has done.

Redbox also cites *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350-51 (1908), in which a book author sued a downstream re-seller *under the Copyright Act*, claiming that the copyright alone gave the author the right to dictate the downstream retail price.  *See Bobbs-Merrill*, 210 U.S. at 343 (noting that that "case involves rights under the copyright act . . . without agreement between parties [regarding price] and where the alleged right springs from the protection of the copyright law alone").  The Supreme Court rejected the contention that copyright law alone gave

the author any downstream control rights, but emphasized throughout the opinion that the author's rights would have been totally different if there had been a contract in place with respect to downstream distribution.  *See*, *e.g., id*. at 350 ("[I]t is to be remembered that this is purely a question of statutory construction.  *There is no claim in this case of contract limitation, nor license agreement controlling the subsequent sales of the book*.") (emphasis added).

Finally, Redbox cites *LucasArts Entm't Co. v. Humongous Entm't Co.*, 870 F. Supp. 285, 290 (N.D. Cal. 1993).  But the court in *LucasArts* did not discuss the first-sale doctrine at all, and certainly did not analyze whether contractual distribution restrictions would violate that doctrine. What *LucasArts* does say is that it *does not constitute misuse* for a copyright holder to seek to control downstream use of its copyrighted materials.  *See LucasArts*, 870 F. Supp. at 290 ("The Court finds no basis for a claim of copyright misuse.  LucasArts only seeks to control rights over its [computer program]; it does not seek control over materials in which it does not own a copyright.").  *LucasArts*, therefore, supports Universal, not Redbox.

In short, Redbox cites no case that even hints that a "first sale" terminates an author's contractual or common law rights (as opposed to terminating only the Copyright Act's distribution right) to control the distribution of its products, just because those products happen to enjoy copyright protection.  Such a ruling would be unprecedented, and cast into doubt the legitimacy of the vast web of distribution agreements whereby authors and manufacturers of copyrighted goods (books, magazines, CDs, video games, photographs, DVDs) exercise control over how and when their products may be distributed and sold at retail.[2]

---

[2] Universal notes that Redbox essentially concedes that the movie studios legitimately exercise *some* control over the resale of DVDs, even after they have parted with particular copies via a "first sale."  Redbox alleges that the studios set a "street date," which, by "industry convention" is the date on which a DVD released by a studio "is made available for home viewing."  *See* FAC ¶ 31.  Redbox does not challenge that downstream restriction on the ability to rent and sell DVDs after the first sale.  The street date restriction imposes a "window" between the motion picture's theatrical release and its release for home viewing on DVD that is no different in kind than the "window" Universal proposed to Redbox in the proposed Revenue Sharing Agreement.  Neither window violates the "first

### 3.      No Other Alleged Facts Could Support A Finding Of Misuse

The Opposition Brief makes clear that the only basis *other* than the purported violation of

the first-sale doctrine on which Redbox relies to urge to a finding of misuse is Redbox's

assertion that Universal is "seeking to control through joint ventures or unilaterally [to] take over

the kiosk distribution system and drive competition from the market."  *See* Opp. Br. at 15.  This

unsupported assertion is insufficient to state a claim.[3]

First, there would be nothing improper or illegal or anticompetitive if Universal *were* to

try to enter the DVD kiosk market, and then to compete vigorously in that market to the

detriment of Redbox, including by refusing to sell Universal DVDs to Redbox altogether.  The

Supreme Court in recent years has reaffirmed the general principle that "there is no duty to aid

competitors" by selling to them, *see Verizon Commc'n, Inc. v. Law Offices of Curtis V. Trinko*,

540 U.S. 398, 411 (2004), and the more specific principle that there is no antitrust duty to sell to

competitors *on terms or at prices that the competitor prefers.  See Pacific Bell Tel. Co. v.

Linkline Commc'ns, Inc.*, 129 S. Ct. 1109 (U.S. Sup. Ct., slip op. at 1, February 25, 2009)

(vertically integrated seller with no antitrust obligation to sell to retail competitor has no antitrust

obligation to sell at any particular price).  So this contention cannot support a finding of

"misuse" either; the conduct about which Redbox (incorrectly) hypothesizes simply would not

violate the antitrust laws.

Additionally, any argument that Universal's alleged conduct should be deemed misuse

despite the fact that the allegations cannot support a violation of the antitrust laws is directly

---

sale" doctrine, and it is puzzling that Redbox contends that the window Universal would impose on it is illegal while
at the same time touting a business strategy that is premised on the legitimacy of the street date window.  *Cf.* FAC
¶ 32 (describing Redbox's perceived need to be able to stock DVDs immediately upon "street date").

[3] The news articles that Redbox attaches to the FAC do not support the assertion that Universal is preparing to enter
the DVD kiosk business in the United States.  One article describes a purported license agreement between NBC
Universal and a third-party kiosk operator whose kiosks offer download of digital content, not sales or rentals of
physical DVDs; the other discusses kiosks in the United Kingdom, not the United States.  *See infra* section II.b.1.a.

foreclosed by the 2003 *Video Pipeline* decision, in which the Third Circuit made clear that the only possible circumstance in which conduct that is not "anticompetitive" can support a misuse claim is when the conduct stifles the creation, innovation, or expression of *ideas* -- a circumstance that Redbox does not allege here.

As previously noted, the Third Circuit did not recognize the copyright misuse doctrine at all until *Video Pipeline. See Video Pipeline Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 203-204 (3d Cir. 2003) ("Neither the Supreme Court nor this Court has affirmatively recognized the copyright misuse doctrine."). The *Video Pipeline* court addressed the question in the course of analyzing licensing agreements by which Disney precluded its licensees from denigrating Disney or the entertainment industry, which the defendant argued evidenced copyright misuse. *Id.* at 203. The Third Circuit expressly acknowledged the viability of the defense in this Circuit, but in doing so emphasized the limited category of conduct the doctrine to intended to address: conduct by which a copyright holder "depriv[es] the public of the would-be competitor's creativity." *Id.* at 204-05 (noting that application of copyright misuse doctrine should serve the purposes of the Constitution's Copyright and Patent Clause, which is "to promote the Progress of Science and useful Arts") (quoting Const. Art. I, § 8, cl. 8). Indeed, it was this conclusion -- that conduct should be deemed copyright misuse only if it *significantly* suppresses creative expression -- that caused the *Video Pipeline* court to reject the contention that the license agreements at issue there evidenced *copyright* misuse. *See id.* at 206 (rejecting misuse claim where minimal suppression of expression did not "affect in any significant way the policy interest in increasing the public store of creative activity").

None of the alleged facts suggest that anything Universal purportedly has done has had any suppressive effect whatsoever on creative output or the expression of ideas by Universal's

competitors, by its distributors, or by Redbox, let alone an effect that "interferes with creative expression" in a "significant way." *Cf. id.*  This Court should dismiss the copyright misuse claim for this additional reason as well.

**B.**     <u>The Antitrust Claims Must Still Be Dismissed</u>

Redbox's allegations have changed with each submission to the Court as to the factual predicate of the variously titled Section 1 claims.  Although the FAC now contains four separate counts purporting to state claims under Section 1, it still remains unclear which counts are intended to be directed at which purported agreements.  Count II, for example, alleges that it is directed, "in the alternative" (FAC ¶ 66), at the terms of the proposed Revenue Sharing Agreement -- which is not even an "agreement" because Redbox *rejected* it.  *See* FAC ¶ 47.  Despite the continuing uncertainty as to which agreements Redbox contends violate the Sherman Act, one thing is clear:  Redbox still has not alleged a cognizable Sherman Act claim.

**1.**     **Redbox Does Not Allege A Horizontal Conspiracy**

Redbox now argues that Count II ("Quick Look") and Count V ("Violation of § 1") survive because Redbox purportedly has alleged a horizontal conspiracy in that (1) Universal allegedly competes at the retail level; and (2) Universal has orchestrated a "group boycott" of Redbox that includes "major retailers" who purportedly have agreed not only with Universal but also with each other.  Neither theory is legally sufficient as alleged in the FAC.

**a.**     **Universal's Alleged Involvement In Retail Sales -- Even If True -- Would Not Make This A Horizontal Conspiracy Case**

The first argument -- that Universal's alleged vertical agreements with distributors or retailers should be analyzed as if they were horizontal agreements because Universal may enter the kiosk market as a retail competitor -- fails as a matter of law.

As an initial matter, Redbox does not allege that Universal *currently* sells or rents DVDs

at retail in the United States, either on its own, or through a subsidiary, or through a joint

venture.  Redbox alleges only that Universal "seeks" to take control of "kiosk distribution,"

presumably in the future, through its own kiosks or kiosks in which it has a financial stake.  *See*

FAC ¶ 5.[4]

Even if Universal currently were selling its own DVDs at retail, that fact would not

transform Universal's alleged vertical agreements with retailers into horizontal arrangements for

purposes of antitrust analysis.  The law recognizes that it is commonplace for manufacturers to

sell their own products at retail themselves, and simultaneously to engage distributors or

middlemen to sell their products to *other* retailers.  This is called "dual distribution."  *See, e.g.,*

*Davis-Watkins Co. v. Service Merch.*, 686 F.2d 1190, 1201 n.14 (6th Cir. 1982) ("dual

distribution" describes a manufacturer who "operates a branch or dealership on the same market

level as one or more of its customers").

Moreover, controlling Third Circuit precedent -- *AT&T Corp. v. JMC Telecom, LLC*, 470

F.3d 525 (3d Cir. 2006) -- holds that agreements between a manufacturer engaged in "dual

distribution" and its downstream distributors or retailers, with whom the manufacturer also

competes at that downstream level, are viewed by the antitrust laws as vertical agreements (not

horizontal agreements), and are subject to scrutiny only under the rule of reason.  *See AT&T*, 470

F.3d at 531.

*AT&T* involved a contractual arrangement between AT&T, an upstream supplier of

telephone services, and JMC, a downstream marketer of pre-paid telephone cards that sold the

cards principally in the "maritime market" (for example to foreign seamen and cruise ship

passengers).  *See AT&T*, 470 F.3d at 528 & n.2.  A dispute arose.  When AT&T sued for breach

---

[4] As noted previously, the news articles Redbox attached as exhibits to the FAC in support of this contention actually refute it.  Exhibit D describes kiosks that permit consumers to purchase electronic downloads, not physical DVDs.  Exhibit E describes kiosks in the United Kingdom, not the United States.  *See also* Supp. Br. at 18 & n.7.

of contract, JMC asserted antitrust counterclaims, alleging that the contractual prohibition

against "selling the cards to non-maritime customers" violated the Sherman Act.  *See id.* at 531.

JCM argued in the district court and on appeal that its contract with AT&T should be

analyzed as a horizontal agreement -- given that AT&T also competed with JCM by selling

phone cards at the same distribution level as JCM.  *See id.*  The Third Circuit disagreed, and

affirmed dismissal of the antitrust counterclaim:

> The problem with JCM's argument, however, is that the
> relationship was primarily vertical.  Although we agree that the
> relationship had horizontal elements, it is undisputed that AT&T
> supplied telecommunications service to JCM for resale. *The fact
> that AT&T also sold phone cards at the resale level does not
> change the analysis.* Vertical restraints are generally not *per se*
> violations of the Sherman Act, even where a distributor and
> manufacturer also compete at the distribution level, i.e., have some
> form of horizontal relationship (a/k/a/ dual distributor
> arrangement), as is the case [here].

*Id.* (emphasis added) (citing *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*, 129 F.3d

240, 243-44 (2d Cir. 1997)).

The Third Circuit is not alone in rejecting the contention that a manufacturer's dual

distributor status does transform its vertical agreements into horizontal ones.  The eight other

circuits that have considered the dual distributor issue all have reached the same result.[5]

Accordingly, Universal's alleged involvement with the retail sale or rental of DVDs -- even if

that involvement placed it in direct competition with the "large retailers" who allegedly agreed

with Universal not to re-sell to Redbox -- would not transform any of its agreements from

---

[5] *See Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 243 (2d Cir. 1997) (holding dual distributor arrangement should be analyzed as a horizontal agreement under the rule of reason); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986) (same); *Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366, 368 (10th Cir. 1993) (same); *Hampton Audio Electronics, Inc. v. Contel Cellular, Inc.*, 966 F.2d 1442 (4th Cir. 1992), as amended, (Aug. 6, 1992) (same); *International Logistics Group, Ltd, v. Chrysler Corp*, 884 F.2d 904 (6th Cir. 1989) (same); *Ill. Corporate Travel, Inc. v. Am. Airlines, Inc.*, 889 F.2d 751, 753 (7th Cir. 1989) (same); *Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215, 1230 (8th Cir. 1987) (same); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1004-1007 (5th Cir. 1981) (same).

vertical into horizontal arrangements, as a matter of law.

> **b.      Redbox Has Not Alleged Any Facts to Support Its Assertion of Agreements Between Retailers**

Redbox also argues that it has alleged horizontal agreements because it has "alleged 'concerted' activity organized by Universal amongst Redbox's retail competitors."  Opp. Br. at 31.  It argues that Best Buy and other retailers agreed with Universal and with each other to cease or severely limit their sales of Universal DVDs to Redbox and that "no rational retailer would engage in such behavior unless it knew, or had been reassured, that the potential customer would not be able to meet the demand by going elsewhere."  Opp. Br. at 32.

This argument -- and the allegations of the Complaint upon which it is based -- fails to meet the pleading standards for Section 1 claims recently established by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1966 (2007).  In *Twombly*, the Court held that a Section 1 complaint must be dismissed for failure to plead the agreement element of the claim absent pleading of "some factual context suggesting agreement, as distinct from identical, independent action."  *Id.,* 127 S. Ct. at 1961.  The Court explained that allegations of "parallel conduct or interdependence, without more," could not alone state a claim because such conduct might be "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Id.* at 1964 (citation omitted).  As a result, a Section 1 complaint must assert allegations "plausibly suggesting (not merely consistent with) agreement" among the alleged conspirators.  *Id.* at 1966.

Redbox seeks to turn *Twombly* on its head by suggesting that because one or two retailers allegedly have refused to sell large quantities of DVDs to Redbox, there "must" be a vast conspiracy orchestrated by Universal among all retailers to "boycott" Redbox.  *See, e.g.*, FAC

¶¶ 50, 51.  There are no allegations, however, of actual agreements among any retailers -- with or without the involvement of Universal.  Rather, Redbox musters only conclusory assertions.  *See* FAC ¶ 74 (Universal has violated Section 1 "by combining with its distributors and major retailers to boycott Redbox"); ¶ 79 ("By boycotting Redbox (and orchestrating a boycott of Redbox by others) …"); ¶ 82 ("Defendants also obtained the agreement of other distributors and major retailers not to sell (or to severely restrict sales) to Redbox"); ¶ 84 ("Defendants' agreements with distributors and retailers that they not sell to Redbox is [sic] a group boycott in violation of the antitrust laws").

Redbox's assertion that the refusal of Best Buy and other retailers to sell large quantities of DVDs to Redbox can only be explained by a concerted agreement to boycott Redbox fails to recognize traditional competitive concepts.  Indeed, as Redbox itself acknowledges, the members of this alleged conspiracy of retailers are "Redbox's retail competitors," Opp. Br. at 31, and there are any number of plausible reasons why a Redbox competitor might choose not to let Redbox stock its kiosks from the competitor's own shelves -- beginning with the fact that Redbox would turn around and do its best to rent those same DVDs to customers who might otherwise be purchasers of DVDs and other products from the competing retailer.  Under *Twombly,* because the Complaint fails to allege any actual agreement or any other "plausible suggestion of conspiracy," Redbox's musings are insufficient to state a claim under Section 1.  *See Twombly,* 127 S. Ct. at 1971 (rejecting conclusory allegations of conspiracy when "there is no reason to infer that the [alleged conspirators] had agreed among themselves to do what was only natural anyway").

        **c.**       **Without A Horizontal Conspiracy, Redbox's "Quick Look" Claim Fails And Its Complaint Must Be Judged Under The Rule of Reason**

Redbox argues that "Universal is wrong to the extent that it asserts that this Circuit will

- 14 -

not apply the quick look doctrine to vertical restraints." Opp. Br. at 22. But it cites no case

where this -- or any other -- circuit applied the quick look doctrine to a vertical restraint. Instead,

it notes only that the Third Circuit in *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1368

(3rd Cir. 1996), did not judge "agreements to set resale prices" under the rule of reason and that

here, "Redbox has specifically alleged that Universal's actions are specifically designed to set

and maintain artificially high prices." Opp. Br. at 22-23. The portion of *Orson* on which

Redbox relies has been overruled. In *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 127

S. Ct. 2705, 2712 (2007), the Supreme Court held that resale price maintenance agreements, like

all other vertical agreements, are to be judged under the rule of reason. Accordingly, because

Redbox alleges only vertical restraints, its claims must be judged under the rule of reason.

      **2.**      **The Rule Of Reason Claims Fail Because Redbox Has Not Alleged Market Power Or Injury To Competition In Any Relevant Market**

            **a.**      **Redbox Has Not Alleged Market-Wide Injury To Competition Or Market Power Sufficient To Cause Any Such Injury**

Redbox's rule of reason allegations fail for the basic reason that it has not alleged, as it

must, facts suggesting an anticompetitive effect in a tenable relevant market. *IDT Corp. v.*

*Building Owners & Managers Ass'n Intern.*, 2006-1 Trade Cases 75,151, No. Civ. A. 03-4113,

2005 WL 3447615, at * 8 (D.N.J. Dec. 15, 2004). Although Redbox argues that its proposed

relevant markets are tenable, it devotes only two paragraphs to addressing Universal's showing

that the FAC is devoid of allegations suggesting that any of Universal's alleged agreements have

caused injury to competition within any market, or that Universal possesses sufficient market

power to impose any restraint causing injury to competition within any market. *See generally*

Op. Br. at 12-15; Supp. Br. at 12-15.

Redbox tries to deflect the argument by asserting that Universal has "orchestrat[ed] a

boycott" . . . "for the purpose of eliminating an innovative competitor . . ." Opp. Br. at 29. But

an allegation that Universal entered agreements with its distributors or with retailers *with the subjective purpose* of "eliminating" Redbox is not an allegation that whatever agreements actually were reached had the required anticompetitive "effect."  No allegation suggests that these mysterious, unspecified agreements caused any reduction in the sort of *interbrand* competition as between Universal and its studio competitors that Universal previously has demonstrated is the principal concern of the Sherman Act.  *See, e.g.*, Opening Br. at 2; *see also Leegin*, 127 S. Ct. at 2715 (noting that "the primary purpose of the antitrust laws is to protect . . . competition [between different brands]") (quotations omitted).

Redbox also disputes Universal's showing that Redbox has not made, and cannot make, any factual allegations suggesting that Universal has market power sufficient to impose any restraint that could injure competition in the market as a whole.  *See* Opp. Br. at 29; *cf.* Opening Br. at 15-17; Supp. Br. at 14-15.  Universal cited *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1432 (1995) (*cited in* Supp. Br. at 15), to support the proposition that courts measure "market power" over time, and that the antitrust laws are not concerned with transitory "market power" that arises in one week and disappears the next.  But Redbox does not even address the case or explain why it does not require dismissal here.

Universal also demonstrated that Redbox's own allegations -- including the now deleted allegation that only 15% of product it stocks comes from Universal (*see* Orig. Comp. ¶ 34) -- *negate* any finding of market power.  Universal cited three cases in support of that argument, *see* Supp. Br. at 15, and the only argument Redbox makes in response is that none of the three cases is a pleading case.  But that is not the point.  Redbox has cited no case -- at the pleading stage, at summary judgment, or post trial -- that has confirmed the viability of a rule of reason claim in which the defendant has only a 15% market share.  Redbox cannot avoid the consequences of its

- 16 -

allegations by continually deleting them and failing to replace them with allegations sufficient under the law.

      **b.**      **Redbox's Alleged Product Markets Fail As A Matter Of Law**

Universal already has briefed why Redbox's two alternative product markets -- the first being "each copyrighted work recorded on DVD" (FAC ¶ 70) and the second being "each DVD category, or genre" (FAC ¶ 77) -- are impermissibly narrow as a matter of law. *See* Supp. Br. at 15-17. Redbox's defense of these alleged markets (Opp. Br. at 24-29) is unavailing.

With respect to the proposed single-title markets, Redbox mistakenly relies on *Eastman Kodak Co. v. Image Technical Inc. Servs.*, 504 U.S. 451, 482 (1992). In *Kodak,* the Supreme Court held that the parts or supplies for a *specific* product, like a Kodak copier, can constitute a relevant market because parts for another kind of copier cannot be used for the same purpose; that is, they cannot be used to service Kodak copiers. Numerous courts have recognized that the exception established in *Kodak* to the prohibition against single-brand markets is limited to *after-market* products. *See*, *e.g.*, *Little Caesar Enterprises, Inc. v. Smith*, 34 F. Supp. 2d 459, 478-86 (E.D. Mich. 1998). The *Kodak* exception is therefore inapplicable here.[6]

Conversely, case after case holds that individual brands — no matter how distinctive, unique, or popular — are not separate markets for antitrust purposes. *E.g.*, *Green Country Food*

---

[6] The series of cases Redbox cites at page 26 of its Opposition that purportedly apply the *Kodak* exception are of no assistance. One of the cases held that the relevant market *could not be limited to one brand*, despite allegations of a *Kodak*-like aftermarket. *See Tarrant Serv. Agency, Inc. v. American Standard Oil, Inc.*, 12 F.3d 609, 614 (6th Cir. 1993) (discussing *Kodak* but holding that relevant product market was broader than just one brand). Two of the cases expressly applied *Kodak* to aftermarket settings and so are inapplicable for the reasons *Kodak* is inapplicable. *See Mitel Corp. v. A&A Connections, Inc.*, 1998 U.S. Dist. LEXIS 3576, at *13 (E.D. Pa. Mar. 20, 1998) (holding that aftermarket of Mitel products fell into the *Kodak* exception); *Hewlett-Packard Co. v. Arch Assocs. Corp.*, 908 F. Supp. 265, 270 (E.D. Pa. 1995) (following *Kodak* and holding that HP could constitute its own market where plaintiffs alleged that HP had 75% of the computer printer sales in the United States and that HP "totally dominate[s] the market"). The remaining two cases are factually and legally distinguishable. *Woods Exploration & Producing Co v. Aluminum Co. of America*, 438 F.2d 1286, 1307 (5th Cir. 1971), allowed a market consisting of one oil field only after deciding that because the practice at issue was "illegal in itself," a market analysis was "unnecessary in this case and the 'relevant market' [was] in that sense irrelevant." *U.S. Anchor Mfg. Co. v. Rule Indus.*, 7 F.3d 986, 997-98 (11th Cir. 1993), held only that a significantly higher priced brand of boat anchor could be excluded from the relevant market of generic brands otherwise constituting the market.

*Market, Inc. v. Bottling Group, LLC,* 371 F.3d 1275, 1282 (10th Cir. 2004) (holding that Pepsi is

not a product market, and noting that "[e]ven where brand loyalty is intense, courts reject the

argument that a single branded product constitutes a relevant market"); *Disenos Artistocos E.*

*Industriales, S.A. v. Work*, 714 F. Supp. 46, 48 (E.D.N.Y. 1989) (rejecting proposed market

consisting only of Lladro porcelain figurines despite "intense brand loyalty" for Lladro and

despite that many retailers do not purchase competing brands); *Shaw v. Rolex*, 673 F. Supp. 674,

679 (S.D.N.Y. 1987) (Rolex watches cannot be own market).  If a single brand -- which

ordinarily encompasses multiple different products marketed under the same trademark -- cannot

be its own market, then *a fortiori* a single product within that brand -- such as a single Universal

title -- cannot be either.

    And with respect to the proposed *single-genre* markets, Redbox makes no legal

argument, and cites no legal authorities at all.  Instead, Redbox belittles Universal's observation

that the boundaries of the proposed "single genres" -- "action/adventure, comedy, drama, family

and kids, horror and sci-fi, suspense, *others*" (FAC ¶ 39) (emphasis added) -- are neither obvious

nor self-executing.  But the observation is fully justified, and finds its basis in case law.  *See,*

*e.g.*, *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004) (dismissing

complaint because "Plaintiff's attempted definition of the relevant product market [was]

insufficient and fatally vague.").

    Finally, Redbox argues, incorrectly, that market definition is too fact intensive to be

decided on a motion to dismiss.  This is not the law.  Rather, "[f]ailure to identify a relevant

market is a proper ground for dismissing a Sherman Act claim."  *Nat'l Hockey League Players*

*Assoc. v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719-20 (6th Cir. 2003).  Courts

regularly dismiss complaints where the alleged product market is "implausible or not tenable."

*See, e.g., Spahr v. Leegin Creative Leather Products, Inc.*, 2008 WL 3914461, at *9 (E.D. Tenn. Aug. 20, 2008) (dismissing complaint with prejudice on grounds that single-brand market was legally untenable despite allegations that demand for the product was "inelastic").

•  •  •  •

Redbox's shifting antitrust theories have run their course.  It now is clear that the only relevant "fact" Redbox can allege is that it prefers to obtain Universal DVDs on terms that are at odds with the terms on which Universal wants to sell them.  This is not an antitrust claim, and the Court should dismiss all four of the FAC's Sherman Act counts, with prejudice.

### C. Redbox Makes No Reasoned Defense Of The Interference Claim

The common law recognizes that the exercise of a legal right -- such as a supplier's right to direct the downstream distribution of its products -- cannot serve as the predicate for an interference claim, as a matter of law.  This is what all the leading treatises say, and this is what all the cases say.  *See generally* Opening Br. at 20-26; Supp. Br. at 20-22.  Redbox has no reasoned response.

The *only* argument Redbox makes in response is the bizarre assertion that Universal's written contracts with its distributors, which expressly confirm those rights, and which Universal submitted to this Court along with an authenticating declaration from the Vice President, Business and Legal Affairs of Universal Studios Home Entertainment, LLC, constitute "highly-questionable bits of paper."  *See* Opp. Br. at 33.

The argument is, in the end, irrelevant:  Universal made clear in its Opening and Supplemental Briefs that the claim would be subject to dismissal regardless whether Universal had contracts that expressly confirmed its right to direct the manner in which its own products are to be distributed.  *See, e.g.*, Opening Br. at 24 n.9.  But the argument is nonetheless totally

7325865.3

improper.  Redbox discloses no basis whatsoever on which this Court should disregard the

authenticating declaration swearing that these contracts are what they appear to be and say what

they appear to say, and no basis on which to hypothesize that Universal's lawyers would have

submitted something to this Court that was in any way inauthentic.  *Cf.* Opp. Br. at 16

(suggesting the contracts may not be authentic).  This claim must be dismissed as well.

## III.   **CONCLUSION**

This Court should dismiss the FAC in its entirety, with prejudice.


Dated: March 13, 2009

ATTORNEYS FOR  DEFENDANTS OF
COUNSEL:

*/s/David C. Dinielli*
_____
Glenn D. Pomerantz, Bar No. 112503
David C. Dinielli, Bar No. 177904
Munger, Tolles & Olson LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560

Paul H. Zoubek
R. Monica Hennessy
**MONTGOMERY, MCCRACKEN,
 WALKER & RHOADS, LLP**
Liberty View
457 Haddonfield Road, Suite 600
Cherry Hill, NJ 08002
(856) 488-7700

Respectfully submitted,

*/s/ R. Montgomery Donaldson*
_____
R. Montgomery Donaldson (DE Bar ID 4367)
*rdonaldson@mmwr.com*
Lisa Zwally Brown (DE Bar ID 4328)
*lzbrown@mmwr.com*
**MONTGOMERY, MCCRACKEN,
WALKER & RHOADS, LLP**
1105 N. Market St, Suite 1500
Wilmington, DE 19801
(302) 504-7800
*Counsel for Defendants Universal Studios Home
Entertainment LLC, Universal City Studios,
LLLP, Universal City Studios Productions,
LLLP, and Focus Features, LLC*

- 20 -

7325865.3